# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| NORTH AVENUE GROUP HOLDINGS, LLC, and REDSTONE M&A GROUP, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) ) CIVIL ACTION FILE NO. |
| v. | ) NO. 1:18-cv-03659-AT ) |
| LASALLE CAPITAL GROUP II-A, L.P., and LASALLE CAPITAL GROUP PARTNERS II-A, LLC, | ) ) ) JURY TRIAL DEMANDED ) ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

This is a breach of contract action to recover damages from Defendants LaSalle Capital Group II-A, L.P. and LaSalle Capital Group Partners II-A, LLC. Defendants entered into a contract with plaintiffs, and, agreed to strict confidentiality, non-solicitation, and non-circumvention terms. They then blatantly breached that agreement. As a result of Defendants' breaches, Plaintiffs Redstone M&A Group, LLC and The North Avenue Group Holdings, LLC have suffered millions of dollars in damages. Plaintiffs bring this lawsuit to recover those damages, along with prejudgment interest and their attorney's fees and expenses of litigation.

1714526.1

1

## Parties

1.

Plaintiff Redstone M&A Group, LLC ("Redstone") is a Georgia limited liability company whose sole member is Akpovogho James Igherighe, a citizen of the State of Georgia. Redstone is a consulting firm that provides professional services, including deal sourcing, due diligence, fund raising, and portfolio management primarily in the "micro-market" sector (companies with EBITDA ranging between $1 million to $5 million).

2.

Plaintiff The North Avenue Group Holdings, LLC ("North Avenue Group") is a Georgia limited liability company whose sole member is Terry Comer, a citizen of the State of Georgia.

3.

North Avenue Group is an independent sponsor. An independent sponsor functions much like a traditional private equity group, but unlike those groups, independent sponsors do not have their own in-house sources for equity financing. Instead, independent sponsors identify acquisition targets, enter into negotiations with those companies, and once the preliminary terms of an acquisition are negotiated, seek out financing to close the deal.

4.

Defendant LaSalle Capital Group II-A, L.P. ("LaSalle Capital") is a Delaware limited partnership that may be served with process through its registered agent, Alan B. Roth, at 353 N. Clark Street, 45th Floor, Chicago, Illinois 60654.  LaSalle Capital holds itself out as "a leading private equity firm with extensive experience in the lower middle market."

5.

Defendant LaSalle Capital Group Partners II-A, LLC ("the LaSalle General Partner") is the general partner of LaSalle Capital and may be served with process through its registered agent, Alan B. Roth, at 353 N. Clark Street, 45th Floor, Chicago, Illinois  60654.

**Jurisdiction and Venue**

6.

This Court appears to have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds $75,000 exclusive of costs and interest, and Defendant LaSalle Capital has filed declarations in support of its notice of removal that aver that there is complete diversity.  The Court has indicated that, "[a]t this point, the Court [has]

determine[d] that LaSalle has sufficiently addressed the Court's concerns regarding diversity jurisdiction." Order, Sept. 25, 2018, Dkt. No. 27.

7.

Venue and personal jurisdiction are proper in this Court because this cause of action arises from Defendants transacting business in Fulton County, Georgia, which is located within the Atlanta Division of the United States District Court for the Northern District of Georgia.

8.

LaSalle Capital entered into a contract with Redstone in Fulton County, Georgia, the contract was to be performed by RedStone and North Avenue Group in Fulton County, Georgia, and it is that contract that is the subject of this action.

9.

Further, both the performance of the contract and its subsequent breach involved Defendants accessing confidential information stored and furnished by Redstone and North Avenue Group in and from Fulton County, Georgia.

10.

In addition, upon information and belief, Defendants routinely transact business in Fulton County, Georgia by, among other things, engaging in capital raising activities and reviewing potential acquisition targets.

11.

Finally, LaSalle Capital admits on its website that it is not merely a passive investor in its portfolio companies, but instead "work[s] closely with management" at those companies and provides "support" and "operational insight" to them. In fact, LaSalle Capital touts a "proven track record of **partnering** with management teams." LaSalle Capital's current portfolio includes companies that regularly transact business in Georgia and/or maintain offices in the state, including, for example, Eclipse Advantage.

**Background**

12.

Plaintiffs partner with each other to explore and consummate private equity transactions. Redstone provides professional services and consulting, while North Avenue Group identifies potential acquisition targets and sources of financing. Plaintiffs consider and hold themselves out as affiliates, and work closely together.

13.

Through investment banking and brokerage firm Sett & Lucas, Plaintiffs began discussions with Gen3 Marketing, LLC ("Gen3") about acquiring Gen3.

