# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| NORTH AVENUE GROUP HOLDINGS, LLC, and REDSTONE M&A GROUP, LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 1:18-cv-03659-AT |
| | ) | |
| LASALLE CAPITAL GROUP II-A, L.P., and LASALLE CAPITAL GROUP PARTNERS II-A, LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW, Suite 3900
Atlanta, Georgia  30309-3417
404-881-4100 – Telephone
404-881-4111 -- Facsimile

David M. Abner (admitted *pro hac vice*)
david.abner@dma-law.com
David M. Abner & Associates
1901 Harrison Street
Oakland, CA  94612
(510) 844-7814 – Telephone

1784437.1

## TABLE OF CONTENTS

**PAGE**

BACKGROUND ................................................................................3

ARGUMENT AND CITATION OF AUTHORITIES............................................14

I.   THERE IS A BINDING AND ENFORCEABLE CONTRACT BETWEEN PLAINTIFFS AND DEFENDANTS..................................14

    A.   Plaintiffs and Defendants are Parties to the Contract .........................15

       1.   Redstone and the LaSalle Fund are Bound as Signatories.................................................................15

       2.   North Avenue is Covered as a "Representative."....................15

       3.   The LaSalle Manager is Bound as a "Receiving Party" "Representative."...........................................17

       4.   Alternatively, Defendants Ratified the Contract ......................17

    B.   The Contract is Supported by Consideration ......................................18

II.   DEFENDANTS BREACHED THE CONTRACT.......................................19

CONCLUSION .................................................................................20

# TABLE OF AUTHORITIES

**CITE**                                                                 **PAGE**

*Am. Legacy Found. v. Lorillard Tobacco Co.*
   831 A.2d 335, 343 (Del. Ch. 2003) ..............................................................17

*Caradigm USA LLC v. PruittHealth, Inc.*
   253 F. Supp. 3d 1175, 1193, 1195 (N.D. Ga. 2017) ....................................14

*Eagle Force Holdings, LLC v. Campbell*
   187 A.3d 1209, 1212-13 (Del. 2018) ...........................................................14

*Elia v. Hertrich Family of Auto. Dealerships, Inc.*
   103 A.3d 514 (Del. 2014) ..............................................................................15

*Fox v. Rodel*
   No. 98-531-SLR, 1999 WL 588293, at *8 (D. Del. July 14, 1999)..............19

*Kuehn v. Cotter*
   77 A.3d 272 (Del. 2013) ................................................................................17

*Kuroda v. SPJS Holdings, L.L.C.*
   971 A.2d 872, 883 (Del. Ch. 2009) ..............................................................14

*Osborn ex rel. Osborn v. Kemp*
   991 A.2d 1153, 1158-59 (Del. 2010) ............................................................15

*Ripsom v. Beaver Blacktop, Inc.*
   No. CIV.A. 83C-AU-128, 1988 WL 32071, at *10
   (Del. Super. Ct. Apr. 6, 1988) ......................................................................18

*Shepherd v. Mazzetti*
   545 A.2d 621, 623 (Del. 1988) .....................................................................18

*Wolf v. Crosby*
   377 A.2d 22, 27 (Del. Ch. 1977) ..................................................................18

This is a breach of contract action between Plaintiffs North Avenue Group Holdings, LLC ("North Avenue") and Redstone M&A Group, LLC ("Redstone") (collectively "Plaintiffs") and Defendants LaSalle Capital Group II-A, L.P. ("LaSalle Fund") and LaSalle Capital Group Partners II-A, LLC ("LaSalle Manager") (collectively "Defendants").

The facts regarding the breach of contract are straightforward. Defendants' private equity fund is in the business of buying companies as investments. Plaintiffs developed an opportunity for interested investors, including Defendants, to purchase a particular privately held company. Unsurprisingly, before providing Defendants any information about the opportunity, Plaintiffs demanded that Defendants agree to (a) maintain the confidentiality of the information Plaintiffs provided, (b) refrain from contacting the target company without the Plaintiffs' permission, and (c) refrain from making an investment in the target company without Plaintiffs' inclusion in the transaction.

Defendants recognized the existence of these confidentiality and non-circumvention obligations in a written agreement. Their acknowledgment of the contract was even recorded multiple times in their internal documents.

