# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| NORTH AVENUE GROUP HOLDINGS, LLC, and REDSTONE M&A GROUP, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NO. 1:18-cv-03659-AT |
| LASALLE CAPITAL GROUP II-A, L.P., and LASALLE CAPITAL GROUP PARTNERS II-A, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW, Suite 3900
Atlanta, Georgia  30309-3417
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

David M. Abner
(admitted *pro hac vice*)
david.abner@dma-law.com
DAVID M. ABNER & ASSOCIATES
747 Third Avenue
Suite 200
New York, New York  10017
(212) 572-0762 – Telephone
(214) 293-2580 – Facsimile

# TABLE OF CONTENTS

**PAGE**

ARGUMENT AND CITATION OF AUTHORITIES................................................4

I.    NORTH AVENUE HAS A VIABLE BREACH OF CONTRACT
      CLAIM AGAINST DEFENDANTS ...............................................................4

      A.    North Avenue is a Party to the Contract .................................................4

      B.    Alternatively, and Additionally, North Avenue is an
            Intended Third Party Beneficiary of the Contract..................................8

II.   A JURY MUST DECIDE WHETHER (AND THEN
      HOW MUCH) DEFENDANTS' BREACH DAMAGED
      THE PLAINTIFFS ........................................................................................12

      A.    Evidence Shows the Fact of Damages: Plaintiffs' Contract
            Had Value and Defendants' Breach Destroyed That Value ...............13

            1.    Plaintiffs' Complete Contractual Power Over the Gen3
                  Transaction Had Value Prior to the Breach, And That
                  Alone Establishes the "Fact" of Damages ................................13

            2.    LaSalle's Arguments Cannot Defeat the Fact of
                  Damages Because They Cannot Show that the
                  Plaintiff's Contractual Rights to Participate in the Gen3
                  Transaction Were Worthless as a Matter of Law ....................16

      B.    The Record Evidence Allows a Jury to Estimate the Amount
            of Plaintiffs' Damages with All the Necessary Certainty,
            and thus a Jury must decide Damages..................................................20

III.  AT A MINIMUM, THERE IS A FACT DISPUTE ON THE
      ISSUE OF BAD FAITH, ENTITLING PLAINTIFFS TO A
      JURY TRIAL ON ATTORNEY'S FEES ......................................................23

1793396.1

i

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**CITE**                                                                **PAGE**

*Accountable Health Solutions, LLC v. Wellness Corporate
Solutions, LLC*
    333 F. Supp. 3d 1133 ....................................................................17

*Alliance, LLC v. United Medical, LLC*
    C.A. No. 7710-VCP, 2014 WL 6488659, at *4 ........................................9, 11

*Am. Gen. Corp. v. Cont'l Airlines Corp.*
    622 A.2d 1, 10 ....................................................................20

*Beard Research, Inc. v. Kates*
    8 A.3d 573, 613 ....................................................................20

*Cura Financial Services N.V. v. Electric Payment Exchange, Inc.,*
    No. CIV.A. 18278, 2001 WL 1334188, at *20 ...........................12-15, 20-23

*Duncan v. Theratx, Inc.*
    775 A.2d 1019, 1022 ...................................................................12, 14, 20

*Farmers Bank of State of Delaware v. Howard*
    276 A.2d 744, 745-46 ....................................................................11

*Geier v. Mozido, LLC*
    No. CV10931-VCS, 2016 WL 5462437, at *6 ...............................................5

*In re Asian Yard Partners*
    No. 95–333–PJW, 95–334–PJW, 1995 WL 1781675, at *20........................7

*Johnston v. Arbitrium (Cayman Islands) Handels AG*
    720 A.2d 542, 546 ....................................................................24

*Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*
    312 A.2d 322, 326 ....................................................................11

1793396.1

*PharmAthene, Inc. v. SIGA Techs., Inc.*
    No. CIV.A. 2627-VCP, 2014 WL 3974167, at \*8 ........................................13

*Scion Breckenridge Managing Member, LLC v. ASB*
*Allegiance Real Estate Fund*
    68 A.3d 665, 687 ...........................................................................................24

*SIGA Techs., Inc. v. PharmAthene, Inc.*
    132 A.3d 1108, 1130 ............................................................... 12, 20-21, 23

Defendants LaSalle Capital Group II-A, L.P. and LaSalle Capital Group Partners II-A, LLC (collectively "Defendants" or "LaSalle") have moved for summary judgment in this breach of contract action brought by Plaintiffs North Avenue Group Holdings, LLC ("North Avenue") and Redstone M&A Group, LLC ("Redstone") (collectively "Plaintiffs").  The contract at issue contains a non-circumvention term intended to prevent Defendants from acquiring the "Target," Gen3 Marketing, LLC ("Gen3"), without Plaintiffs' participation, and bars Defendants from using Plaintiffs' information and analyses for any purpose other than consummating a transaction to acquire Gen3 with Plaintiffs.  In their motion, Defendants do not dispute the existence of the contract and do not even attempt to argue that they complied with its terms.  Instead, Defendants contend that one of the Plaintiffs lacks standing, and that Plaintiffs have adduced no damages evidence.  Because both of these arguments are without merit, the Court should deny Defendants' entire motion.

