# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| NORTH AVENUE GROUP HOLDINGS, LLC, and REDSTONE M&A GROUP, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NO. 1:18-cv-03659-AT |
| LASALLE CAPITAL GROUP II-A, L.P., and LASALLE CAPITAL GROUP PARTNERS II-A, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW, Suite 3900
Atlanta, Georgia  30309-3417
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

David M. Abner
(admitted *pro hac vice*)
david.abner@dma-law.com
DAVID M. ABNER & ASSOCIATES
747 Third Avenue
Suite 200
New York, New York  10017
(212) 572-0762 – Telephone
(214) 293-2580 – Facsimile

# TABLE OF CONTENTS

**PAGE**

**ARGUMENT AND CITATION OF AUTHORITY** ............................................1

**I.     PLAINTIFFS HAVE AN ENFORCEABLE CONTRACT
          WITH DEFENDANTS** .......................................................................1

**II.    DEFENDANTS BREACHED THE CONTRACT** ..................................6

**III.   PLAINTIFFS HAVE EVIVDENCE OF DAMAGES** ...........................13

**CONCLUSION** ........................................................................................17

# TABLE OF AUTHORITIES

**CASES**:                                                                      **PAGE**

*Brock v. King*,
    279 Ga. App. 335 (2006) .......................................................................... 16-17

*Fox v. Rodel*,
    No. 98-531-SLR, 1999 WL 588293
    (D. Del. July 14, 1999) ...................................................................................3

*Palmer v. Moffat*,
    No. Civ.A.01C-03-114JEB, 2004 WL 397051
    (Del. Feb. 27, 2004) ......................................................................................17

*Ripsom v. Beaver Blacktop, Inc.*,
    No. CIV.A. 83C-AU-128, 1988 WL 32071
    (Del. Super. Ct. Apr. 6, 1988) ........................................................................3

*Savannah College of Art & Design, Inc. v. Nulph*,
    265 Ga. 662 (1995) ........................................................................................17

*Shepherd v. Mazzetti*,
    545 A.2d 621 (Del. 1988) ...............................................................................3

*Wolf v. Crosby*,
    377 A.2d 22 (Del. Ch. 1977) ..........................................................................3

**STATUTES:**

DEL. CODE. ANN. tit. 8, § 203 ................................................................................2

DEL. CODE. ANN. tit. 5, § 3303 ..............................................................................2

O.C.G.A. § 13-6-6 ....................................................................................................17

O.C.G.A. § 13-6-11 ..............................................................................................8, 16

The undisputed facts establish that Plaintiffs had an enforceable contract with Defendants and that Defendants breached.  Defendants do not credibly contest that they breached the non-circumvent portions of the agreement by contacting the principals of Gen3 Marketing, LLC ("Gen3") without Plaintiffs' permission, and closing a transaction to acquire Gen3 without Plaintiffs' involvement.  Defendants also breached that contract by using Plaintiffs' confidential information to explore a transaction with Gen3 without Plaintiffs.  To be sure, there are fact disputes as to damages, primarily involving the question of whether Gen3 would have participated in a transaction that included Plaintiffs.  A jury will have to resolve that issue and determine the amount of Plaintiffs' damages.  But there is no reason for further proceedings on the questions of contract formation and breach.  Accordingly, Plaintiffs respectfully request that this Court grant summary judgment in their favor on those issues.

<u>**ARGUMENT AND CITATION OF AUTHORITIES**</u>

**I.    PLAINTIFFS HAVE AN ENFORCEABLE CONTRACT WITH DEFENDANTS.**

Defendants effectively concede that they and Redstone are parties to the contract.  Defendants' argument that North Avenue is not a party has already been extensively briefed by Plaintiffs, and Plaintiffs incorporate those arguments here.

