# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

```
--------------------------------------------------------X
REDSTONE M&A GROUP, LLC,                    :
                                            :
                Plaintiff,                  :
                                            :       Case No. 18-cv-03659-AT
                v.                          :
                                            :
LASALLE CAPITAL GROUP II-A, L.P.,           :
and LASALLE CAPITAL GROUP                   :
PARTNERS II-A, LLC,                         :
                                            :
                Defendants.                 :
```

## DEFENDANTS' POST-TRIAL SUBMISSION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Introduction ................................................................ 1

II.   Argument ..................................................................... 2

    A.    Issues 1-3: The trial evidence proved that Redstone's damages
          (if any) should be limited to a $150,000 consulting fee or some
          other reasonable measure of its contemplated role and actions
          as a consultant/finder, as it represented itself to LaSalle. ................... 2

        1.    Issue 1: Confidentiality Agreement's use of the term
              "Acquirer" does not affect the parties' reasonable
              expectations. ............................................................ 5

        2.    Issue 2: The "Book of Wisdom" should not be read under
              these circumstances. ................................................. 7

        3.    Issue 3: There is no competent evidence that LaSalle
              would have agreed to pay Redstone a seven-figure sum
              merely for the opportunity to pursue a transaction with
              Gen3. ....................................................................... 8

            a.    The Gen3 transaction inherently came with risks. .......... 9

            b.    Financial projections aside, Redstone's options were
                  limited, while LaSalle could always invest
                  elsewhere. ..................................................... 10

    B.    Issue 4: The Court may consider Redstone's conduct in
          deciding whether to award litigation expenses under O.C.G.A.
          § 13–6–11 and should deny Redstone's claim because of its
          dishonest conduct. ........................................................... 11

        1.    Redstone misled LaSalle about the status of the Gen3
              opportunity to induce LaSalle into signing the
              Confidentiality Agreement. ....................................... 12

2.   Redstone provided a CIM with material
misrepresentations to keep persuading LaSalle to pursue a
deal Redstone could not deliver. ............................................ 13

III.   Conclusion ................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Fin. Corp. v. Comput. Scis. Corp.*,
  558 F. Supp. 1182 (D. Del. 1983)..................................................................5, 6

*Comrie v. Enterasys Networks, Inc.*,
  837 A.2d 1 (Del. Ch. 2003) ................................................................................7

*Crotty v. Crotty*,
  219 Ga. App. 408 (1995) ..................................................................................11

*Duncan v. Theratx, Inc.*,
  775 A.2d 1019 (Del. 2001) .................................................................................2

*In re Flyboy Aviation Props., LLC*,
  525 B.R. 510 (Bankr. N.D. Ga. 2015) ........................................................12, 15

*King v. Edwards*,
  559 F. Supp. 75 (N.D. Ga. 1982) ....................................................................12

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) .................................................................................6

*PharmAthene, Inc. v. Siga Techs., Inc.*,
  2014 WL 3974167 (Del. Ch. Aug. 8, 2014) .......................................................7

*Siga Techs., Inc. v. PharmAthene, Inc.*,
  132 A.3d 1108 (Del. 2015) .................................................................................7

**Statutes**

O.C.G.A. § 13–6–11 ...............................................................................................11

## I.    Introduction

Defendants respectfully make this submission addressing the issues identified in the Court's February 7, 2022 Order (Dkt. 197).   Concerning the first three topics, the trial proved that Redstone's reasonable expectation damages are limited to the loss of its hoped-for opportunity to participate in a transaction with Gen3 as a consultant, meaning the loss of a finder's fee of $150,000, or some comparable sum based on its relatively brief work attempting to secure the transaction.   Any award beyond that would lack a reasoned basis in law or fact, erroneously "punish" LaSalle, and provide a windfall to Redstone as though this were a case in tort.   Neither the Confidentiality Agreement's definition of "Acquirer" nor the "Book of Wisdom" doctrine alters the fact that the parties (LaSalle and Redstone) had no reasonable expectation that Redstone would be paid millions of dollars simply from executing an agreement by which Redstone shared with LaSalle information about NAVG's desire to acquire Gen3.   There is no competent evidence that LaSalle would have even considered paying Redstone millions merely for the opportunity to participate in such a transaction.   The evidence is the opposite.   Numerous investors received the same or similar information from Redstone yet were uniformly unwilling to offer *anything*, let alone millions, to pursue the transaction.   Mr. Lesovitz's claim that LaSalle would have done so simply because Redstone created a model projecting a

1

profit—as would any model created by a broker seeking to do a deal—is unsupported and defies common sense.