14.

Gen3 is a marketing agency that focuses on "affiliate marketing" which is a method of driving sales through e-commerce platforms by providing business rewards to so-called affiliates who direct visitors or customers to a business.

15.

During discussions with Gen3 and in preparation for a transaction, Plaintiffs performed extensive analysis on Gen3's industry and Gen3's potential within that industry. Plaintiffs developed a series of strategies and ideas to position Gen3 for substantial growth.

16.

In March 2017, acting as an independent sponsor, North Avenue Group entered into a letter of intent with Gen3 to acquire 100% of the membership units of that company.

17.

After entering into the letter of intent, North Avenue Group, working in conjunction with Redstone, sought investors to provide financing to close the acquisition of Gen3.

18.

Among others, Plaintiffs contacted Chatham Capital, a private investment firm that concentrates on lower-middle market private equity transactions, to explore potential financing for the Gen3 transaction.

**The Confidentiality Agreement**

19.

In late June 2017, Chatham Capital introduced Mr. Igherighe to Nicolas Christopher, a partner at LaSalle Capital. As part of that introduction, Chatham Capital's representative, Jeff Hagar, mentioned that Redstone was working on an investment opportunity that might be of interest to LaSalle Capital.

20.

Mr. Igherighe informed Mr. Christopher that in order for Redstone to share the identity of the target company with LaSalle Capital or to disclose financial data and business strategies concerning the potential transaction, LaSalle Capital would have to execute a confidentiality agreement.

21.

Mr. Christopher confirmed that LaSalle Capital was interested in exploring the opportunity and receiving the confidential information Redstone had to offer. Accordingly, LaSalle Capital executed the Confidentiality Agreement on June 30, 2017.  Specifically, in writing, Mr. Christopher directed Lindsay Kremer to sign the Confidentiality Agreement on LaSalle Capital's behalf and send the executed Confidentiality Agreement to Mr. Igherighe in advance of a call scheduled between Mr. Christopher and Plaintiffs.

22.

A true and correct copy of the executed Confidentiality Agreement is attached as Exhibit A to this Complaint.

23.

Section 5 of the Confidentiality Agreement provides:

> For a period beginning on the date hereof and ending two (2) years from the date that the Receiving Party notifies the Acquirer of its decision not to participate in the Partnership Opportunity or the Transaction in any way (the "Restricted Period"), the Receiving Party agrees with the Acquirer that the Receiving Party will not directly or indirectly initiate conversations with or attempt to acquire the Target and the Receiving Party will not solicit another potential acquirer to provide financing in connection with the acquisition of Target.

Ex. A, § 5.

24.

Section 6 of the Confidentiality Agreement provides in relevant part:

> Until the expiration of the Restricted Period, except in the ordinary course of business unrelated to the Transaction, the Receiving Party agrees not to initiate or maintain contact with any officer, director, employee or agent of the Target regarding the Target's business, operations, prospects or finances, except with the express permission of the Acquirer During the Restricted Period. . . .

Ex. A, § 6.

25.

LaSalle Capital was the "Receiving Party" pursuant to the Confidentiality Agreement, as was the LaSalle General Partner.

26.

The LaSalle General Partner is also a "Representative" of LaSalle Capital pursuant to the Confidentiality Agreement, and is thus bound by its terms just as LaSalle Capital is.

27.

Redstone was the "Acquirer" pursuant to the Confidentiality Agreement.

28.

Gen3 was the "Target" and the subject of the "Transaction" and "Partnership Opportunity" referenced in the Confidentiality Agreement.

29.

In addition to protecting Redstone, the parties to the Confidentiality Agreement also intended to cover North Avenue Group as a "Representative" of Redstone and as an "affiliate" of Redstone.

30.

In fact, North Avenue Group was an intended third-party beneficiary of the Confidentiality Agreement.

31.

The Confidentiality Agreement includes an enforceable choice of law provision selecting Delaware law.  Accordingly, this Court should apply the substantive law of Delaware in this action and the procedural law of Georgia.

**Plaintiffs Performed Their Promises Under the Confidentiality Agreement**

32.

After receiving the signed Confidentiality Agreement, Mr. Igherighe and Mr. Comer of North Avenue Group, provided Defendants and their representatives with confidential information concerning the Gen3 investment opportunity, including a confidential investment memorandum including the Plaintiffs' business strategies and projections for Gen 3.

33.