Defendants then ignored the agreement completely—using and distributing Plaintiffs' information, contacting the target, and ultimately consummating an

extremely lucrative transaction with the target, all behind the Plaintiffs' back. There will be factual disputes in this case about what happened between Plaintiffs and the target company. There will be conflicting testimony about a breakfast meeting in New York City between the target's broker and Defendants' representative. There will be different theories about whether the breach caused Plaintiffs any damages. Those disputes can be resolved in a trial on damages.

But there is no dispute that Plaintiffs and Defendants entered into the contract, and that Defendants breached that agreement. Indeed, discovery has confirmed the validity and enforceability of the contract as well as Defendants' breach of the contract by, at least, (1) distributing and using confidential information without Plaintiffs' consent, and (2) closing a transaction with the target in violation of the contract's non-circumvention clause. Because there are no material fact disputes on these points, the Court can and should resolve them now to simplify and streamline the issues that remain for trial (*e.g.*, damages). Accordingly, Plaintiffs respectfully move this Court for summary judgment on liability.

## BACKGROUND

### *The Parties*

North Avenue is an independent or "unfunded" sponsor whose principal is Terry Comer.  Ex. 1 (Christopher Dep.) at 116; Ex. 2 (Comer Dep.) at 10-11.  An independent sponsor is "[a] person or group of individuals working together to sponsor private equity buyouts, meaning that they are going to act as the sponsor of a deal and create . . . a capital structure and then try to or attempt to try to manage that deal through its . . . conclusion."  Ex. 1 (Christopher Dep.) at 119.  Independent sponsors typically operate at "the lower end of the middle market" for private equity, focusing on "deals of . . . 1 to 5 million of EBITDA."  *Id.*

Redstone "provides research, problem solving, investment thesis development, valuation, financial modeling" and assistance with "capital raising" and "post-closing" "deal management" efforts in connection with private equity transactions.  Ex. 3 (Igherighe Dep.) at 65.  Akpovogho "A.J." Igherighe is Redstone's sole member and principal.  *Id.* at 11.  North Avenue and Redstone work together, and split fees and earnings from private equity transactions they work on a "50/50" basis.  *Id.* at 82.

The LaSalle Fund is a "traditional kind of closed-end private equity fund.  It makes investments in operating businesses and a management company [the

LaSalle Manager] directs that fund."  Ex. 1 (Christopher Dep.) at 8; *see also*

Answer to Am. Compl., Dkt. No. 42, at 5, ¶5 (LaSalle Manager controls and

manages the Fund).  LaSalle raises capital from outside sources and then uses that

capital to acquire and invest in portfolio companies.  Ex. 1 (Christopher Dep.) at 8-

9.  The Fund has eleven such companies, which LaSalle refers to as "platform

investments."  *Id*. at 14.  The Fund ceased making platform investments in 2018.

*Id*.  (Christopher Dep.) at 14.

### The "Target": Gen3 Marketing LLC

Gen3 Marketing, LLC ("Gen3") is a full-service digital marketing agency

that focuses on "affiliate marketing," a strategy that utilizes large numbers of

digital content providers to place display advertisements on a "pay for

performance" model that rewards these content providers (affiliates) for sales

generated as a result of the advertising.  Ex. 4 (Tabasso Dep.) at 8-10.

Defendants first learned of Gen3's existence in late 2016 when an

investment broker, Sett & Lucas, sent Defendants a confidential information

memorandum describing an opportunity to invest in Gen3.  Ex. 1 (Christopher

Dep.) at 21.  Defendants reviewed the document and had a telephone conference

with a representative of Sett & Lucas.  *Id*. at 21-22.  Defendants' reaction to the

Sett & Lucas memorandum was disinterest; Defendants' 30(b)(6) witness recalled

1784437.1

"not completely understanding what the business did" and concluding that the Sett & Lucas memorandum "didn't have a clear, compelling kind of business case in it." *Id*. at 21-22.  He further testified, "It was a lot of, you know, just kind of generalities." *Id*. at 22.  Defendants concluded that the Gen3 opportunity they were presented by Sett & Lucas was "probably a pass" and decided to "spend [their] time elsewhere." *Id*.  Defendants therefore made the decision not to purchase Gen3 or otherwise invest in the company.  *Id*. at 23.