While Defendants implicitly concede that Redstone has an enforceable contract and may bring a claim under it, Defendants argue that the absence of North Avenue's signature on that contract, coupled with the fact that North Avenue is not expressly identified or named in the contract, deprive North Avenue of standing to assert a claim against them.  Defendants are wrong.  First, the contract

1

affords protection and imposes broad obligations on the "Representatives" of the signatories. "Representatives" is a defined term in the contract, and includes (among many others) the affiliates and advisors of the signing parties. The summary judgment record confirms the sort of close connection and relationship between Redstone and North Avenue that brings North Avenue within the ambit of an affiliate or advisor. The two companies' principals speak daily, collaborate on transactions together, split fees, and offer each other extensive advice and analytical support. For all intents and purposes, they are partners. Second, even if North Avenue is not a party to the contract, it is an intended third party beneficiary to it because the parties expressly agreed in the contract that "[t]his Agreement is for the Benefit of the Acquirer [Redstone], the Receiving Party [LaSalle] *and their respective Representatives*." Pl. Ex. 7 at NAVG004913 (emphasis added).[1] The record before the Court demonstrates that North Avenue meets the requirements under Delaware law to sue as a third party beneficiary.

Defendants also challenge Plaintiffs damages, arguing that there is no evidence establishing the fact of damage, and that Plaintiffs' quantification of

---

[1] References to "Pl. Ex." are to the exhibits Plaintiffs filed in support of their own motion for summary judgment (Dkt. No. 76), and references to "Def. Ex." are to exhibits Defendants submitted in support of their motion for summary judgment (Dkt. No. 69). References to "Ex." followed by letters (*e.g.*, "Ex. A") are to the exhibits attached to this memorandum of law.

1793396.1

damages is impermissibly speculative.  Here too, Defendants are wrong.
Defendants' primary factual assertion on this front is that the principals of the
"Target," Gen3, would never have agreed to sell their company to Plaintiffs.
Putting aside the fact that this *post hoc* explanation relies entirely on the testimony
of Defendants' and their witnesses, the summary judgment record shows that by
the summer of 2017 the only thing Gen3's principals cared about was securing a
capital partner with the funds to buy their company.  Gen3's investment banker
summed up where things stood: "If you bring capital to the table, we would close.
That's it."  Ex. A (Antony Dep.) at 187:18-19.  Defendants ask this Court to ignore
that evidence and accept the testimony of their witnesses that if Plaintiffs had
enticed LaSalle to participate in a transaction with them to acquire Gen3, Gen3
would have refused to sell.  Plaintiffs never had the chance to disprove this absurd
counterfactual because Defendants breached their contract with Plaintiffs only two
days after their last contact with Plaintiffs—and repeatedly breached it thereafter.

Defendants' communications with Plaintiffs ceased on July 18, 2017.  That
day, the same LaSalle partner with whom Plaintiffs communicated about Gen3 e-
mailed a representative of Gen3's investment banker and asked to meet.  Two days
later, they met in New York.  At that meeting, the investment banker supposedly
brought up the subject of Gen3.  Instead of informing the investment banker of the

non-circumvention agreement Defendants had signed with Plaintiffs and declining

to participate in the transaction without Plaintiff's consent and involvement,

Defendants breached the agreement, moved forward with a transaction to acquire

Gen3, and closed by the end of the year.  The terms of the transaction are strikingly

similar to the deal negotiated and proposed by Plaintiffs.  By cutting Plaintiffs out

of the transaction, Defendants destroyed the value of the contract that Plaintiffs had

secured from Defendants.  And Defendants now stand to earn millions of dollars in

fees as a direct result of their breach.  On this record, there is evidence of damages

and bad faith.  Plaintiffs therefore respectfully request that the Court deny

Defendants' motion for summary judgment.

## ARGUMENT AND CITATION OF AUTHORITIES

### I. NORTH AVENUE HAS A VIABLE BREACH OF CONTRACT CLAIM AGAINST DEFENDANTS.

#### A. North Avenue is a Party to the Contract.

By its terms, the contract between Plaintiffs and Defendants includes both

Redstone and North Avenue.  While the contract identifies Redstone as the

"Acquirer" and is signed by Redstone only, the opening paragraph of the

agreement elaborates on the definition of "Acquirer," indicating that it includes

Redstone's "Representatives," defined as "a party's affiliates, directors, officers,

1793396.1

4

managers, stockholders, partners, members, owners, critical employees and advisors, including legal counsel, affiliated investment funds, valuation consultants, lenders and financial advisors."  Def. Ex. 36 at 1.  The evidence before the Court establishes that North Avenue fits within the definition of "Representatives" in at least two ways: as an affiliate and advisor.