1799563.1

1

*See* Dkt. No. 85 at 9-16.[1]  But even if Defendants were unaware of North Avenue's identity at the time of contract formation, their subsequent conduct ratifies North Avenue's status as a party to the contract because Defendants later circulated the confidential information memorandum at issue and in doing so stated that it was "from an unfunded sponsor."  By August 2017 Defendants unquestionably understood that (a) this "unfunded sponsor" was North Avenue, and (b) that the confidential information memorandum was covered by the parties' contract.  Pl. Ex. 14 (Aug. E-mail Thread between Christopher and Shaw); Pl. Ex. 1 (Christopher Dep.) at 143-44.[2]

In arguing against the existence of an enforceable contract, Defendants essentially attack the contract's consideration.  But Defendants' argument rests on a fundamental misapplication of contract law.  The issues of contract formation

---

[1] On the question of whether North Avenue is an "affiliate" of Redstone's, Defendants cite DEL. CODE. ANN. tit. 8, § 203(c)(1) to support their interpretation of the term "affiliate," which is not defined in the parties' contract. But that statutory definition has no bearing here, because the same statute makes clear that it is defining "affiliate" "[a]s used in this section *only*. . . ."  DEL. CODE. ANN. tit. 8, § 203(c)-(c)(1) (emphasis added).  That code section does not govern here, and Defendants make no argument that it could.  The other statutory definition they cite is also limited in scope.  *See* DEL. CODE. ANN. tit. 5, § 3303 ("For the purposes of *this chapter*,  . . ." (emphasis added)).

[2] References to "Pl. Ex." and "Def. Ex." followed by numbers are to the exhibits filed by each side in support of their initial summary judgment motions; references followed by letters are to the exhibits the parties filed with their opposition briefs to each others' motions.

and breach are distinct.  Consideration, no matter how slight – a peppercorn – is sufficient to establish the existence of a contract.  *Fox v. Rodel*, No. 98-531-SLR, 1999 WL 588293, at *8 (D. Del. July 14, 1999) ("If the consideration has *any value whatsoever*, it is sufficient to support the promise and render it enforceable." (emphasis added)).  Recognizing this, Defendants devote pages to arguing that what Mr. Igherighe provided to them after the contract was executed did not qualify as "Evaluation Material."  That is really an argument that Plaintiffs breached the contract; it has nothing to do with whether there was consideration sufficient to create a legally enforceable obligation.  The legal reality that speaks directly to the formation issue Defendants attempt to raise is this: in Delaware merely exchanging mutual promises suffices as consideration as a matter of law. *Shepherd v. Mazzetti*, 545 A.2d 621, 623 (De1. 1988); *Ripsom v. Beaver Blacktop, Inc.*, No. CIV.A. 83C-AU-128, 1988 WL 32071, at *10 (Del. Super. Ct. Apr. 6, 1988); *Wolf v. Crosby*, 377 A.2d 22, 27 (Del. Ch. 1977).  As identified in Plaintiffs' summary judgment motion, and further discussed in Plaintiffs' response to Defendants' summary judgment motion, the contract is replete with mutual promises, so there can be no dispute about the existence of consideration as a matter of settled Delaware law.  That is the end of Defendants' argument.

But in any event, Defendants are also wrong to the extent they contend Plaintiffs supplied them with no "Evaluation Material."  The contract intentionally establishes an expansive definition of that term as essentially whatever Defendants receive from Plaintiffs pursuant to the contract subject to several exclusions set forth in section 1 of the contract and quoted in Defendants' brief.  Pl. Ex. 8 at NAVG004944-45, preamble language & §1.  First, it is irrelevant that LaSalle had already been offered a chance to explore a transaction involving Gen3 and decided not to do so six months before receiving Plaintiffs' separate description of that opportunity based on a different financial model and new proposals for expanding Gen3's business.  The first time Defendants analyzed the Gen 3 deal, they did not have Plaintiffs' confidential information memorandum and apparently had no interest in Gen3.  After they got Plaintiffs' materials that changed.  *Compare* Pl. Ex. 10 (July 11 E-mail from Mr. Christopher to Mr. Igherighe) ("I remain interested in the business and would like to have the opportunity to speak live with the independent sponsor and management team."), *with* Pl. Ex. 1 (Christopher Dep.) at 21-23 (testifying about his disinterest in Gen3 after reviewing the Sett & Lucas confidential information memorandum in late 2016).