As for the fourth topic, the law is clear that the Court may—and, based on the evidence, should—consider Redstone's "unclean hands" in determining whether to award litigation expenses. Redstone engaged in a pattern of less-than-forthright conduct with both Gen3 and LaSalle, including misrepresenting to LaSalle the nature of its and NAVG's relationship with Gen3. Thus, the Court should preclude any award of litigation expenses.

## II.    Argument

### A.    Issues 1-3: The trial evidence proved that Redstone's damages (if any) should be limited to a $150,000 consulting fee or some other reasonable measure of its contemplated role and actions as a consultant/finder, as it represented itself to LaSalle.

Breach of contract damages are "based upon the reasonable expectations of the parties *ex ante*," and are "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).

Redstone is a "consulting firm that provides professional services, including deal sourcing, due diligence, fund raising, and portfolio management primarily in the 'micro-market' sector." DTX-2 ¶ 1; *see also* Stipulated Facts ¶ 1 (Dkt 125-6). That is how Redstone has represented itself to this Court and, indeed, the world,

including in its previous deals. *See* Day 1 Trial Tr. 85:21-86:2, 88:9-16.

Thus, it comes as no surprise that in its first interaction with LaSalle, Redstone described itself as a "Transaction Consultant/Advisor" working on behalf of an unidentified "Sponsor" that was attempting to acquire a company. DTX-94 at 1, 4; Day 1 Trial Tr. 89:9-90:16, 185:8-16, 215:4-6, 215:25-216:3. From the start, this led Mr. Christopher to understand Redstone to be "an intermediary working with an independent sponsor who had locked up a deal," and that Redstone and the independent sponsor were distinct entities. Day 3 Trial Tr. 25:9-28:4, 29:1-10, 29:18-23, 36:12-37:19. Mr. Comer not only agreed that Mr. Christopher's interpretation was reasonable but, in fact, also testified that this is precisely what Redstone and NAVG were intending to accomplish. DTX-94 at 1; Day 1 Trial Tr. 90:1-91:2. By representing themselves as distinct entities, Redstone (the consultant) and NAVG (the independent sponsor) expected to be able to "capture [their] *respective* fees accordingly." *Id.* (emphasis added).

With this understanding, LaSalle executed the Confidentiality Agreement and Redstone provided LaSalle with a CIM and financial model, the latter identifying the hypothetical terms of a transaction by which NAVG would acquire Gen3. DTX-98; Day 1 Trial Tr. 146:5-148:13, 150:12-18. Redstone's model represented that NAVG was to earn sponsor fees, management fees, equity interests, and future

profits from the transaction, while Redstone anticipated receiving a consulting fee of $150,000.  DTX-98 at 1; Day 1 Trial Tr. 146:5-148:13, 150:12-18, 233:3-7.

The Court should disregard as irrelevant to Redstone's damages Mr. Comer's and Mr. Igherighe's self-serving testimony that Redstone and NAVG supposedly had an oral agreement to split all deal proceeds evenly.

*First*, Mr. Comer and Mr. Igherighe are sophisticated parties who knew how to draft and enter into a written proceeds-sharing agreement.  Indeed, Mr. Comer touted "airtight" agreements as integral to his business.  Day 1 Trial Tr. 41:22-25, 78:8-11.  So, if such an arrangement existed, Mr. Comer's own testimony suggests that it would have been in writing.  Yet, Mr. Comer could not point to any written agreement between the two.  *Id.* at 99:15-101:1.  Instead, Mr. Comer claimed: "There was never a reason to . . . codify [the arrangement] on paper . . . .  [W]e didn't have to do that."  *Id.* at 100:14-21.  That testimony strains credibility, and this Court should not simply "take [Mr. Comer's and Mr. Igherighe's] word" for it.  *Id.* at 101:19-22.[1]

---

[1] Mr. Comer also testified that Redstone and NAVG had split proceeds on four or five deals preceding the Gen3 transaction.  Day 1 Trial Tr. 100:17-21.  If such splitting had occurred, surely there would exist documents supporting that claim— if not written agreements, then at least, for example, bank transfer statements.  Yet Plaintiff failed to offer *any* documentary evidence illustrating the splitting of proceeds for any such previous deals.