In addition to the confidential investment memorandum, Mr. Igherighe also shared with Mr. Christopher additional information about the structure of the transaction with Gen3 that North Avenue Group was marketing to its investors. In particular, this information included a financial model that outlined the financing, ownership structure, transaction costs, and expected future performance of Gen3 after the transaction closed.

34.

As articulated in the financial model, Plaintiffs' transaction with Gen3 was a $20.0 million deal with an additional $7.0 million earn out opportunity. This would generate $1.25 million in transaction related fees for Plaintiffs, and involve $13.25 million in debt, $2.0 million in seller financing in the form of rollover equity, and $5.67 million in investor equity. The financial model further demonstrated that investors could expect a 35% return on cash investments if Gen3's revenues doubled to $14 million, based on a five-year investment in the target.

35.

Additionally, the financial model laid out the fees, revenues, and equity interests that Plaintiffs would receive both at closing and over the life of the

1714526.1

investment. Specifically, Plaintiffs would receive consulting and other fees at closing totaling $475,000.00, as well as $149,000.00 in preferred returns, a return of invested equity capital of $325,000 and 18.25% of the common equity in the recapitalized Gen3. Over the planned five-year lifespan of the investment, North Avenue Group would have also received $1,192,000 in management fees.

36.

Using conservative financial performance and growth projections, at the end of the planned five-year life cycle of the investment, North Avenue Group's common equity interests would have yielded $11,062,000.00 in additional value.

37.

Shortly after LaSalle Capital's receipt of the financial model and execution of the Confidentiality Agreement, Mr. Comer engaged in a direct dialogue initiated by Mr. Christopher of LaSalle Capital: the two spoke by telephone on July 12, 2017, for approximately 30 minutes during which Mr. Comer shared further details of the Gen3 investment opportunity, the strategic growth thesis for the investment, and scheduling of an in-person meeting with management of Gen3.

38.

Ultimately, the transaction was not consummated, and Defendants ceased all communication with Plaintiffs regarding Gen3.

## LaSalle Capital Circumvents Plaintiffs to Acquire Gen3

39.

On December 20, 2017, Defendants announced via press release that LaSalle Capital had "completed a strategic investment" in Gen3.

40.

Defendants never informed Plaintiffs of their continuing interactions with Gen3 or its ultimate transaction, and LaSalle Capital acquired Gen3 without Plaintiffs' permission or approval.

41.

LaSalle Capital's acquisition of Gen3 arose from and depended upon information that Defendants acquired from Plaintiffs pursuant to the Confidentiality Agreement.

42.

Plaintiffs did not discover LaSalle Capital's acquisition of Gen3 until April 2018, when Mr. Comer learned of the acquisition during e-mail correspondence with Sett & Lucas.

## COUNT ONE – BREACH OF CONTRACT

43.

Plaintiffs incorporate and re-allege all preceding allegations of the Complaint as if fully alleged herein.

44.

The Confidentiality Agreement between the Parties to this lawsuit is a binding and enforceable contract.

45.

Defendants breached that contract by, among other things, violating the confidentiality, non-solicitation, and non-circumvention terms of the Confidentiality Agreement by using Plaintiffs' confidential information to acquire Gen3 without Plaintiffs' knowledge, approval, or involvement, and without compensating Plaintiffs.

46.

Defendants' breaches have caused Plaintiffs millions of dollars in damages, which include the full value of the contract.

47.

Plaintiffs have satisfied all conditions precedent to bringing this breach of contract action.

48.

Plaintiffs are entitled to recover their damages from Defendants along with prejudgment interest.

**COUNT TWO – ATTORNEY'S FEES AND EXPENSES OF LITIGATION**

49.

Plaintiffs incorporate and re-allege all preceding allegations of the Complaint as if fully alleged herein.

50.

Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense.

51.

Plaintiffs have incurred attorney's fees and expenses of litigation as a direct result of Defendants' bad faith and stubborn litigiousness.

52.

Plaintiffs are entitled to recover their attorney's fees and expenses of litigation from Defendants pursuant to Delaware law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants and for the following relief:

1714526.1

A. That the Court award damages sustained by Plaintiffs in an amount to be proved at trial, plus interest, including prejudgment interest, attorney's fees, expenses of litigation, and costs of suit; and

B. That the Court order such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable thereby.

Respectfully submitted this ___ day of _____, 2018.

_____
Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW
Suite 3900
Atlanta, GA  30309-3417
404-881-4100

David M. Abner (admitted *pro hac vice*)
david.abner@dma-law.com
David M. Abner & Associates
1901 Harrison Street
Oakland, CA  94612
(510) 844-7814 – Telephone

*Attorneys for Plaintiffs*