In early 2017 Gen3's principals met with Mr. Comer of North Avenue.  Ex. 4 (Tabasso Dep.) at 34-35.  After that meeting, Andy Cantos, one of Gen3's then-owners, sent an e-mail to Mr. Comer, writing:



Ex. 5 (Feb. 24 E-mail Thread).  Sett & Lucas proceeded to negotiate with North Avenue on Gen3's behalf in an effort to work out terms for a potential transaction. Ex. 4 (Tabasso Dep.) at 40-42.  On March 20, 2017, Gen3 executed a letter of intent to sell itself to North Avenue for ▮▮▮▮▮▮.  Ex. 6 (North Avenue LOI).

North Avenue then began working with Redstone to prepare a confidential information memorandum and identify capital partners to fund the transaction.

Eventually, on June 29, 2017, a business associate connected Redstone with Nick Christopher of the LaSalle Manager.  Ex. 7 (Introductory E-mail Thread) at 2.  Mr. Igherighe of Redstone invited Defendants to sign a non-disclosure agreement so that he could share a confidential information memorandum and financial model for the proposed Gen3 transaction with Defendants.  *Id*. at 1.  He also informed Defendants that Mr. Comer of North Avenue was the independent sponsor with which he was working, copying Mr. Comer on the e-mail exchange.  *Id*.

*The Parties' Contract*

The next day, on June 30, 2017, LaSalle emailed the signed "Confidentiality Agreement" ("the contract") to Redstone.  Ex. 8 (E-mail attaching contract). Section 1 of the contract sets forth broad confidentiality obligations, restricting the use of information provided pursuant to the contract to working to close a transaction with Plaintiffs to acquire Gen3.  *Id*. at 6, §1.  Section 5 of the contract prohibits circumvention of Plaintiffs as follows:

> For a period beginning on the date hereof and ending two (2) years from the date that the Receiving Party notifies the Acquirer of its decision not to participate in the Partnership Opportunity or the Transaction in any way (the "Restricted Period"), the Receiving Party agrees with the Acquirer that the Receiving Party will not directly or indirectly initiate conversations with or attempt to acquire the Target and the Receiving Party will not solicit another potential acquirer to provide financing in connection with the acquisition of Target.

*Id*. at 8, §5.  Defendants admit that the term "Receiving Party" includes LaSalle, Ans. to Am. Compl. at 8, ¶25, and that the "Target" was Gen3.  *Id*. at 8, ¶28.

After the contract was executed, Redstone sent LaSalle a copy of its confidential information memorandum and a financial model.  Ex. 1 (Christopher Dep.) at 56; Ex. 8 (E-mail attaching contract) at 1; Ex. 3 (Igherighe Dep.) at 314.  The confidential information memorandum contains a "Disclaimer" that provides in part:  "Use of this Confidential Information Memorandum is governed by the terms of a previously executed confidentiality agreement."  Ex. 9 (E-mail thread attaching CIMs) at 4.

A few days later, Mr. Christopher, Defendants' representative, expressed an interest in pursuing a transaction to acquire Gen3.  Ex. 10 (July 11 E-mail to Mr. Igherighe).  Further, he updated Defendants' internal "Pipeline Meeting" report, which Defendants use to identify acquisitions they are pursuing.  He included Gen3 in the "Pipeline Meeting" report and noted that the source for the transaction was "Redstone M&A" and that he received the confidential information memorandum for Gen3 on June 30, 2017.  Ex. 11 (July Pipeline Report) at 3.

After LaSalle's interest was piqued, the transaction involving Plaintiffs and Gen3 did not proceed.  The specific facts surrounding why Plaintiffs, Defendants, and Gen3 together did not consummate a transaction are hotly contested.

1784437.1

However, for the reasons discussed below, those facts are irrelevant to Defendants'

breach of the contract as a matter of law.