It is true that North Avenue and Redstone are separately owned, single-member limited liability companies.  But that does not preclude them from being "affiliates."  The companies are indisputably closely connected, working together on transactions, taking common ownership interests in their acquisitions, sharing fees, and making critical business decisions together as partners. Ex. B (Igherighe Dep.) at 316:23-317:9; *id*. at 113:16-114:5; *id*. at 94:22-95:8; Ex. C (Comer Dep.) at 101:17-20; Ex. D (Igherighe Declaration) at ¶¶ 4-5; Ex. E (Comer Declaration) at ¶¶ 4-6.  As the Delaware Chancery Court recently observed in construing a settlement agreement that included the term "affiliate" without defining it:

> In determining the meaning of "affiliate," standard dictionary definitions are instructive, including: "an affiliated person or organization," "being close in connection, allied, associated, or attached as a member or branch," *or* "[s]omeone who controls, is controlled by, or under common control with an issuer of a security."

*Geier v. Mozido, LLC*, No. CV10931-VCS, 2016 WL 5462437, at *6 (Del. Ch. Sept. 29, 2016) (emphasis added; internal footnotes and alteration omitted).

1793396.1

5

Redstone and North Avenue fall within the broad scope of the term because of their undisputed close connection and association.

Indeed, the testimony of Gen3's investment banker, Sett & Lucas, confirms the contemporaneous understanding of the participants in the transaction that Redstone and North Avenue were affiliates.  Sett & Lucas' 30(b)(6) witness, while being examined by Defendants' counsel, testified:

> Q:    Did Mr. Comer represent to Sett & Lucas or to Gen3, as far as you know, that RedStone and North Avenue Group were legally affiliated with one another?
>
> . . .
>
> A:    *It was quite obvious* … – because since he had multiple entities, we thought that this was probably another entity that was affiliated with him.
>
> Q:    You understand that … the letter of intent between Gen3 and North Avenue Group, you understood that to constitute a legal agreement with RedStone?
>
> A:    Yes.

Ex. A (Antony Dep.) at 165:22-166:14 (emphasis added).

Defendants contend that "affiliates" must share common ownership and control in a technical legal sense.  But Delaware law does not cabin the meaning of the term in that way.  As the Delaware Bankruptcy Court has explained, "there is no generally prevailing meaning of the term 'affiliate'; many commonly used

1793396.1

6

definitions of 'affiliate' are not limited to common ownership control situations."

*In re Asian Yard Partners*, No. 95–333–PJW, 95–334–PJW, 1995 WL 1781675, at

*20 (Bankr. D. Del. Sept. 18, 1995).

In any event, Redstone and North Avenue are also "advisors" to each other

under the language of the contract.  They confer on an almost daily basis about

their transactions and investments in which they partner, they provide advice to

each other, they share information about the deals on which they are working

together, and they perform financial and due diligence analysis for each other

throughout of the life of the transaction negotiation and consummation processes.

Ex. B (Igherighe Dep.) at 72:6-12; Ex. D (Igherighe Declaration) at ¶¶ 4-5; Ex. E

(Comer Declaration) at ¶¶ 4-6.

Finally, Defendants knew in 2017 that North Avenue was covered by the

contract.  Defendants' own documents and the testimony of their 30(b)(6) witness

confirm this.  When Mr. Christopher e-mailed copies of Plaintiffs' confidential

information memorandum to others, he described it by referencing the "unfunded

sponsor," which was North Avenue.  *See, e.g.*, Pl. Ex. 9 (Sept. 12 E-mail and

attachments); Pl. Ex. 1 (Christopher Dep.) at 155:21-156:4; Pl. Ex. 14 (Aug. E-

mail Thread between Christopher and Shaw).  This is clear and undisputable

evidence that in 2017 Defendants knew that the confidential information

1793396.1

7

memorandum, the use of which was governed by the parties' contract,[2] was also

North Avenue's work as Redstone's affiliate and therefore covered by the

contract.[3]

> ### B. Alternatively, and Additionally, North Avenue is an Intended Third Party Beneficiary of the Contract.

Defendants' primary argument in their brief is that North Avenue is not an

intended third party beneficiary of the parties' contract.  Of course, if the Court

determines that North Avenue is a party (albeit a non-signatory), for the reasons set

forth above, it need not reach this issue.  But as an alternative and additional

ground for denying summary judgment to Defendants, the record confirms that

North Avenue was an intended third party beneficiary of the contract.