Defendants suggest that because the exclusivity period in the letter of intent between Plaintiffs and Gen3 had expired that nothing Plaintiffs shared with them

1799563.1

4

was "Evaluation Material."  But that claim has no basis in the contract.  In fact, nothing in the contract provides that the expiration of exclusivity terms favoring the Plaintiffs would excuse Defendants from abiding by the contract's terms, including the confidentiality and non-circumvention terms.

Moreover, Defendants' claim that Plaintiffs' confidential information memorandum literally contained no meaningful information is belied by at least three undisputed facts: (a) Defendants actually forwarded it and referred to it repeatedly and those very acts demonstrate its value; (b) Defendants undeniably were not interested in Gen3 before receiving Plaintiffs' materials, and they became interested after; and (c) Gen3's management team has reacted forcefully to some of the proposals Plaintiffs offered in their confidential information memorandum for growing and altering Gen3's business.  If those ideas were devoid of content, Gen3's principals would not go to such pains to describe the proposals using hyperbolic, offensive *ad hominem* attacks.  Indeed, while there is clearly overlap between the Sett & Lucas confidential information memorandum and the one prepared by Plaintiffs, even Defendants will only go so far as characterizing them as "similar" which is not equivalent to the "same" or "identical" by definition. Even a nugget of new information or a new idea in Plaintiffs' materials qualifies as

"Evaluation Material" and definitively defeats Defendants' misguided consideration argument as a matter of law.

## II.      DEFENDANTS BREACHED THE CONTRACT.

The summary judgment record confirms that Defendants breached their contract in at least three ways.  First, Defendants acquired Gen3 without Plaintiffs' participation in violation of the non-circumvention clause contained in section 5 of the contract.  *Id*. at NAVG004946, §5.  Second, Defendants contacted Gen3's principals outside "the ordinary course of business unrelated to the Transaction" in breach of section 6 of the contract.  *Id*. at NAVG004946, §6.  And third, they used the materials provided to them, particularly Plaintiffs' confidential information memorandum, for a purpose other than "evaluating, negotiating, structuring, financing and/or consummating the Transaction" with Plaintiffs.  Pl. Ex. 8 at NAVG004944, §1.  That was a breach of section 1 of the contract.  There are no material fact disputes on any of these points, and Plaintiffs rely entirely on Defendants' testimony and own documents to show that each breach occurred.

In an effort to sidestep the obvious breaches of the non-circumvention aspects of the contract, Defendants focus on section 1 of the contract and claim that they cannot be liable because they never received any "Evaluation Material."  This is covered *supra*. The contract defines Evaluation Material as what Redstone

provided to Defendants subsequent to execution of the contract, excluding those

categories of information carved out in section 1 (and quoted in Defendants' brief).

There is no doubt that after Defendants signed the contract, Plaintiffs provided the

confidential information memorandum and financial model.  *See* Pl. Ex. 8 at

NAVG004944, preamble language ("[T]h Receiving Party has requested an

exchange of certain oral and written information concerning the Target for the

purpose of evaluating the Transaction and the Partnership Opportunity.  Such

information will be obtained from the Acquirer . . . including, without limitation,

any oral or written information . . . the 'Evaluation Material.'"); Def. Exs. 35, 37,

& 38 (e-mail transmitting the confidential information memorandum and financial

model to Defendants after the parties' contract was executed).  That is "written

information concerning the Target," and is thus indisputably "Evaluation Material"

for purposes of the contract.  Accordingly, any defense to breach grounded in the

assertion that Defendants received nothing protected by the contract is baseless.

There is likewise no dispute that Defendants used Plaintiffs' confidential

information memorandum to pursue a transaction that did not involve Plaintiffs.

Once again, Plaintiffs proof on this issue comes from Defendants' own testimony

and documents, and therefore, there is no basis for Defendants to dispute it.