4

***Second***, even if such an arrangement were in place, Mr. Comer conceded that no one but he and Mr. Igherighe were aware of its existence. *Id.* at 101:24-102:16. LaSalle did not know. *Id.* at 101:24-102:2. Because contract damages depend on the reasonable expectations of the parties, not upon the undisclosed, subjective expectations of the injured party alone, any secret arrangement between Redstone and NAVG is irrelevant to the question of damages. *Cf. Am. Fin. Corp. v. Comput. Scis. Corp.*, 558 F. Supp. 1182, 1185 (D. Del. 1983) ("[A]llow[ing] the unilateral intent of one party to [control the question of reasonable expectations] would thwart the power that contracting parties should have to control their legal relations, particularly in a commercial setting.").

1.   **Issue 1: Confidentiality Agreement's use of the term "Acquirer" does not affect the parties' reasonable expectations.**

There is no coherent and consistent way to interpret the term "Acquirer" as used in the Confidentiality Agreement, let alone an interpretation compelling the conclusion that LaSalle expected Redstone to be the literal "acquirer" of Gen3. Certainly, a single confusingly worded term should not be used as a "form over substance" basis to transform the nature of the Agreement and Redstone's relationship with LaSalle from that of consultant/finder and potential investor to that of strategic buyer and potential investor. When first used in the opening sentences of the Agreement, the term "Acquirer" refers to a third-party "affiliate" of Redstone,

5

not Redstone itself, although "affiliate" is not defined.  DTX-96 at 1.  Elsewhere, "Acquirer" seems to refer to Redstone.  *See, e.g.*, *id.* ("[C]ertain oral and written information concerning the Target . . . will be obtained from the Acquirer.").  Mr. Igherighe's trial testimony sows more confusion on this point.  He testified that he understood the term to encompass Redstone, NAVG, Sett & Lucas, LaSalle, and "any of the other people that [would be] involved in getting the transaction done." Day 1 Trial Tr. 178:24-179:12, 183:23-184:2, 200:18-19.  That reveals the impossibility of using this confusing term as a definitive basis on which to determine the parties' reasonable expectations.  It would have LaSalle paying damages based not only on compensation that Redstone never hoped to earn for itself—such as NAVG's hoped-for independent sponsor fees and equity—but also compensation for third parties who did not even know about the Confidentiality Agreement or the prospect of a deal with Gen3.  That makes no sense.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (interpretations that create absurd results should be avoided).  Mr. Igherighe's testimony confirms that he did not reasonably expect the Confidentiality Agreement's use of the term "Acquirer" to define his or LaSalle's expectations for what Redstone—the only party with standing to recover

damages in this case—reasonably anticipated earning from the execution of the Agreement.

2.    **Issue 2: The "Book of Wisdom" should not be read under these circumstances.**

Although Delaware courts have considered post-breach evidence in measuring breach-of-contract damages, such evidence may only be considered to determine the parties' reasonable expectations at the time of breach. *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1133 (Del. 2015) (court properly "limited the use of [post-breach] evidence to the parties' expectations, and 'in all other respects' determined that the post-breach evidence was 'irrelevant' to measure expectation damages"); *PharmAthene, Inc. v. Siga Techs., Inc.*, 2014 WL 3974167, at *9 (Del. Ch. Aug. 8, 2014) (same); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17 (Del. Ch. 2003) (same).

Within this framework, the "Book of Wisdom" is inapplicable to the assessment of Redstone's expectation damages. The reasonable expectations of the parties, based on Redstone's representations to LaSalle, were that Redstone would receive a consulting fee as part of a Gen3 transaction, not a share in future profits or an equity interest in Gen3. *See supra* II.A. It follows that the profitability of a future Gen3 transaction has no use in determining reasonable expectations as of the date of the breach, and in all other respects such post-breach evidence is irrelevant.

7

3.   **Issue 3: There is no competent evidence that LaSalle would have agreed to pay Redstone a seven-figure sum merely for the opportunity to pursue a transaction with Gen3.**

Mr. Lesovitz testified that LaSalle would have paid between $3.2 and $5.5 million for Redstone's CIM in a hypothetical negotiation, based in part on Mr. Lesovitz's supposition that LaSalle would be gaining the opportunity to pursue a profitable deal, according to Redstone's financial model. Day 2 Trial Tr. 75:10-20, 76:12-20, 125:14-21, 134:18-135:8. There is no evidence to support Mr. Lesovitz's speculation about LaSalle's hypothetical behavior, which defies common sense.