*Defendants Meet with Sett & Lucas*

On or about July 20 or 21, 2017, less than three weeks after LaSalle signed

the contract and received Plaintiffs' confidential investment thesis and model

regarding Gen3, Mr. Christopher met for breakfast with a representative of Sett &

Lucas in New York.  Ex. 1 (Christopher Dep.) at 55, 79-80.  Plaintiffs' were not

involved in this meeting at all.   *Id*. at 80.  And LaSalle would never communicate

with the Plaintiffs again.  During the meeting, Mr. Christopher discussed several

potential transactions, including Gen3.  *Id*.[1]

*Defendants Use Plaintiffs' Confidential Information Memorandum*

A month later, on August 18, 2017, Mr. Christopher e-mailed a copy of

Plaintiffs' Gen 3 confidential information memorandum to Jon Shaw, a retired

businessman in Baltimore who has served on the boards of directors of several of

---

[1] Defendants' August "Pipeline Meeting" report identifies █ potential
transactions referred to Mr. Christopher by Sett & Lucas in late July 2017.  Ex. 12
(Aug. 21, 2017 Pipeline Report) at 2-3.  However, like the July report before it, the
August Pipeline report still identifies the source for the Gen3 transaction as
"Redstone M&A."  *Compare id*. at 2, *with* Ex. 11 (July Pipeline Report) at 3.
Notably, Exhibit 12 was produced after Mr. Christopher's deposition following the
parties' presentation of certain discovery disputes to the Court.  An earlier version
of this report was marked as Exhibit 7 to Mr. Christopher's deposition, and
included redactions that obscured the transactions associated with Sett & Lucas.
*See* Ex. 13 (Prior Version of Aug. 21, 2017 Pipeline Report) at 2-3.

Defendants' portfolio companies.  Ex. 1 (Christopher Dep.) at 19-20, 141-42; Ex. 14 (Aug. E-mail Thread between Christopher and Shaw).  Mr. Shaw worked with Defendants during their diligence process to acquire Gen3 and now serves on Gen3's board of directors.  Ex. 1 (Christopher Dep.) at 19-20, 141-43.  In his cover e-mail to Mr. Shaw, Mr. Christopher described Plaintiffs' confidential information memorandum as from "███████████████████████."  Ex. 14 (Aug. E-mail Thread between Christopher  and Shaw).  Mr. Christopher agreed in his deposition that this reference was to the Redstone confidential information memorandum.  Ex. 1 (Christopher Dep.) at 143.  He further testified:

> Q:  And you forwarded both of those to Mr. Shaw?
>
> A:  Yes.
>
> Q:  And you expected him to read both?
>
> A:  Yes.
>
> Q:  And you knew you were sending the Redstone Confidential Information Memorandum to him?
>
> A:  Yes.
>
> Q:  You knew that was subject to a Confidentiality Agreement?
>
> A:  Yes.
>
> Q:  Did you believe that Mr. Shaw was covered by that Confidentiality Agreement?

A:      Yes.

Q:      Is that because he worked with LaSalle?

A:      He works with us as an advisor to us. . . . He's kind of an
        independent guy that works with us.

*Id.* at 143-44.

Mr. Shaw responded to Mr. Christopher's e-mail, noting that he had taken a

" ████████████████████ " and that it "████████████ ." Ex. 15 (Shaw E-

mail of Aug. 19, 2017).  He also posed a question to Mr. Christopher about ██



); *cf.* Ex. 9 (E-mail thread attaching CIMs) (attaching

confidential information memorandum, which ████████ ██ ████████

).

On August 23, 2017, Mr. Christopher e-mailed a copy of Plaintiffs'

confidential information memorandum to Alan Levy.  Ex. 16 (Aug. 23 E-mail).

Mr. Levy is a "former merchant" of "Processing.com that operates in the affiliate

marketing world."  Ex. 1 (Christopher Dep.) at 149.  Processing.com is a LaSalle

portfolio company, and according to Mr. Christopher, "merchant" means that Mr.

Levy was a "customer."  *Id*.  Mr. Levy has no contract or agreement with LaSalle.

*Id*.  In his e-mail transmitting Plaintiffs' confidential information memorandum to

Mr. Levy, Mr. Christopher wrote: "████████████████████████████

████████████████████████████████."  Ex. 16 (Aug. 23 E-

mail).[2]  Mr. Christopher sent the confidential information memorandum to Mr.

Levy, and had a follow-up call with him to discuss it, because Mr. Levy is a "smart

person" and Mr. Christopher wanted his input on the "business model" as part of

Defendants' due diligence process.  Ex. 1 (Christopher Dep.) at 150.