Under Delaware law, determining whether a person or entity is a third party

beneficiary does not depend on them being named or expressly identified in the

contract; instead, Delaware courts look for the satisfaction of three elements: "(1)

an intent between the contracting parties to benefit a third party through the

---

[2] Pl. Ex. 9 (E-mail thread attaching CIMs) at 4 ("Use of this Confidential Information Memorandum is governed by the terms of a previously executed confidentiality agreement.").

[3] In the event the Court concludes that the contract's definition of "Representatives" is an any way ambiguous, this evidence and the testimony of Plaintiffs and Sett & Lucas, is parol evidence upon which the Court may rely to resolve that ambiguity in Plaintiffs' favor.

1793396.1

8

contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a material aspect to the parties agreeing to contract." *United Health Alliance, LLC v. United Medical, LLC*, C.A. No. 7710-VCP, 2014 WL 6488659, at *4 (Del. Ch. Nov. 20, 2014). Here, North Avenue meets all three prongs.

First, it is clear that the contract is intended to bind and benefit more than its signatories because the contract contains explicit language expanding its reach, most relevant here, to "affiliates" and "advisors" (both of which fall under rubric of "Representatives"). Indeed, the following paragraph immediately precedes the signature block on the contract:

> This Agreement is *for the Benefit of* the Acquirer [Redstone], the Receiving Party [LaSalle] *and their respective Representatives*. Please confirm your agreement with the foregoing by signing and returning to the undersigned an originally executed copy of this letter.

Pl. Ex. 7 at NAVG004913 (emphasis added). It is difficult to conceive of clearer language to demonstrate an "intent between the contracting parties to benefit a third party."

To satisfy the second element of the third party beneficiary test, Delaware courts "require[] that the agreement confer a beneficial effect on a third party." *United Health Alliance*, 2014 WL 6488659, at *6. Plaintiffs' contract with

Defendants accomplishes this to by, *inter alia*, protecting North Avenue's confidential information, and protecting North Avenue's rights to participate in any transaction involving the "Target" (Gen3).  These benefits are not a gratuity because North Avenue was working with Redstone to explore the possibility of a transaction, as the introductory e-mails between Redstone and LaSalle confirm by referencing the "independent sponsor."  Pl. Ex. 8 at NAVG004942 (introductory e-mail from Chatham Capital to LaSalle noting that "I have known the independent sponsor that he [Mr. Igherighe] is working with on this deal for a number of years."); *id.* at NAVG004940 (introductory e-mail from Redstone to LaSalle, twice mentioning the independent sponsor working with Redstone on the transaction).

Likewise, the materiality element is satisfied.  The contract repeatedly and consistently extends its protections and obligations to the signing parties' "Representatives."  If the extension of the agreement to cover non-signatories was not material, there would be no reason for the contract to reference those "Representatives" at least 24 times in a six page document, and again and again in the language of key terms.

Defendants make much of the fact that North Avenue is not named in the contract, and that the term "independent sponsor" does not appear in the contract (even though it is in the introductory e-mails forwarding the contract to Defendants

for execution).  But Delaware law does not require that third party beneficiaries be listed by name.  *See United Health Alliance*, 2014 WL 6488659, at *4-6 (denying motion to dismiss third party beneficiary claims by third parties not named in underlying contract or designated expressly as third party beneficiaries because three-element test was satisfied); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 326 (Del. Super. 1973) ("Dorr's failure to fully disclose Barcroft's identity as owner of the property to Cannon is not fatal to the claim. It is not necessary that the beneficiary be named and identified as an individual."); *Farmers Bank of State of Delaware v. Howard*, 276 A.2d 744, 745-46 (Del. Ch. 1971) ("A contract made for the benefit of a third party is enforceable in Delaware and the third party may sue to enforce a promise made for his benefit, even though he is a stranger to both the contract and the consideration.").

Finally, while Plaintiffs contend that there is no material fact dispute that North Avenue was an intended third party beneficiary of the contract based on the use of the terms "affiliate" and "advisor," if the Court harbors any doubt on this front, it should still deny Defendants' motion because there is at least some evidence from which a jury could conclude that North Avenue satisfies each of the three elements to qualify as a third party beneficiary under Delaware law.

1793396.1

11

## II.   A JURY MUST DECIDE WHETHER (AND THEN HOW MUCH) DEFENDANTS' BREACH DAMAGED THE PLAINTIFFS.

Defendants' argument regarding damages has two fundamental flaws: (a) it simply ignores the aspects of the factual record that don't support its argument—an impossibility on summary judgment; and (b) it ignores binding Delaware law. Under that law, the "remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). The breaching party must "compensate the promisee for [its] reasonable expectation of *the value of the breached contract*." *Id.* (emphasis added).