As an initial matter, Defendants' 30(b)(6) witness testified that "in the middle of September" 2017 – after Defendants had prepared their own internal memorandum describing the Gen3 opportunity – Defendants moved Plaintiffs' confidential information memorandum into a folder labelled "Do Not Use" on Defendants' network shared drive.  Def. Ex. C (Christopher Dep.) at 168:2-13.[3] According to Mr. Christopher, at that point Defendants did not "want to use" the confidential information memorandum anymore.  *Id*. at 168:5-6.  But by then, Defendants' own documents show that they had been using Plaintiffs' confidential information memorandum for over a month to evaluate the Gen3 transaction.

*First*, on August 18, 2017, Mr. Christopher forwarded the confidential information memorandum, which he described as coming "from an unfunded sponsor" (obviously North Avenue in context), to Jon Shaw, who works with Defendants to evaluate transactions and who now serves on Gen3's board at Defendants' behest.  Pl. Ex. 14 (Aug. E-mail Thread between Christopher and

---

[3] Defendants' recognition that they should not use Plaintiffs' materials is further evidence supporting their knowledge of and ratification of their contractual obligations with respect to the materials.  It is not dissimilar from Mr. Christopher's admission that they were bound by an "NDA."  Pl. Ex. 14 (Aug. E-mail Thread between Christopher and Shaw); Pl. Ex. 1 (Christopher Dep.) at 19-20, 141-42.  And it is also powerful evidence of bad faith for purposes of O.C.G.A. § 13-6-11 because it shows Defendants were aware contemporaneously that they would be breaching the parties' contract if they used information supplied by Plaintiffs.

Shaw); Pl. Ex. 1 (Christopher Dep.) at 19-20, 141-42.  Mr. Christopher admitted in

his deposition that he expected Mr. Shaw to read the memorandum, and that Mr.

Shaw was covered by the parties' contract as an advisor to Defendants in doing so.

*Id*. at 143-44.  Mr. Shaw read Plaintiffs confidential information memorandum,

writing that it "looks interesting" and then asking a specific question about what

"investment it would take to do" one of Plaintiffs' unique investment theses for

Gen3.  Pl. Ex. 15 (Shaw E-mail of Aug. 19, 2017).   Whatever else was said in

those e-mails, they demonstrate that in August 2017 Defendants were using

Plaintiffs work to provide information to their advisors as they explored the

transaction, and to provoke and evaluate concepts they clearly found "interesting."

That is a clear breach of section 1 of the contract.

*Second*, a few days later Mr. Christopher again sent an e-mail outside of

LaSalle attaching Plaintiffs' confidential information memorandum.  Pl. Ex. 16

(Aug. 23 E-mail).  This time, Mr. Christopher wanted the input of another "smart

person" outside his organization on the Gen3 "business model."  Pl. Ex. 1

(Christopher Dep.) at 150.  Again, this was another evaluative use of Plaintiffs'

materials, regardless of whether Defendants ultimately followed Plaintiffs'

recommendations for growing Gen3's business or not.

*And third*, on September 12, 2017, before Defendants finalized their own internal written assessment of the Gen3 opportunity, Mr. Christopher forwarded Plaintiffs' confidential information memorandum to his boss to "give [him] some context" on Gen3 and the potential investment opportunity.  Pl. Ex. 9 (Sept. 12 E-mail and attachments).  Using Plaintiffs' confidential information memorandum as part of a briefing for his superior and partner was also clearly a prohibited use of Plaintiffs' material, and thus another breach.[4]

That Defendants circulated and used Plaintiffs' confidential information memorandum simultaneously with the Sett & Lucas one does not excuse Defendants' breach, it underscores it.  If Plaintiffs' confidential information memorandum was useless, entirely duplicative, or devoid of content, there would have been no reason for Mr. Christopher to share it both inside his organization and with at least two people outside it.  And even if the memoranda were identical, distributing Plaintiffs' memorandum with a second one not covered by the contract

---

[4] As a half-sentence throw-away argument, Defendants contend that Plaintiffs have not "alleged any resulting damages based on the 'use' or 'review' of any information they provided."  Dkt. No. 82 (Defs. Mem. of Law in Opp'n to Pls. Mot. for Summ. J.) at 21. This completely un-developed thought hardly requires a response.  Defendants evaluated information they were prohibited from using in a transaction that did not involve Plaintiffs, and then consummated that transaction. Their breach of section 1 of the contract is part and parcel of their breach of section 5.