To support his opinion, Mr. Lesovitz cited LaSalle transactions where it made no money or less than Redstone *projected* the Gen3 deal to be worth. *Id.* at 52:23-53:6, 147:11-22, 150:9-151:4. But that only proves why LaSalle never would have paid a substantial sum just for the opportunity to pursue a deal—LaSalle knew from past experience that no deal is guaranteed to succeed. *Id.* LaSalle could just as easily lose money as make it. Surely, those other deals in which LaSalle lost money were also *projected* to be profitable. Having lost or made no money on past deals, it would have been irrational for LaSalle to jeopardize its return on a potential deal with Gen3 by fronting millions of dollars just for the chance to pursue that deal.

Mr. Lesovitz baldly asserted that "[t]his is how deals are done all the time in th[e] investment space in terms of private equity," *id.* at 134:25-135:8, though he

8

was not qualified as a "private equity" expert and did not cite a single example of anything like what he claims LaSalle would have done—not by LaSalle or any other private equity firm.  His testimony is ungrounded speculation, and, as shown below, the evidence proved the opposite.

### a.   The Gen3 transaction inherently came with risks.

The CIM was a "marketing document prepared by [Redstone] to make [Gen3] look . . . as good as possible."  Day 3 Trial Tr. 20:17-23.  By Mr. Igherighe's own admission, it lacked sufficient information for an investor to decide to invest in Gen3, let alone decide to pay for the chance to do so.  Day 1 Trial Tr. 221:17-222:9. Mr. Igherighe thus effectively conceded that LaSalle never would have agreed to pay Redstone based on the CIM alone.  *Id.* at 222:6-9; Day 3 Trial Tr. 14:4-7, 20:11-16.  That is sufficient to refute Mr. Lesovitz's claim.  And, rather than blindly relying on Redstone's model, LaSalle would have conducted its own diligence, including hiring an accounting advisor, an insurance diligence firm, and legal counsel; conducting an industry study; and having multiple discussions with management, only after which could LaSalle have finalized any investment decision.  Day 3 Trial Tr. 20:17-21:16, 46:19-47:19, 78:1-19; Day 1 Trial Tr. 222:3-9.

And even then, if convinced it was worth pursuing a transaction with Gen3, LaSalle still would know that success was uncertain.  Mr. Comer acknowledged that

most deals come with risk and that there is never a guarantee that a deal will succeed. Day 1 Trial Tr. 154:16-24, 155:11-156:6. Thus, although the Gen3 deal had potential upside, there was also a risk that it could be a huge loss for many reasons, including an uncertain market, risk of disintermediation by bigger players, Gen3's recent loss of a major customer, and reliance on senior management. *Id.* at 51:25-52:3, 66:18-67:5, 114:22-115:2, 124:14-22, 157:5-7, 206:20-208:22; DTX-55; Day 3 Trial Tr. 203:5-10. The evidence is undisputed that Redstone struggled to find interested investors and sent its financial model to numerous other private equity firms, none of which offered a single cent to pursue the transaction. Day 1 Trial Tr. 114:4-6, 124:14-23; Day 2 Trial Tr. 134:14-17, 138:20-24. Mr. Lesovitz has no explanation for that incongruity. But the explanation is obvious: no rational investor would pay millions of dollars just for the opportunity to invest millions more, *all of which* could be lost.

> **b.    Financial projections aside, Redstone's options were limited, while LaSalle could always invest elsewhere.**

Critical to any valuation of Redstone's non-circumvention right: both Redstone and LaSalle knew there was no chance that Gen3 would have completed a deal if Redstone were involved. DTX-7; DTX-30; DTX-130; Dkt. 183-1 at 28:21-29:19, 30:2-22, 51:17-52:2; Dkt. 183-2 at 73:5-17, 92:16-94:7, 140:10-141:19; Day 3 Trial Tr. 79:6-10. As a result, in a hypothetical negotiation, Redstone's options

10

were (i) to accept whatever LaSalle was willing to pay Redstone or (ii) take nothing at all in relation to Gen3, while LaSalle's options were (i) to pay Redstone an amount that made sense for the opportunity to participate in a transaction with Gen3, not knowing what the future would hold or (ii) simply walk away and invest its money elsewhere, as it had done many times before and would do again in the future.  Day 3 Trial Tr. 157:10-159:21, 166:12-167:13, 201:6-202:20.  It is flatly contrary to common sense that, in such a negotiation, Redstone would have demanded a seven-figure payout or else accept nothing, or that LaSalle would have agreed to pay such an excessive amount rather than simply make a different investment.