On or around September 12, 2017, Mr. Christopher forwarded his e-mail to

Mr. Shaw (including the e-mail attachment copy of Plaintiffs' confidential

information memorandum) to Jeffrey Walters, one of Defendants' senior and

founding partners.  Ex. 9 (Sept. 12 E-mail and attachments).  In his e-mail, Mr.

Christopher indicated that he was forwarding the information to "███████████

███████."  *Id*.  Mr. Christopher also referenced an "██████████████" in describing

the confidential information memorandum he was forwarding.  Ex. 1 (Christopher

Dep.) at 155.  In Defendants' 30(b)(6) deposition, Mr. Christopher explained what

he meant:

---

[2] The parties' contract covers "advisors" to each respective party, which are
defined in the contract as part of the term "Representatives."  *See* Ex. 8 (E-mail
attaching contract) at 6, preamble.

Q:     In the first paragraph of your email, there's a reference to an
        unfunded sponsor.  Do you see that?

A:     Yes.

Q:     Is that Mr. Comer's North Avenue Group?

A:     Yes.

Q:     And that's what you meant when you sent that email?

A:     Yes.

*Id*. at 155-56.

Mr. Christopher sent Mr. Walters this information in connection with private

meetings he had with him to discuss the potential for Defendants to acquire Gen3.

*Id*. at 156-57, 96-98.  Mr. Christopher described the purpose of the meetings in

Defendants' 30(b)(6) deposition:

> I probably had a private meeting with him because he'd been hearing
> about it [a potential Gen3 transaction] now a couple times in pipeline
> meetings and I said, you know – we're on the record, so I'll be
> careful.  But Jeff is one of those guys that likes to – have to be careful
> because he signs my paychecks.  He just likes to kind of iterate and
> talk a lot and kind of feel like he's getting, you know, kind of special
> treatment.
>
> So I will have a pre-meeting with him.  I'll send him information.  I'll
> have another private meeting with him.  And so there will be a series
> of those.  There's no set formula, just, you know, lots of kind of
> private conversations.

*Id*. at 156-57.  Mr. Christopher also testified he sent the confidential information memorandum to Mr. Walters because at that point in time Defendants likely did not have their own internal memo on the potential transaction:

> As stuff becomes more serious and you know, kind of the pipeline conversations, you know, at some point, you know, kind of get people information so they can get smart and evaluate it on their own.  So I'm just sending him the documents that we've obtained on the business.  At this point we probably would not have had an internal memo generated yet.

*Id*. at 155.[3]

### *Defendants Acquire Gen3*

On December 20, 2017, Defendants closed a transaction to purchase Gen3 without informing the Plaintiffs, and without the Plaintiffs participating in any way.  Ex. 17 (Equity Purchase Agreement).  Defendants invested ████████ in common equity in the transaction.  Ex. 18 (Duff & Phelps Valuation) at LASALLE_0009716.  By June 30, 2018, the consulting firm Duff & Phelps performed an independent valuation of Defendants' investment and concluded that after slightly more than six months Defendants' equity in Gen3 had ███████ in value to approximately $███████.  *Id*. at LASALLE_0009727.

---

[3] Mr. Christopher further testified that he continued forwarding copies of Plaintiffs' confidential information memorandum to various individuals because: "It's data. It's information, you know.  If someone else finds value or knows – can understand, you know, something out of that that helps them understand the business, then it's useful to us."  Ex. 1 (Christopher Dep.) at 173-74.

## ARGUMENT AND CITATION OF AUTHORITIES

Under Delaware law, the elements of a breach of contract claim are: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009) (internal quotations marks and footnote omitted). Here, the undisputed facts establish Plaintiffs' entitlement to summary judgment on the first two elements of their breach of contract claim. *See Caradigm USA LLC v. PruittHealth, Inc.*, 253 F. Supp. 3d 1175, 1193, 1195 (N.D. Ga. 2017) (granting summary judgment to plaintiff on liability in breach of contract action, leaving only the issue of damages for trial).

## I.   THERE IS A BINDING AND ENFORCEABLE CONTRACT BETWEEN PLAINTIFFS AND DEFENDANTS.

Delaware courts follow the hornbook rule that "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1212-13 (Del. 2018). The summary judgment record shows no dispute of material fact on any of these points as a matter of law.