To establish damages, Plaintiffs need first "show defendant[s'] breach to be the cause of [their] injury with 'reasonable certainty' [meaning] that the *fact of damages* must be taken out of the realm of speculation." *Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, No. CIV.A. 18278, 2001 WL 1334188, at *20 (Del. Ch. Oct. 22, 2001) (emphasis added). Where a Plaintiff proves "the *fact* of damages— meaning that there would have been *some profits* from the contract," then, "less certainty is required of the proof establishing the *amount* of damages." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015), *as corrected* (Dec. 28, 2015) (second emphasis added). Indeed, once "causation has been

established for the *fact* of damages, less certainty (*perhaps none at all*) is required in proof of the *amount* of damages. . . .   [P]roof of the amount can be an estimate, uncertain, or inexact."  *PharmAthene, Inc. v. SIGA Techs., Inc.*, No. CIV.A. 2627-VCP, 2014 WL 3974167, at *8 (Del. Ch. Aug. 8, 2014) (emphasis added).

### A. Evidence Shows the Fact of Damages: Plaintiffs' Contract Had Value and Defendants' Breach Destroyed That Value.

#### 1. Plaintiffs' Complete Contractual Power Over the Gen3 Transaction Had Value Prior to the Breach, And That Alone Establishes the "Fact" of Damages.

In addition to it confidentiality obligations, Defendants agreed that they would not "directly or indirectly initiate conversations with or attempt to acquire" Gen3.   Pl. Ex. 7 at NAVG004910.  They had also agreed to get Plaintiffs' "express permission" before Defendants could "initiate or maintain contact with any officer, director, employee or agent of [Gen3] regarding [Gen3's] business. . . ."  *Id*. ¶ 6.  This provided Plaintiffs with the equivalent of a "veto" right over any transaction between Defendants and Gen3.

This contractual right is the precise equivalent of the contractual right that the plaintiff had in *Cura Financial Services*, and that case establishes the proper analysis here.  There, the plaintiff offered to introduce a payment processor to a bank so that the processor could enter a potentially lucrative contract to perform

services for the bank.  Before the plaintiff revealed the identity of the bank, and before the parties could agree on any compensation package for the plaintiff's services, "[i]n the presence of uncertainty, [the plaintiff] protected himself by extracting a veto power over [Defendant's] ability to exploit his bank sources without his permission."  *Cura*, 2001 WL 1334188, at *17.  In that case, just like here, the defendant "was interested enough in obtaining access to [plaintiff's] sources that it agreed to this unambiguous provision."  *Id.*

Just as in this case, the defendant in *Cura* breached the agreement by circumventing the plaintiff and entering into a contract directly with the target bank.  Because of the breach, the plaintiff was left in court trying to prove what kind of compensation he would have negotiated absent the breach.  *Id.* at *20. Thus, just as in this case, the plaintiff's "damages claim turn[ed] on events that did not transpire…."  *Id.*

However, the Court in *Cura* held that the fact that the events did not occur "does not mean that his claim must be rejected."  *Id.*  Indeed, where a defendant's breach destroys the ability to determine what would have happened, the Delaware Courts still fashion remedies to value the lost contract rights and thus determine the fact of damages.  *Id.  See also, e.g.*, *Duncan*, 775 A.2d at 1022–23 (where

defendants' breach rendered damages "determinations … necessarily hypothetical," measure of damages was "estimated" value of lost contract right).

Here, as in *Cura*, Plaintiffs' contract right provided for maximum leverage with respect to any deal between Gen3 and Defendants.  Pl. Ex. 7 at NAVG004910 ¶¶ 5-6.  As in *Cura*, this right to veto any transaction provided Plaintiffs with a reasonable expectation that they would have the opportunity to negotiate with LaSalle to obtain a share of the profits associated with that deal.  *Accord Cura*, 2001 WL 1334188, at *20.  Indeed, the evidence in this case shows unequivocally that Plaintiffs expected to be compensated in connection with any transaction between Defendants and Gen3, and that this compensation would be based on a number of factors, including the value of the transaction.  Ex. B (Igherighe Dep.) at 341:9-18; 344:23-345:4; Ex. F (Lesovitz Expert Rep.) at 2.  And here, as in *Cura,* "by cutting [Plaintiffs] out of the loop, the defendants ensured that [they] had no role in the [Gen3] negotiations and no chance to obtain [their] fair share of the profits and opportunities from that relationship."  2001 WL 1334188, at *20*.  That destruction of valuable rights and opportunities is sufficient to establish the *fact* of damages.