1799563.1

would not excuse or authorize the use of Plaintiffs' material in breach of the terms of section 1 of the contract.

Moreover, in explaining his decision to send a copy of both memoranda to his boss (the person who "signs [his] paychecks"), Mr. Christopher testified that he did it "so they can get smart and evaluate" the transaction ("evaluating" being one of the activities prohibited in section 1 of the contract) and because at that point in time Defendants had not prepared their own written internal analysis of the transaction.  Pl. Ex. 1 (Christopher Dep.) at 155-57.

Defendants' sole argument as to their breaches of sections 5 (non-circumvention) and 6 (no contact) is that the contract has to be read as a whole, and that because Redstone did not have a "viable opportunity" "to acquire that potential target" and Defendants had been previously introduced to Gen3 by Sett & Lucas and passed on the transaction, Defendants are somehow excused from their breaches.  Dkt. No. 82 (Defs. Mem. of Law in Opp'n to Pls. Mot. for Summ. J.) at 22.  That is not the law.  Nothing in the contract provides that Plaintiffs had to have a "viable opportunity" to acquire Gen3 for Defendants to be bound to those terms, which are unequivocal.[5]  And even if Defendants had previously learned of an

---

[5] Of course, as shown in Plaintiffs' response to Defendants' motion for summary judgment (Dkt. No. 85), whether there was a "viable opportunity" to close the

opportunity to acquire Gen3, and then declined to do so, no Delaware authority

prevented them from contracting away their rights to proceed with a Gen3

transaction without Plaintiffs.[6]

Finally, Defendants' post-litigation theory that Plaintiffs provided them

nothing of value and that therefore, they could not have breached the parties'

contract, is inconsistent with the record.  Mr. Christopher never responded to

Plaintiffs in the summer of 2017 that he already knew about the Gen3 opportunity,

nor did he express a lack of interest in exploring it with them after receiving the

confidential information memorandum and financial model.  Instead, he confirmed

his interest, and then almost immediately after he ceased communications with

Plaintiffs he turned around and began pursuing Gen3, repeatedly relying on

Plaintiffs' materials to explain the potential transaction to his colleagues and

---

transaction is hotly contested.  As Gen3's broker testified (and as common sense
dictates), if Plaintiffs had secured a capital partner to pay the Gen3 principals
millions of dollars, Plaintiffs would have been able to close the transaction and
"[t]hat's it."  Dkt. No. 85 at 22-25.

[6] At first blush, Defendants' point might support some fraud in the inducement or
excuse by prior breach defense, but of course, Defendants have not pleaded either.
*See* Dkt. No. 42 (Ans. to Am. Compl.) at 2-3 (operative set of affirmative
defenses).  And even if they did, Defendants failure to seek rescission and their
subsequent ratification of the contract would defeat any fraud-based defense.  Any
defense as to prior breach would fail as well because Defendants cannot point to
obligations in the text of the contract that Plaintiffs breached.  In any event,
Defendants have not made these arguments, and cannot therefore avoid summary
judgment based on them.

1799563.1

advisors.  Pl. Ex. 10 (July 11 E-mail to Mr. Igherighe); Pl. Ex. 1 (Christopher

Dep.) at 55, 79-80.  And as late as August 2017, the internal pipeline report

prepared and used by Defendants during their regular business meetings identified

Redstone as the source for the Gen3 opportunity they were pursuing and described

the target using financial projections from Plaintiffs' memorandum.  *Compare* Pl.

Ex. 11 (July Pipeline Report) at LASALLE_0001305 (noting $3.411 million in

projected EBITDA for 2017), *with* Pl. Ex. 9 at LASALLE_0001342 (financials

from Redstone confidential information memorandum projecting $3.411 million in

EBITDA for 2017), *and* Pl. Ex. 16 at LASALLE_0001478 (financials from Sett &

Lucas confidential information memorandum projecting $4.3 million in EBITDA

for 2017).  By contrast, the other transactions introduced to Defendants at the July

20 meeting with Sett & Lucas identify the investment banker as the source of the

transactions.  Pl. Ex. 12 (August Pipeline Report) at LASALLE_0001732-33.  This

is all further, undisputed evidence of Defendants' breaches.