**B.    Issue 4: The Court may consider Redstone's conduct in deciding whether to award litigation expenses under O.C.G.A. § 13–6–11 and should deny Redstone's claim because of its dishonest conduct.**

Whether or not the evidence establishes LaSalle acted in bad faith—and it does not—Redstone's misconduct precludes recovery of its litigation expenses under O.C.G.A. § 13–6–11.  *See Crotty v. Crotty*, 219 Ga. App. 408, 411 (1995) ("When a party seeking attorney fees has engaged in bad faith or stubborn litigiousness, or has caused unnecessary trouble and expense, such factor may be considered by the trial court and will … constitute some evidence to support a denial of the request for attorney fees.") (affirming denial of litigation expenses because of movant's misconduct); *In re Flyboy Aviation Props., LLC*, 525 B.R. 510, 530

11

(Bankr. N.D. Ga. 2015) (same); *see also King v. Edwards*, 559 F. Supp. 75, 98–99 (N.D. Ga. 1982) (discounting fee claim because of plaintiffs' unclean hands). Redstone intentionally made material misrepresentations to entice LaSalle to sign the Confidentiality Agreement for a deal that neither Redstone nor NAVG had any hope of closing and engaged in other misconduct that warrants denial of its claim for litigation expenses.

### 1.   Redstone misled LaSalle about the status of the Gen3 opportunity to induce LaSalle into signing the Confidentiality Agreement.

By the time Mr. Igherighe contacted Nick Christopher on June 30, 2017, NAVG's LOI with Gen3 had expired, Gen3 no longer had any obligation to transact with NAVG, and Redstone and NAVG had failed in their effort to line up an interested equity investor. DTX-12 at 5-6; DTX-30; Stipulated Facts ¶ 17 (Dkt. 125-6); Day 1 Trial Tr. 104:13-16, 124:14-22; Dkt 183-2 at 140:10-141:5. Even so, Mr. Igherighe represented to LaSalle that Redstone represented an independent sponsor (NAVG) in a live deal and was expecting two term sheets from potential investors within the next week. DTX-94 at 1; Day 1 Trial Tr. 212:1-4. Mr. Igherighe clearly intended for his email to create a sense of urgency about competition among investors for the ability to participate in the Gen3 deal. Day 1 Trial Tr. 212:12-16.

Redstone was unable to provide any evidence supporting its representations to LaSalle. Despite agreeing that term sheets are a "notable step in an investment

12

process," Mr. Igherighe could not identify any investors referenced in his email. Day 1 Trial Tr. 211:4-18, 212:24-213:15, 214:6-20. Indeed, before Mr. Igherighe's email to LaSalle, four potential investors had rejected the deal without providing, or even mentioning, term sheets. Day 1 Trial Tr. 112:3-22, 189:18-190:3, 202:18-203:1, 204:18-24, 205:9-19; DTX-49; DTX-50; DTX-142; DTX-143.[2] A fifth potential investor rejected the deal without providing a term sheet shortly after Mr. Igherighe's email. Day 1 Trial Tr. 209:2-23; DTX-54. Redstone presented no documentary evidence of any term sheets or that Mr. Igherighe truly expected any.

As intended, Mr. Igherighe's misrepresentations led Mr. Christopher to believe he needed to move quickly. Day 3 Trial Tr. 30:11-32:13, 37:22-38:13. Moreover, Mr. Igherighe's misrepresentations led Mr. Christopher to believe the independent sponsor had the deal under LOI and had exclusivity over the deal. Day 3 Trial Tr. 34:8-15, 39:5-12. Thus, Redstone relied on false pretenses to generate enough interest for LaSalle to sign the Confidentiality Agreement.

### 2. Redstone provided a CIM with material misrepresentations to keep persuading LaSalle to pursue a deal Redstone could not deliver.

Redstone's misrepresentations about the investment opportunity continued in

---

[2] Redstone and NAVG made similar misrepresentations to Gen3 about the status of their capital-raising efforts. *Compare* DTX-45, DTX-50, *with* DTX-51; DTX-52; Day 1 Trial Tr. 117:1-118:25.

the CIM it provided to LaSalle.

First, Redstone's CIM misrepresented that the independent sponsor had the opportunity under LOI, when in fact the LOI had expired.  DTX-97 at 15; Day 1 Trial Tr. 234:13-18, 235:3-6; DTX-12 at 5-6; Stipulated Facts ¶ 17 (Dkt 125-6).  The existence of an LOI conveys important information, including that substantial progress has been made on a deal and the sender of the LOI has rights in the deal. Day 1 Trial Tr. 235:9-21.  Yet, Mr. Igherighe never disclosed that NAVG's LOI with Gen3 had expired.  Day 3 Trial Tr. 40:11-17.