1784437.1

14

### A.    Plaintiffs and Defendants are Parties to the Contract.

### 1.    Redstone and the LaSalle Fund are Bound as Signatories.

There is no dispute that Redstone and the LaSalle Fund signed the contract. The signatures of their authorized representatives to that document conclusively establish that it is a binding contract between them. *Elia v. Hertrich Family of Auto. Dealerships, Inc.*, 103 A.3d 514 (Del. 2014) ("a party who signs a contract may be bound by it"); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158-59 (Del. 2010) ("The face of this contract manifests the parties' intent to bind one another contractually. Both parties signed the contract and had the contract notarized."). Here, the contract was signed by Mr. Igherighe and Lindsey Kremer, Defendants' authorized agent. Ex. 8. at 12.

### 2.    North Avenue is Covered as a "Representative."

Even though North Avenue is not named in the contract or a signatory to it, it is covered by the contract's definition of a "Representative." The contract expansively defines "Acquirer" (Redstone) to cover "Representatives" which includes "a party's affiliates" and "affiliated investment funds." North Avenue and Redstone's close working relationship, including on this deal, clearly bring North Avenue within the ambit of the term "affiliates," and thus mean that North Avenue

may benefit from the contract's confidential information and non-circumvention terms.

Moreover, Defendants knew North Avenue was covered by the contract. Defendants' own contemporaneous documents and the testimony of Defendants' 30(b)(6) witness establish this point.  Indeed, when Mr. Christopher e-mailed copies of Plaintiffs' confidential information memorandum to others, he referred to it by referencing the " ███████████ ," which was North Avenue.  *See, e.g.*, Ex. 9 (Sept. 12 E-mail and attachments); Ex. 1 (Christopher Dep.) at 155-56.  This is unambiguous evidence that in 2017 Defendants knew that the confidential information memorandum – which recited on its face that its use was governed by the parties' contract – was also North Avenue's work as Redstone's affiliate and it was subject to the contract.[4]  Based on the words, admissions, and actions of Defendants' agents and representatives, any effort to present allegedly contradictory facts on this point is, at best, a disingenuous effort to create a fact issue where none exists.

---

[4] That Defendants contemporaneously indicated to Mr. Levy that he was covered by the contract as an " █████ " further underscores this point.  Ex. 16 (Aug. 23 E-mail).  Mr. Levy had no contract or agreement with Defendants; he was merely a customer of one of the companies Defendants have invested in.  Nevertheless, Defendants construed his connection to them as sufficient to bring him within the contract's definition of "Representatives" when it suited them.

1784437.1

### 3. The LaSalle Manager is Bound as a "Receiving Party" "Representative."

Likewise, the LaSalle Manager is bound just as effectively as the LaSalle Fund because of the contract's open-ended and inclusive definition of "Representatives." At a minimum, the Manager is a "partner" (one of the terms included in that definition). But the Manager is also likely covered as an "affiliate," "owner," "stockholder," and "affiliated investment fund." In any event, there is no dispute that the contract's plain language includes and binds both Defendants.

### 4. Alternatively, Defendants Ratified the Contract.

Delaware law is clear that "[o]ne does not have to be a signatory to a contract . . . to become bound by it. Third parties to an agreement may become parties to it, and thus bound by it, by either expressly or implicitly adopting the agreement." *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003). Moreover, a party may ratify a contract through subsequent action and be bound by ratification even where the contract was unenforceable prior to ratification. *Kuehn v. Cotter*, 77 A.3d 272 (Del. 2013). Here, even if Defendants were not bound by the contract in June 2017 following its execution, Defendants later ratified the contract by accepting its benefits (i.e., using Plaintiffs'

17

confidential information memorandum) and by affirmatively acknowledging that they were bound by an "███" when they shared Plaintiffs' memorandum with others. Ex. 16 (Aug. 23 E-mail). For Defendants to now allege or claim otherwise would be a deliberate effort to impugn their