The *SIGA Tech* case makes this point even more forcefully.  In that case, the defendant had a small pox vaccine and promised to "negotiate" an agreement that

1793396.1

would provide plaintiff with "a worldwide, exclusive license to use, develop, sell, and sublicense [the vaccine material] and related products." 132 A.3d at 1112. Even though the defendant only breached an "obligation to negotiate," the Delaware Supreme Court affirmed an award valuing that opportunity to negotiate at $113 million because, had the negotiation been successful, the plaintiff would have had the "opportunity to develop the vaccine, to enhance [plaintiff's] reputation, and to access government funding to support continued drug development." *Id.* at 1131. These outcomes not only required a successful negotiation, but were to occur over a long period of time, based on a number of contingencies and third parties. The value of the opportunity in this case—to participate and receive compensation based on a single transaction over which Plaintiffs had veto power—is far less speculative than the opportunity in *Siga Tech*, and LaSalle's breach undeniably took that value from Plaintiffs. That again demonstrates the fact of damage.

> ### 2. LaSalle's Arguments Cannot Defeat the Fact of Damages Because They Cannot Show that the Plaintiff's Contractual Rights to Participate in the Gen3 Transaction Were Worthless as a Matter of Law.

Defendants argue that Plaintiffs suffered no discernible injury because the Gen3 principals would never have closed a deal with them.  They are wrong both as a matter of law and as a matter of fact.

First, given Defendants' breaches, the above cases establish that Plaintiffs' damages would only be too speculative to recover if the Plaintiffs' contract right had *no value at all*.  Indeed, that is what happened in *Accountable Health Solutions, LLC v. Wellness Corporate Solutions, LLC*, 333 F. Supp. 3d 1133 (D. Kan. 2018), the case on which Defendants principally rely.  In *Accountable Health,* after a bench trial, the Court found that, *as a matter of fact*, the opportunity that the plaintiff lost was worthless.  *Id.* at 1153-54.[4]

Here, on summary judgment and in stark contrast to *Accountable Health*, it is impossible to find that Plaintiffs' contract rights had *no value*.  First, the record contradicts the Gen3 witnesses.  Of course, on summary judgment this conflicting evidence must be construed in the light most favorable to Plaintiffs.  In that light, the evidence shows that Gen3 was frustrated that it had not found a suitable buyer.

---

[4] That this case involved a trial rather than summary judgment is important, and Gen3's testimony illustrates why:  testimony that the counterparty did not want to do business with a proposed intermediary will exist in every non-circumvention case.  Anytime two parties are willing to go behind someone's back and cut them out of an agreement, there will be evidence that they preferred it this way.  If such evidence could eliminate the *fact* of damages on summary judgment, then there would never be an enforceable non-circumvention agreement.

1793396.1

Gen3's representative at Sett & Lucas testified repeatedly that Gen3's goal was to obtain a capital partner and sell the company.  *See* Ex. A (Antony Dep.) at 187:13-19, 68:15-18, 70:2-15, 181:23-25.  Indeed, when asked specifically if Gen3 would still have closed a transaction with Plaintiffs, he was unequivocal:  "[W]e had a whole bunch of concerns . . . . [But] [i]f you bring capital to the table, we would close.  That's it."  *Id*. at 187:16-19.

Not only does this create a fact issue, but a jury is likely to credit that testimony and discount Gen3's strident assertions to the contrary.  Indeed, while Sett & Lucas is no longer affiliated with any party to this suit, Gen3 is now owned by Defendants and has every incentive to support their position.  Further, their current aggressive position is belied by some of the contemporaneous documents that reflect, for example, that the principals "███████████████" to close a deal with Plaintiffs.  Def. Ex. 42 at GEN3_0003329.

Based on this testimony—and common sense—a jury could reasonably conclude that if Plaintiffs had a capital partner and were prepared to facilitate a transaction, Gen3 would have closed the deal.  To believe otherwise, a jury would have to conclude that the Gen3 principals would each have walked away from millions of dollars in personal wealth, despite having spent many months devoted to selling their company.

Lastly, Defendants' breaches undeniably caused the very uncertainty on which Defendants rely to defeat plaintiffs' damages.  Defendants were obligated not to (a) "initiate conversations with or attempt to acquire" Gen3. Pl. Ex. 7 at NAVG004910 ¶ 5, or (b) "initiate or maintain contact with any officer, director, employee or agent of [Gen3] regarding [Gen3's] business…" without Plaintiffs' permission.  *Id*. ¶ 6.  Defendants not only willfully breached these agreements, but did so within hours of Plaintiffs' informing them that Plaintiffs would not be moving forward with Gen3.  Def. Ex. 39 at NAVG005023; Def. Ex. 44 at LASALLE_0001659.