## III.   PLAINTIFFS HAVE EIVDENCE OF DAMAGES.

Defendants repeat throughout their brief the point that damages are an

element of a contract claim, and that if Plaintiffs have no damages, then their claim

fails.  This theme is an attempt to distract and mislead the Court.  Plaintiffs' motion

specifically states that it only addresses and seeks summary judgment on the first

1799563.1

13

two elements of their contact claim – "the existence of the contract" and breach. Dkt. No. 76-1 at 17.  Plaintiffs readily acknowledge that the third element of their claim – "resultant damage" – is an issue around which there are material fact disputes.  In effect, by focusing on an element that is not the subject of Plaintiffs' motion (and which is core to Defendants' cross-motion for summary judgment), Defendants are seeking to shift the Court's inquiry away from Plaintiffs' actual position.  In fact, where there is a written contract like this, with a clear breach, the appropriate procedure is to rule on the contract as a matter of law, and then conduct a trial on the issue of damages.

And that trial on damages will show that Plaintiffs suffered a full measure. As detailed in Plaintiffs' Response to Defendants' Motion for Summary Judgement, absent Defendants' breaches Plaintiffs would have participated in the transaction either as full partners or as partners who negotiated an appropriate value based on their non-circumvention "veto" rights.  Dkt. No. 85 at 22-25.  As for the possibility that they would have been full partners the record shows that Gen3 was frustrated that it had not found a suitable buyer in the months since they started marketing their company.  And Sett & Lucas testified repeatedly that Gen3's goal was to obtain a capital partner and consummate the sale.  *See* Pl. Ex. A (Antony Dep.) at 187:13-19, 68:15-18, 70:2-15, 181:23-25.  Indeed, when asked

1799563.1

14

specifically if Gen3 would still have closed a transaction with Plaintiffs, Sett &

Lucas' 30(b)(6) representative was unequivocal:  "[W]e had a whole bunch of

concerns . . . . [But] [i]f you bring capital to the table, we would close.  That's it."

*Id*. at 187:16-19.  Further, Gen3's contemporaneous documents reflect, for

example, that at least one of Gen3's principals "could be convinced" to close a deal

with Plaintiffs.  Def. Ex. 42 at GEN3_0003329.

On this record, a jury could conclude that if Plaintiffs had a capital partner

and were prepared to facilitate a transaction, Gen3 would have closed the deal as

described by Plaintiffs.  To believe otherwise, a jury would have to decide that the

Gen3 principals would each have walked away from millions of dollars in personal

wealth, despite having spent many months devoted to selling their company.

Further, any doubt the Court may entertain about the *existence* of damages is

put to rest by Defendants' own expert witness, Mark Hosfield, who assumed

liability for purposes of his work and performed an alternative damages calculation

he described as a "finder's fee" designed to compensate Plaintiffs in a world in

which they had no on-going participation in a management or equity stake in

Gen3.  Ex. 19 (Hosfield Report) at 22.  Hosfield opined as follows:





*Id*. at 23-24 (footnote omitted).  Hosfield's interpretation of the record is not

accurate, and Plaintiffs intend to challenge the admissibility of his testimony in

accordance with the applicable law, but his opinion provides proof that even if

Plaintiffs could not have participated in the Gen3 transaction, their work and the

veto power arising from their contract rights, still had quantifiable value.  In light

of this, Defendants' contention that there is no evidence of damages is wrong.