Second, the Redstone CIM represented that the independent sponsor had "built an excellent relationship with management."  DTX-97 at 15.  In fact, NAVG and Redstone had caused the relationship with Gen3 management to deteriorate to the point where Mr. Cantos was "having a difficult time sleeping at night" because of the prospect of partnering with Redstone and NAVG, and Mr. Tabasso was "counting down the days until the expiration of the LOI."  Dkt. 183-1 at 28:21-29:19, 40:12-41:3; Dkt. 181-1 at 97:1-23.

Third, the Redstone CIM represented that Gen3 was looking for a partner to implement Redstone's investment thesis of transforming Gen3 into an affiliate network ratings service.  DTX-97 at 15.  In reality, Gen3 management had shown no interest in that idea.  DTX-29; Dkt. 183-1 at 31:3-32:11; Dkt. 181-1 at p. 73, l.

14

24–p. 75, l. 22.[3]   Far from it—Gen3 did not fully understand and strongly disapproved of the idea.  Dkt. 183-1 at 28:21-29:19, 30:2-22; Dkt. 183-2 at 73:10-17.  Redstone nonetheless told LaSalle that Gen3 was ready to implement it.  Day 1 Trial Tr. 239:21-240:19.  These misrepresentations masked the fact that Redstone was marketing a deal it had no hope of delivering.

Redstone also misappropriated information from the Sett & Lucas CIM to prepare the Redstone CIM without crediting Sett & Lucas, and Mr. Igherighe instructed his assistant to do the same.  DTX-92; Day 1 Trial Tr. 198:22-200:12, 200:21-201:1.  No NDA between Redstone and Sett & Lucas authorizing the use of Sett & Lucas confidential information is in evidence.

Allowing Redstone to recover its expenses would award a benefit reserved for exceptional cases to a litigant who engaged in bad faith by enticing LaSalle to sign the Confidentiality Agreement under false pretenses.  Redstone's unclean hands negate any award of litigation expenses.  *In re Flyboy*, 525 B.R. at 530.

## III.   Conclusion

LaSalle appreciates the Court's consideration of this submission and remains willing to address any additional issues as the Court believes would be helpful.

---

[3] Because transcript page numbering is inconsistent in the Designated Deposition Testimony of Prabhu Antonty (Dkt. 181-1), citations are to the document page number and transcript line.

Dated: March 1, 2022

Respectfully submitted,

/s/ *Joseph L. Motto*
Joseph L. Motto (*pro hac vice*)
Karalena M. Guerrieri (*pro hac vice*)
Tyler C. Richards (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600
jmotto@winston.com
kguerrieri@winston.com
trichards@winston.com

Michael T. Murphy (*pro hac vice*)
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
(713) 561-2600
mtmurphy@winston.com

J. Carole Thompson Hord
Georgia Bar No. 291473
SCHREEDER, WHEELER &
FLINT, LLP
1100 Peachtree Street N.E., Suite 800
Atlanta, GA 30309-4516
(404) 681-3450
chord@swfllp.com

*Counsel for Defendants*

## **CERTIFICATION OF FONT SIZE**

Pursuant to L.R. 7.1D, N.D. Ga., I hereby certify that this brief is prepared

using the 14 point Times New Roman font approved in L.R. 5.1C, N.D. Ga.

This 1st day of March, 2022.

/s/ *Joseph L. Motto*
Joseph L. Motto (*pro hac vice*)
Karalena M. Guerrieri (*pro hac vice*)
Tyler C. Richards (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600
jmotto@winston.com
kguerrieri@winston.com
trichards@winston.com

Michael T. Murphy (*pro hac vice*)
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, TX  77002-2925
(713) 561-2600
mtmurphy@winston.com

J. Carole Thompson Hord
Georgia Bar No. 291473
SCHREEDER, WHEELER &
FLINT, LLP
1100 Peachtree Street N.E.
Suite 800
Atlanta, GA 30309-4516
(404) 681-3450
chord@swfllp.com

*Counsel for Defendants*

17

## **CERTIFICATE OF SERVICE**

This is to certify that on March 1, 2022, a copy of the foregoing Defendants'

Post-Trial Submission was electronically filed with the Clerk of the Court using the

Court's CM/ECF system, which will automatically serve all counsel of record.

/s/ *Joseph L. Motto*
Joseph L. Motto