### B. The Contract is Supported by Consideration.

Here, there can be no dispute that the contract is supported by sufficient consideration. First, in exchange for Defendants' agreement to its terms, Redstone promised to provide Defendants with the name of the potential target and related, confidential information. Defendants in turn promised to abide by, among other things, the confidentiality and non-circumvention terms of the contract. Redstone fully-performed its promises. But even if it had not, the mere exchange of bargained-for promises is sufficient consideration for a contract to be enforceable. *Shepherd v. Mazzetti*, 545 A.2d 621, 623 (De1. 1988) (son's promise to continue to manage family business was sufficient consideration for father's promise to devise family home to son); *see also Ripsom v. Beaver Blacktop, Inc.*, No. CIV.A. 83C-AU-128, 1988 WL 32071, at *10 (Del. Super. Ct. Apr. 6, 1988) ("[T]he promises of each party to perform the contract supply the consideration necessary to support the contract." (citations omitted)); *Wolf v. Crosby*, 377 A.2d 22, 27 (Del. Ch. 1977) (same).

Moreover, in addition to promising to identify a target for a potential transaction and promising confidential information to evaluate it, Plaintiffs actually did provide information to Defendants that Defendants indisputably used as part of their due diligence process in determining whether to purchase Gen3 and on what terms. Setting aside any *post hoc* dispute about the value of this information, it had sufficient value to provide contract consideration. As the District Court in Delaware has explained, "whether the consideration is commensurate with the promise is immaterial. If the consideration has any value whatsoever, it is sufficient to support the promise and render it enforceable." *Fox v. Rodel*, No. 98-531-SLR, 1999 WL 588293, at *8 (D. Del. July 14, 1999). Consequently, for the reasons discussed above, there can be no doubt that Plaintiffs and Defendants had an enforceable contract as a matter of law.

## II.     DEFENDANTS BREACHED THE CONTRACT.

Defendants breached the contract in at least three ways. First, they violated its confidentiality term by using information supplied by Plaintiffs to pursue Gen3 in a transaction in which Plaintiffs were not involved. Ex. 8 (E-mail attaching contract) at 6, §1. The evidence on this front is unequivocal. Defendants repeatedly shared, reviewed, and used Plaintiffs' confidential information

memorandum as they were evaluating and pursuing the Gen3 transaction.  *See supra* at 8-13.

Second, Defendants contacted Gen3 directly without Plaintiffs consent or knowledge.  Third, Defendants breached the contract by contacting and then acquiring Gen3 in a transaction that did not include Plaintiffs.  Ex. 8 (E-mail attaching contract) at 8, §5.  Because the facts are undisputed on each of these points, the Court should grant summary on the element of breach.

## **CONCLUSION**

Because the undisputed facts show that Defendants contracted with Plaintiffs and that Defendants breached that contract in at least three ways, Plaintiffs are entitled to summary judgment on the liability elements of their breach of contract claim against Defendants as a matter of law.  Accordingly, Plaintiffs respectfully request that the Court grant their motion and conduct a jury trial to determine the extent of the damages for which Defendants are liable.

Respectfully submitted, this 16th day of July, 2019.

/s/ John H. Rains IV
Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW, Suite 3900
Atlanta, Georgia  30309-3417
404-881-4100 – Telephone
404-881-4111 -- Facsimile

David M. Abner (admitted *pro hac vice*)
david.abner@dma-law.com
David M. Abner & Associates
1901 Harrison Street
Oakland, CA  94612
(510) 844-7814 – Telephone

**_Attorneys for Plaintiffs_**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14 point font.

<u>/s/ John H. Rains IV</u>
John H. Rains IV
Georgia Bar No. 556052

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of July, 2019, a copy of the foregoing

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**

**MOTION FOR SUMMARY JUDGMENT** was electronically filed with the

Clerk of Court using the Court's CM/ECF system, which will automatically serve

all counsel of record as follows:

> J. Carole Thompson Hord
> SCHREEDER, WHEELER & FLINT, LLP
> 1100 Peachtree Street N.E., Suite 800
> Atlanta, Georgia 30309-4516
> chord@swfllp.com
>
> Joanna C. Wade (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 300 S. Tryon Street
> Charlotte, North Carolina 28202
> jwade@winston.com
>
> Joseph L. Motto (admitted *pro hac vice*)
> Karalena M. Guerrieri (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 35 W. Wacker Drive
> Chicago, IL 60601
> jmotto@winston.com
> kguerrieri@winston.com

> /s/ John H. Rains IV
> John H. Rains IV

1784437.1

23