Aside from the immediate outreach, Defendants also admittedly breached the agreement when their representative sat down with Sett & Lucas at breakfast on July 20, 2017, and every time they communicated with Sett & Lucas or Gen3 for the next several months.  At any moment in that process, had Defendants complied with the contract and informed Sett & Lucas or Gen3, for example, that they needed to obtain Plaintiffs' permission before continuing any discussions, then there would be no uncertainty about whether Gen3 would have closed a deal with Plaintiffs.  Similarly, had Defendants approached Plaintiffs and sought permission, that would have provided Plaintiffs with the extremely powerful negotiation opportunity that they bargained for and there would be no uncertainty

about the value of that opportunity.  Under Delaware's "wrongdoer doctrine," the fact that this alleged uncertainty flows directly from Defendants' breach prevents them from relying on that uncertainty to defeat Plaintiffs' damages. *Siga Techs*, 132 A.3d at 1131-32.[5]

> **B.    The Record Evidence Allows a Jury to Estimate the Amount of Plaintiffs' Damages with All the Necessary Certainty, and thus a Jury must decide Damages.**

Where Plaintiffs have established that some damage has occurred, "the injured party need not establish the amount of damages with precise certainty." *SIGA Techs.*, 132 A.3d at 1131.  Instead, Plaintiffs must offer "sufficient evidence to provide a reasonable basis for the [fact finder] to estimate with a fair degree of certainty his probable loss." *Cura*, 2001 WL 1334188, at *19.  Plaintiffs here have

---

[5] *See also Duncan*, 775 A.2d at 1023 ("the issuer-defendant should bear the risk of uncertainty in the share price because the defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.") (quotations omitted); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) ("Public policy has led Delaware courts to show a general willingness to make a wrongdoer bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.") (quotations omitted); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) ("The defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable. Because it is the defendant who creates this uncertainty, 'fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be 'laid at defendant's door.'").

1793396.1

20

provided evidence of the compensation that Plaintiffs began to negotiate with Defendants prior to Defendants' breach.  Ex. G (Financial Model).  This evidence demonstrates Plaintiffs' reasonable expectations and provides a basis for a fact finder to determine the amount of damages Plaintiffs suffered.  In addition, Plaintiffs' expert testified that ████████████████████████████████ ████████████████████████ Ex. F (Lesovitz Report) at 15-16.

Further, the transaction between Gen3 and Defendants in fact occurred in accordance with a financial model similar to the one Plaintiffs provided to Defendants.  This suggests that Plaintiffs' expectation that Defendants and Gen3 would reach an agreement was reasonable, and that Plaintiffs' expectations about the size of the transaction were accurate. *See SIGA Techs.*, 132 A.3d at 1133–34 ("[T]he court could consider post-breach evidence when determining the reasonable expectations of the parties before or at the time of the breach.").

The fact that the compensation terms for Plaintiffs' services were excluded from the parties' contract does not impact the calculation of damages.  *Cura*, 2001 WL 1334188, at *17, *20.  The evidence shows that ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████ Ex. F (Lesovitz Report) at 11-14.  *See Cura*, 2001 WL

1334188 at *17 ("This arrangement was a commercially reasonable way to proceed

in a context in which [defendant] was uncertain about the ultimate compensation

[plaintiff] and it could receive, and in which [defendant] therefore argued that

[plaintiff]'s compensation could not be determined until the terms of a deal with an

acquiring bank could be negotiated.")

Defendants now argue that Plaintiffs' damages theory is speculative.  But, as

in *Cura*, Plaintiffs and Defendants entered a binding contractual agreement where

Plaintiffs "extract[ed] a veto power over [defendants'] ability to exploit [their]

sources without [their] permission. *Id.*  As the court found in *Cura*, this veto

power provided plaintiffs with the reasonable expectation that they would be able

to negotiate reasonable compensation terms.  *Id.* at *17.[6]  And, ample evidence

shows that the terms were reasonable.

Indeed, Defendants' breach ultimately caused Plaintiffs to lose the

opportunity (1) to participate with Defendants as Gen3's committed capital

investors, (2) to assist in closing the transaction between Gen3 and Defendants, (3)

to invest in Gen3, and (4) to monitor Gen3 as it expanded.  In doing so, Defendants

---

[6] Indeed, Plaintiffs and others in the industry understand the value of this veto
right.  Chatham Capital reached out to Redstone to request release from its own
non-disclosure and non-circumvention agreement, and Plaintiffs declined to grant
the release without compensation.  Ex. D (Igherighe Dec.) at ¶ 6.

deprived Plaintiffs of profits resulting from connecting Gen3 to Defendants, return

from their investment in Gen3, and fees related to monitoring and advising Gen3.