Finally, regardless of how the jury resolves that evidence, under no

circumstances could the court conclude as a matter of law that there would be zero

damages.  At worst, it is now clear in light of the Court's August 30, 2019 Order

reconsidering its prior ruling dismissing Plaintiffs' O.C.G.A. § 13-6-11 claim that

Georgia's remedial damages law applies in this diversity action.  Dkt. No. 89 at 3-

4.  Thus, Plaintiffs should still be able to pursue their breach of contract claim,

even if they cannot prove actual damages and may recover only nominal damages

and an award of fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

*See Brock v. King*, 279 Ga. App. 335, 341 (2006) ("[I]n every breach of contract

the injured party has a right to damages, and if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action.  Nominal damages are generally defined as a trivial sum awarded where a breach of duty or an infraction of the plaintiff's right is shown, but no serious loss is proved." (internal footnote and quotation marks omitted; alteration in original));[7] O.C.G.A. § 13-6-6 (same); *Savannah College of Art & Design, Inc. v. Nulph*, 265 Ga. 662, 662 (1995) ("[The plaintiff] may still pursue his separate claim for attorney fees under O.C.G.A. § 13–6–11, because a recovery of only nominal damages would be sufficient to support attorney fees under that statute").  Thus, even if Defendants are entitled to summary judgment on a claim for actual damages (which they are not), Plaintiffs could still present their breach of contract claim to a jury for an award of nominal damages and fees under Georgia law, rendering Defendants' argument on this point irrelevant.

## **CONCLUSION**

There is clearly a fact dispute as to the amount of Plaintiffs' actual damages. Defendants will rely on Gen3's *post hoc* criticisms of Plaintiffs to contend that

---

[7] *Accord Palmer v. Moffat*, No. Civ.A.01C-03-114JEB, 2004 WL 397051, at *4 (Del. Feb. 27, 2004) ("Even where actual damages cannot be demonstrated, the breach of a contractual obligation often warrants an allowance of nominal damages.").

1799563.1

17

Plaintiffs suffered no damages because Gen3's principals would never have participated in a transaction with them.  Plaintiffs will rely on, among other things, the testimony of Gen3's investment bankers and common sense which confirms that had Plaintiffs brought a capital partner to the table, in this case Defendants, Gen3 would have proceeded with the transaction despite its principals' purported concerns.  The quantification of these damages will be the subject of competing expert testimony.

But on the issues of contract formation and breach, by contrast, there is no material dispute of fact.  A binding and enforceable contract existed between the parties and Defendants breached it.  To simplify the trial and avoid inappropriate arguments as to issues that can be resolved by the Court on an undisputed factual record, Plaintiffs therefore respectfully request that the Court grant their motion and enter summary judgment as to liability on their breach of contract claim.  Alternatively, the Court could grant summary judgment as to the first two elements of Plaintiffs' contract claim, and so instruct the jury.  The result should be the same – a trial on Plaintiffs' damages and attorney's fees claim.

Respectfully submitted, this 3rd day of September, 2019.

/s/ John H. Rains IV
Jason J. Carter
Georgia Bar No. 141669

carter@bmelaw.com
John H. Rains IV
Georgia Bar No. 556052
rains@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree Street, NW
Suite 3900
Atlanta, Georgia  30309-3417
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

David M. Abner
(admitted *pro hac vice*)
david.abner@dma-law.com

DAVID M. ABNER & ASSOCIATES
747 Third Avenue
Suite 200
New York, New York  10017
(212) 572-0762 – Telephone
(214) 293-2580 – Facsimile

**Attorneys for Plaintiffs**

1799563.1

19

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14 point font.

<div style="margin-left: 45%;">

/s/ John H. Rains IV
John H. Rains IV
Georgia Bar No. 556052

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of September, 2019, a copy of the

foregoing **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION**

**FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of Court

using the Court's CM/ECF system, which will automatically serve all counsel of

record as follows:

> J. Carole Thompson Hord
> SCHREEDER, WHEELER & FLINT, LLP
> 1100 Peachtree Street N.E., Suite 800
> Atlanta, Georgia 30309-4516
> chord@swfllp.com
>
> Joanna C. Wade (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 300 S. Tryon Street
> Charlotte, North Carolina 28202
> jwade@winston.com
>
> Joseph L. Motto (admitted *pro hac vice*)
> Karalena M. Guerrieri (admitted *pro hac vice*)
> WINSTON & STRAWN LLP
> 35 W. Wacker Drive
> Chicago, IL 60601
> jmotto@winston.com
> kguerrieri@winston.com

> /s/ John H. Rains IV
> John H. Rains IV

1799563.1

21