*See SIGA Tech*, 132 A.3d at 1108.  Lastly, as before, Plaintiffs should not suffer

where it is, "[b]ecause of the defendants' contractual breach, [that] the court is left

in the position of figuring out what would have resulted in the event that the

defendants had behaved properly." *Cura*, 2001 WL 1344188, at *19.

## III. AT A MINIMUM, THERE IS A FACT DISPUTE ON THE ISSUE OF BAD FAITH, ENTITLING PLAINTIFFS TO A JURY TRIAL ON ATTORNEY'S FEES.

In the final paragraphs of their summary judgment brief, Defendants suggest

that Plaintiffs have "come nowhere close to raising a triable issue" on their

attorney's fees claim.  Def. Br. at 24.  On this point too, Defendants are incorrect.

Defendants acknowledge that "egregious pre-litigation misconduct" gives rise to a

claim for attorney's fees under Delaware law.  *Id.*  As the Delaware Supreme Court

has explained, in "cases in which, although a defendant did not misuse the

litigation process in any way, the action giving rise to the suit involved *bad faith,*

*fraud, conduct that was totally unjustified, or the like* and attorney's fees are

considered an appropriate part of damages."  *Scion Breckenridge Managing*

*Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 687 (Del. 2013)

(emphasis added).  The summary judgment record establishes evidence of "bad faith" and "conduct that was totally unjustified."  *Id.*

Discovery has confirmed that Defendants were bound by a contract that, among other things, precluded them from circumventing Plaintiffs and closing a transaction to acquire Gen3.  Nonetheless, Defendants did this, and in the process violated the parties' agreement again and again by using Plaintiffs' confidential information memorandum to evaluate and analyze Gen3 as part of their planning and due diligence for the transaction.  *See, e.g.*, Pl. Ex. 16 (Aug. 23 E-mail) (e-mail attaching Plaintiffs' confidential information memorandum and noting, "We are under NDA [non-disclosure agreement] on this and you would be covered as a[n] 'advisor' to LaSalle.").  Delaware law specifically recognizes that "totally unjustified" "conduct" can justify an award of attorney's fees for bad faith, and Plaintiffs have shown that here through Defendants' clear and inexplicable breaches of contract.  *Scion Breckenridge Managing Member, LLC*, 68 A.3d at 687; *see also Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998) (concluding that Court of Chancery did not err in considering pre-litigation conduct of the defendants in determining whether their actions in litigation "rose to the level of bad faith because they had no valid defense and knew it").  This Court should therefore also deny summary judgment to

Defendants on Count II, and allow Plaintiffs to present their claim for attorney's fees and expenses of litigation to the jury.

## CONCLUSION

Contrary to Defendants' contention, the summary judgment record on contract formation compels summary judgment in Plaintiffs' favor on that issue, and not Defendants.  Moreover, whether Gen3 would have ultimately consummated a transaction including Plaintiffs if Defendants had not breached their contract with Plaintiffs is a fact dispute for the jury to resolve, as are the amount of damages flowing from that breach.  Finally, Defendants' breach of their clear contractual obligations, especially with respect to the non-circumvention term, is sufficient to create a fact dispute on the issue of "bad faith" so that a jury must resolve Plaintiffs' claim for attorney's fees.  Accordingly, this Court should deny Defendants' motion for summary judgment in its entirety.

Respectfully submitted, this 13th day of August, 2019.

/s/ John H. Rains IV
Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com

1793396.1

25

BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree Street, NW
Suite 3900
Atlanta, Georgia  30309-3417
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile


David M. Abner
(admitted *pro hac vice*)
david.abner@dma-law.com

DAVID M. ABNER & ASSOCIATES
747 Third Avenue
Suite 200
New York, New York  10017
(212) 572-0762 – Telephone
(214) 293-2580 – Facsimile

***Attorneys for Plaintiffs***

1793396.1

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14 point font.

/s/ John H. Rains IV
John H. Rains IV
Georgia Bar No. 556052

1793396.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of August, 2019, a copy of the

foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically

filed with the Clerk of Court using the Court's CM/ECF system, which will

automatically serve all counsel of record as follows:

> J. Carole Thompson Hord
> SCHREEDER, WHEELER & FLINT, LLP
> 1100 Peachtree Street N.E., Suite 800
> Atlanta, Georgia 30309-4516
> chord@swfllp.com
>
> Joanna C. Wade (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 300 S. Tryon Street
> Charlotte, North Carolina 28202
> jwade@winston.com
>
> Joseph L. Motto (admitted *pro hac vice*)
> Karalena M. Guerrieri (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 35 W. Wacker Drive
> Chicago, IL 60601
> jmotto@winston.com
> kguerrieri@winston.com

> /s/ John H. Rains IV
> John H. Rains IV

1793396.1

28