IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

REDSTONE M&A GROUP, LLC,          :
                                  :
    Plaintiff,                    :
                                  :
v.                                :
                                  :        CIVIL ACTION NO.
LASALLE CAPITAL GROUP II-A,       :        1:18-cv-3659-AT
L.P., and LASALLE CAPITAL         :
GROUP PARTNERS II-A, LLC,         :
                                  :
    Defendants.                   :

## ORDER

## I.  Introduction

The original Plaintiffs in this action, North Avenue Group Holdings, LLC ("North Avenue") and Redstone M&A Group, LLC ("Redstone") filed this case in the State Court of Fulton County on May 31, 2018.[1] Defendants LaSalle Capital Group II-A, L.P. and LaSalle Capital Partners II-A, LLC (collectively, "Lasalle")[2] subsequently removed the case to federal court.  Plaintiffs raised two Counts against LaSalle.  First, they raised a Count for breach of contract based on LaSalle's alleged breach of a non-disclosure agreement ("NDA") that it had entered into with Redstone for the purpose of pursuing a private equity transaction with North Avenue.  Specifically, Plaintiffs claimed that LaSalle breached the NDA by acquiring the target company on its own without including

---

[1] Terry Comer is the sole member of North Avenue and Akpovogho James ("AJ") Igherighe is the sole member of Redstone.

[2] Defendants effectively operate as a single entity.

Plaintiffs in the deal.  Second, Plaintiffs claimed that they should be entitled to attorney's fees and litigation expenses because LaSalle breached the NDA in bad faith and engaged in stubborn litigiousness.

The parties filed cross-motions for summary judgment, and the Court issued an  order on May 29, 2020 granting in part and denying in part both motions.  In its summary judgment order, the Court found that LaSalle breached the NDA's non-circumvention provision, which prohibited LaSalle from acquiring the target company, Gen3 Marketing, LLC, for a two-year period unless Redstone was included in the deal.  The Court also found that LaSalle breached the NDA's provision prohibiting LaSalle from using the Confidential Investment Memorandum ('CIM") that Redstone had provided LaSalle on the ground that LaSalle was only authorized to use the CIM for its consideration in a transaction involving Redstone.   In so holding, the Court found that LaSalle had used Redstone's CIM to some degree in the process of purchasing Gen3 after it had been identified as a potential target for acquisition by Redstone and North Avenue.  The Court also dismissed North Avenue as a Plaintiff in the case on the ground that it was not a party to the NDA between Redstone and LaSalle and lacked third-party standing to sue for damages based on Lasalle's breach of the agreement.[3]

---

[3] However, the Court indicated that North Avenue may still have a viable claim to a portion of Redstone's damages on the theory that it had an implied contractual relationship with Redstone for purposes of splitting compensation.

The Court held a four-day bench trial from December 13 through 16, 2021 to determine the amount of Redstone's damages.  After trial, LaSalle submitted a notice to the Court requesting an opportunity to submit post-trial briefing on a number of discrete issues that came up at trial.  The Court subsequently issued an order authorizing LaSalle to submit a post-trial brief not to exceed 15 pages on four of the topics it had selected, and authorizing Redstone to submit a 15-page response that would be limited to those same four topics.

Consistent with its review and analysis of the testimony and evidence presented at trial, and having reviewed the parties' post-trial briefing, the Court enters the following findings of fact and conclusions of law.

## II. Findings of Fact

1.      Gen3 Marketing, LLC is a digital marketing agency that specializes in affiliate marketing.   As a component of its business, Gen3 assists other companies in their efforts to sell other companies' products.  Michael Tabasso and Andrew Cantos are Gen3's co-CEOs and they are both part owners of the business.

2.      On or around the summer of 2016, Tabasso and Cantos decided that they wanted to sell a majority interest in the company to a new owner.  They retained the investment banking firm Sett & Lucas to assist with their search for a buyer.  Sett & Lucas was to be compensated both through an initial retainer and a success fee in the event of a successful sale.  The success fee was significantly

larger than the retainer, accounting for approximately 90% of Sett & Lucas's total compensation.

3.     Sett & Lucas reached out to over 100 potential buyers in an effort to sell Gen3, one of which was LaSalle.  To pitch the company to LaSalle as a target for acquisition, Sett & Lucas sent an email to LaSalle partner Nick Christopher on November 16, 2016 through the account of Sean Brayden.  Sett & Lucas's corporate representative, Prabhu Antony, stated in his deposition that Sean was not a real person but rather a fictional person whose email account was utilized by multiple different individuals to address queries sent from different time zones.

4.     In his email, "Sean" provided Christopher with a brief description of Gen3 using the pseudonym "Project Genesis" and included a link to a one-page teaser summarizing the CIM that Sett & Lucas had prepared about the business. He added that Sett & Lucas could send Christopher the full CIM if he signed an NDA.  (DX 138.)  Christopher replied that he was interested in reviewing the CIM and asked for an NDA, which Sean then provided.  LaSalle's office manager, Lindsey Kremer, signed the NDA on LaSalle's behalf and sent it back to Sean.

5.     Sean sent Kremer the full CIM after she provided him with the signed NDA on November 21, 2016.  In his email attaching the CIM, Sean informed Kremer that the real name of the company was Gen3 Marketing. However, the CIM itself used the pseudonym Project Genesis, and Christopher

was not included on the email in which Sean revealed the actual name of the company to Kremer.  (*See* DX 138, 139.)

6.     On November 29, 2016, Christopher responded to Sean, "Thanks for sending Project Genesis our way. Look[s] like a very interesting business.  I'm traveling the rest of this week, but would like to discuss at a high level early next week if you are available.  Would Monday at 1pm work?" (DX 140.)  Christopher spoke with representatives from Sett & Lucas about the deal shortly thereafter.

7.     On December 15, 2016, Sean emailed Christopher to ask if LaSalle was interested in moving forward with the deal.  Christopher responded later that day:

> Sean,
>
> This is one that we are going to take a pass on. While a nice business, we have concerns about the defensibility of the model and feel as if it is probably a better fit for a strategic company that can plug this into an existing digital marketing strategy.
>
> We greatly appreciate the look and hope we can find another one to work on together in 2017!
>
> Best of luck,
>
> Nick  (*Id.*)

At trial, Christopher explained that when he spoke with members of Sett & Lucas about the deal "they didn't represent the business in a way that made it seem very unique."

8.     Around the same time, Sett & Lucas reached out to another potential buyer about the deal:  Terry Comer of North Avenue.  Just as LaSalle had done

before, North Avenue executed an NDA with Sett & Lucas to access the full version of the Sett & Lucas CIM.   Comer testified that he received the Sett & Lucas CIM on Christmas Day 2016.   Comer was interested in the deal and, according to his testimony at trial, he had an initial phone call with Tabasso and Cantos and members of Sett & Lucas in January 2017.   This led to an in-person follow-up meeting on February 23, 2017.

9.     The initial meeting went well, and Comer followed up with Tabasso and Cantos via email the following day.   In that email, Comer stated,

> Mike/Andy - I wanted to thank you both again for spending the day with me yesterday. I walked away very impressed with your knowledge of the space and pulse on the greater opportunity. Again, I would enjoy partnering with you guys to usher in the next growth phase of Gen3.   (PX 10.)

He added,

> Like you, I think fit is key in situations like this, and I'm excited that you guys would consider my firm as the ideal partner to scale the business as well as take care of your people and customers. I look forward to next steps and feel free to reach out any time.   (*Id.*)

Cantos responded that afternoon,

> It was great meeting you yesterday and we too are excited about next steps as we clearly felt a connection with you.   The meeting was very positive and we walked away very impressed with your ability to not only 'get' our space but also to apply a thoughtful approach to potential future growth. It must be an HBS thing.   (*Id.*)[4]

10.     On March 15, 2017, North Avenue made an offer to buy a majority interest in Gen3 for approximately $27 million through a formal Letter of Intent ("LOI").   Under the terms of the proposed deal, North Avenue would be acting as

---

[4] "HBS" refers to Harvard Business School from which Mr. Comer obtained his business degree.

an "independent sponsor" for the transaction.  (DX 119.)  As the independent sponsor, instead of using its own funding for the purchase, North Avenue would be obtaining funding from a third party to buy the business.  The LOI indicated that North Avenue was "working with Boathouse Capital" for that purpose.  (*Id.*)

11.     Tabasso and Cantos signed the LOI on March 20, 2017.  (PX 19.)  As a consequence of signing the LOI, Tabasso and Cantos were precluded from working with other buyers while the LOI with North Avenue remained in effect.  By its terms, the LOI would expire either in 90 days or upon written notice by the terminating party, whichever came first.  (*Id.*)

12.     Unbeknownst to Gen3 and Sett & Lucas, Comer's efforts to secure funding from Boathouse had not been finalized.  And in an email dated March 20, 2017 — the same date that the LOI was executed between Gen3 and North Avenue — a representative of Boathouse confirmed via email that Boathouse was not interested in moving forward with the deal.  (DX 49.)  Comer forwarded Boathouse's email to AJ Igherighe of Redstone and included the following message:

> some quick feedback from the Boathouse guys on the Gen3 deal we just signed up today. Not surprising ... again, we will need to cast a VERY wide net to find the right partner that can write a $5 to 10 million equity check. We will need to find equity funds that are $100~300M size given some of the bigger funds simply won't write a check below $10M. (*Id.*)

For the next several months while the LOI was still in effect, Comer and Igherighe attempted to secure a source of funding for the deal and to develop their own CIM to pitch their vision for the business to potential investors.

13.    Though Comer had apparently been working with Igherighe behind the scenes from the start, Comer did not introduce Igherighe to Tabasso and Cantos until after the LOI was signed.  He represented that Igherighe was someone who would be working with him to develop a thesis to present to potential investors.  Although Comer was the main point of contact for Gen3, Igherighe was the one primarily responsible for putting together the CIM.

14.    As a technical matter, Comer and Igherighe represented different entities, North Avenue and Redstone, and according to Comer's testimony Comer and Igherighe would occasionally do their own separate consulting jobs.  But Comer also testified that he and Igherighe worked on "deals" together and that they had worked on several such deals together prior to the Gen3 transaction. Comer also testified that he and Igherighe could each speak for the other's entities and that they had an agreement to split the proceeds from the transactions they worked on 50/50.  According to Comer, this was a verbal agreement that was never reduced to writing, and Comer and Igherighe never communicated the existence of their agreement to anyone else.

15.    Tabasso stated in his deposition that "everything" about the thesis conversations "was frustrating."  He explained that he and Cantos essentially put their business on hold to respond to Comer's requests and Comer never hit a

single one of his self-imposed deadlines.  To illustrate, in an April 13, 2017 email to Alex Varghese, an Associate at Sett & Lucas, Tabasso opined, "I understand that we can't exactly push here, but *we're killing ourselves to get our pieces done on time.*"  (DX 124) (emphasis added).  And in a May 1, 2017 email to Cantos, Tabasso stated, **"**This is seriously becoming a fucking joke.  Every week it's something else."  Cantos responded, "I agree.  At least we're starting to make money again if this fails."  (DX 125.)  Tabasso stated in his deposition that these experiences led to a "crisis of confidence" in Comer regarding his ability to meet deadlines and follow through on his promises.

16.     In spite of these apparent hiccups, Igherighe completed his version of the CIM for Gen3 on or around May 8, 2017 and presented it to Tabasso, Cantos, and representatives of Sett & Lucas over a phone call on that same date.  (DX 57.)   Redstone's logo appeared on the first page of the CIM, and the disclaimer on the next page indicated that it had been prepared based on information provided by management (Gen3) and the sponsor (North Avenue).  (DX 97.)  On the call, Comer and Igherighe brought up a number of new ideas that Comer had not previously mentioned when he met with Gen3 and Sett & Lucas earlier that year — without Igherighe.  For instance, Comer and Igherighe proposed standardizing pricing among different clients and transforming Gen3 into a third-party ratings service for advertisers.

17.     The call apparently got cut off when the allotted time for the meeting had expired.  Afterwards, Comer emailed Cantos and Tabasso stating,

> Hey Guys - Seems like we got cut off at the end of the call but as you should know by now, AJ is a "talker" although very thoughtful. Anyway, my hope is that we didn't scare the hell out of you but offered you an alternative vision on where we believe significant opportunity resides (even if its a little different that what you might have expected). But we bring in a group like AJ's to give us a great starting point and unique perspective but don't necessarily view it as where we will end up. It's usually a very iterative process and should not be viewed as a linear development. . . . (DX 59.)

Cantos then sent the following response,

> Hi Terry, thanks very much for your thoughtful note below, we appreciate it very much. The presentation didn't necessarily scare the heck out of us but nor was it something we were expecting to see so we were likely more pensive than usual. The presentation did leave us with a number of initial questions which we've authored and I believe Alex @ Sett will be sending your way. We look forward to speaking with you tomorrow to continue the conversation, Andy (*Id.*)

18.    In his deposition, Tabasso said that to say he and Cantos did not get along with Igherighe was an understatement.  He added that he and Cantos did not agree with the thesis and they thought it was a clear indication that Comer and Igherighe did not understand the space.  Cantos stated in his deposition that Igherighe's proposal was very different from what he and Tabasso had talked about with Comer.  He said that Igherighe was "an acquired taste" and that in his view "the train left the rails" once Igherighe was introduced to the process.  He added that around that time he was having trouble sleeping at night out of concern for the direction in which Comer and Igherighe would take the business.

19.    On June 14, 2017 — which was shortly before the LOI was set to expire on June 18 of that year — Comer emailed Tabasso and Cantos saying that

he still did not have funding but had a goal of securing it by June 23.  (DX 53.)
However, on June 23, the LOI had expired and Comer still did not have funding.
In an email exchange on that date Tabasso and Cantos discussed putting Comer
"in the rear view mirror" and focusing on growing the business instead.  (DX
128.)  In another email exchange dated June 29, 2017, Tabasso emailed Cantos
with the subject line "The last of Terry Tate," which was a reference to Comer.
(DX 30.)  In that email exchange, Tabasso and Cantos discussed Comer's failure
to secure funding.  Tabasso said he was "glad it worked out the way it did" and
Cantos agreed that it was "Definitely for the best" to move on.  (*Id.*)

20.    Tabasso explained in in his deposition that Gen3 stopped working
with North Avenue and Redstone once the LOI expired because at that point they
felt they had no obligation to North Avenue and did not want to be involved in
any further discussions about a transaction.  Although Tabasso and Cantos had
the option to unilaterally terminate the LOI on their own, they never chose to
exercise that option.  But Tabasso said in his deposition that they were counting
down the days until the expiration of the LOI.  Tabasso and Cantos apparently
never communicated these intentions to Comer; instead, they expected Sett &
Lucas to do so on their behalf.  The evidence is unclear whether Sett & Lucas ever
communicated Tabasso and Cantos's decision to Comer.

21.    Comer and Igherighe continued working to identify a source of
funding for Tabasso and Cantos, though the formal expiration date of their
agreement with Tabasso and Cantos had passed on June 18, 2017.  On June 29,

2017, one of the potential funders whom Igherighe had reached out to, Jeff Hagar of Chatham Capital, introduced Igherighe to Nick Christopher.  (PX 39.)  The next day, Igherighe sent Christopher a one-page teaser for the Redstone CIM and an NDA, much like Sett & Lucas had done the previous fall for the same deal. (DX 94.)   Christopher testified at trial that he perceived Redstone as an intermediary working with an unidentified independent sponsor, and his understanding was that the independent sponsor had an LOI with Gen3. Christopher asked Kremer to execute the NDA that morning, and she returned the signed NDA to Igherighe later that day on June 30th.  (DX 121.)

> 22.    The NDA began,

> In connection with the exploration of the possible acquisition (the "Transaction") of a company focused in the Affiliate Optimization/Online Sales industry as identified on Exhibit A attached hereto (the "Target"), by Redstone M&A Group, LLC doing business as RedStone, or its affiliate (the "Acquirer"), and the exploration of a possible partnership opportunity in connection with the Transaction (the "Partnership Opportunity") between Acquirer and _____ (the "Receiving Party"), the Receiving Party has requested an exchange of certain oral and written information concerning the Target for the purpose of evaluating the Transaction and the Partnership Opportunity. . . .  (DX 96.)

Section 1 of the agreement stated,

> The Evaluation Material and Trade Secrets will be used solely for the purpose of evaluating, negotiating, structuring, financing and/or consummating the Transaction with Acquirer, including the Partnership Opportunity (the "Purpose"), and unless and until the Acquirer and the Receiving Party agree to consummate the Partnership Opportunity pursuant to a Definitive Agreement (as defined herein), such information will be kept confidential by the Receiving Party and its Representatives, except that the Receiving Party may disclose the Evaluation Material and Trade Secrets, or

portions thereof, to Receiving Party's "Representatives" who reasonably need to know such information for the purpose of evaluating the Transaction and the Partnership Opportunity (it being understood that those Representatives will be informed of the confidential nature of the Evaluation Material and Trade Secrets and will agree to be bound by this Agreement and not to disclose the information to any other individual). . . . (*Id.*)

Section 2 of the agreement clarified,

The terms "Evaluation Material" and "Trade Secrets" do not include any information that (i) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of a disclosure by the Receiving Party or their respective Representatives in violation of this Agreement), (ii) at the time of disclosure or thereafter is available on a nonconfidential basis from a source other than the Acquirer, the Target or their Representatives, *provided that,* such source is not and was not bound by a confidentiality agreement to the Acquirer or its Representatives, or (iii) was known by the Receiving Party or its Representatives prior to receiving the information from, or on behalf of, the Acquirer or was independently acquired or developed by the Receiving Party or its Representatives prior to execution of this Agreement without use of the Evaluation Material or Trade Secrets under this Agreement. (*Id.*) (emphasis in original)

Section 5 of the agreement contained a non-circumvention provision stating,

For a period beginning on the date hereof and ending two (2) years from the date that the Receiving Party notifies the Acquirer of its decision not to participate in the Partnership Opportunity or the Transaction in any way (the "Restricted Period"), the Receiving Party agrees with the Acquirer that the Receiving Party will not directly or indirectly initiate conversations with or attempt to acquire the Target and the Receiving Party will not solicit another potential acquirer to provide financing in connection with the acquisition of Target[.] (*Id.*)

Section 6 added,

Until the expiration of the Restricted Period, except in the ordinary course of business unrelated to the Transaction, the Receiving Party agrees not to initiate or maintain contact with any officer, director, employee or agent of the Target regarding the Target's business, operations, prospects or finances, except with the express permission of the Acquirer[.] . . . (*Id.*)

23.     Unlike the Sett & Lucas CIM, the Redstone CIM identified the target company as Gen3 instead of using a pseudonym.  At the time, Christopher was apparently unaware that Project Genesis and Gen3 were the same company.  The Redstone CIM also said "sponsor has Target under LOI and has built an excellent relationship with management."  (DX 97.)   Igherighe did not disclose to Christopher that the LOI between Gen3 and North Avenue had in fact expired.

24.     After reviewing Redstone's CIM, Christopher agreed that it was an opportunity that he was interested in pursuing on behalf of LaSalle, and he had a phone call with Igherighe on or around June 30, 2017.  Then, on July 11, 2017 Christopher requested to speak with Comer and Gen3's management.  (PX 58.) Christopher spoke with Comer on July 12, 2017.

25.     Later that day, Comer emailed Tabasso and Cantos informing them that he had stayed the course on the Gen3 deal "albeit in the background" and that he had secured funding for the deal from LaSalle.  (PX 45.)  Comer also emailed Antony separately to inform him about LaSalle and emailed Christopher to let him know that he had reached out to Gen3 about setting up a meeting between Gen3 and LaSalle.  Antony forwarded Comer's email to Tabasso and said, "Let me talk to him and see if there is any merit in moving forward. First I

am going to tell him that it's too late and we've decided to move in another direction." (DX 130.) After receiving the emails from Comer and Antony, Tabasso said to Cantos, "I don't see any merit to moving fwd. you?" and Cantos responded, "Nope." (*Id.*)

26. The next morning Antony sent Comer the following email:

Hello Terry,

Unfortunately, we have moved in another direction and are good to go. But, I am more than happy to get on a call this morning (Thursday) to discuss our decision. Alex will help set up a time. Thanks.

Cheers, Prabhu Antony (PX 51.)

When asked about this exchange in his deposition, Antony stated that he did not remember if there was a specific buyer when he said they were moving in another direction. However, he indicated that Tabasso and Cantos had concerns about Comer's credibility and that they did not want to work with him. Antony also said that Sett & Lucas did not want to press Tabasso and Cantos to reconsider.

27. After Antony spoke with Comer, Tabasso emailed Cantos to inform him that Antony thought they should take the meeting with Comer and LaSalle because "La Salle is the real deal and they might change how we think about the future (with Terry)." (DX 131.) Tabasso added, "My inclination is to say no thanks and not waste any more time, but I could be convinced otherwise." (*Id.*) Cantos responded, "Terry is not the right partner and I'm not sure a call changes that." (*Id.*)

28.    While these conversations were ongoing, Comer was waiting to hear from Sett & Lucas about whether Tabasso and Cantos would be interested in moving forward with the deal, and Christopher was waiting to hear from Comer about whether he would be meeting with Gen3.  On July 16, 217, Comer emailed Antony stating, "Please let me know by end of day tomorrow where things stand as I need to circle back with LaSalle to confirm the meeting."  (PX 57.)  The next day, Alex Varghese from Sett & Lucas responded by saying, "Hi Terry, we will not be moving forward with this, thanks for bringing it to our attention." (*Id.*)

29.    After receiving this email, Comer emailed Christopher on the morning of July 18, 2017, stating, "Hey Nick - The Seller is in discussions with a large strategic at the moment. If things change, I'll circle back your way." (PX 58.)  Christopher responded at 11:45 a.m. that morning saying "Okay.  Thanks." (PX 59.)  Christopher later testified that at that point he had inferred that Comer did not actually have an LOI with Gen3.  Christopher also testified that he would not have met with Redstone and North Avenue if he had known that they did not have an LOI.

30.    That same morning, Antony wrote to Comer saying that there was "only one way this might work" but that Comer would have to call Tabasso directly.  (PX 62.)  Comer refused to call Tabasso and said that Tabasso would have to call him instead.  (*Id.*)  Comer later testified that this was simply a negotiation tactic but he never received a call from Tabasso.

31.    At 1:38 p.m. that afternoon, Christopher sent an email to Sean Brayden replying to their previous email thread with the subject "RE: Project Genesis - M&A Transaction." (PX 60.)  Christopher testified that he commonly responds to old email threads to make sure the emails do not get caught in a firewall.  In his email to Sean, Christopher said that he was going to be in New York that week and wanted to set up a meeting.  "Sean" responded by looping in Alex Varghese, who then set up a breakfast meeting between himself and Christopher in New York for the morning of July 20, 2017.  (PX 65, 66.)

32.    At the breakfast meeting, Christopher and Varghese discussed several different deals that LaSalle could potentially pursue.  At one point during the meeting, Varghese asked Christopher why LaSalle was looking at the Gen3 deal after previously passing on it.  Christopher initially did not understand what Varghese was talking about.  After a few minutes of back and forth, which Christopher described as a very confusing few minutes, Christopher realized that Gen3 and Project Genesis were the same company, and he agreed to take another look at the Gen3 deal.  (As previously noted, Christopher's point of contact about Project Genesis, "Sean," turned out to be a fictitious representative of Sett & Lucas, rather than an actual staff member.  Christopher testified he did not learn of this until his deposition in the instant case and indicated that this news was disturbing.)

33.    At trial, Christopher testified that he did not contact Comer or Igherighe to get their permission to pursue the deal because they had previously

misrepresented their relationship with Gen 3.  Christopher also testified that he thought he could pursue the Gen3 deal without them because he had previously seen the same deal through the Sett & Lucas CIM.  In his view, the fact that he had already seen the Sett & Lucas CIM when LaSalle signed the NDA meant that the "carve-out" in Section 2 of the NDA for previously disclosed information applied to the deal.  In other words, he thought the restricted period would have only been truly restricted if it had involved a deal that LaSalle had not already seen.

34.    On August 18, 2017 Christopher sent both the Redstone CIM and the Sett & Lucas CIM to Jon Shaw, a retired businessman who was on the board of directors of several of LaSalle's portfolio companies.  (DX 39.)  In that email, Christopher said, "Jon – please see attached on a new deal I'm looking at. There are two CIMs because I saw it twice. Once last fall from the investment banker, Sett & Lucas and once this summer from an unfunded sponsor who had it signed up (now expired)." (*Id.*)  He added, "I am sending both because I have a meeting with the management team on Tuesday August 29th in Philly. If you have an interest and can join for a day trip, that would be great." (*Id.*)

35.    On August 23, 2017 Christopher also emailed a copy of the Redstone CIM to Alan Levy, a former customer of LaSalle's who was knowledgeable about the affiliate marketing industry.  In the email to Levy, Christopher stated, "We are under NOA on this and you would be covered as a 'advisor' to LaSalle." (PX 78.)

36.     LaSalle met with Gen3's management in late August 2017.  The attendees in the meeting included Tabasso and Cantos, Christopher, David Murav from LaSalle, Jon Shaw and one of his colleagues, and representatives from Sett & Lucas.  In his deposition, Tabasso said that when Sett & Lucas contacted him saying LaSalle wanted to meet he and Cantos said that if Comer was attached to the proposed deal they did not want to take the meeting, and they only agreed to meet with LaSalle once they learned that Comer would not be involved.

37.     LaSalle entered an LOI with Gen3 on October 3, 2017.  (*See* PX 87.) Afterwards, LaSalle began what Christopher referred to as a "due diligence" period, which culminated in Christopher presenting the deal to LaSalle's investment committee for final approval.  Although Redstone was listed as the point of contact for the deal in one of LaSalle's internal "pipeline reports" of deals that LaSalle was considering as of August 21, 2017, (PX 75), the contact for the deal had been changed to Sett & Lucas by the time of LaSalle's December 11, 2017 pipeline report.  Christopher testified that the reason for the switch was that at some point that fall LaSalle realized that they could not use the Redstone CIM in connection with the deal.

38.     The deal was completed on December 20, 2017, a few weeks after LaSalle's LOI had expired in early December of that year.  LaSalle issued a press release announcing the deal on January 8, 2018.  (*See* DX 239.)  According to the testimony of LaSalle's corporate designee, Kelly Cornelis, the sale price was

approximately $23 million plus deferred compensation. (Tr. Vol. II, Doc. 191 at 10:2–5.)

39.     Christopher has since moved from LaSalle to Longshore Capital, an organization that he founded.  After Christopher departed LaSalle for Longshore, LaSalle sold Gen3 to Longshore in August 2020 for approximately $70 million. Christopher testified that Gen3 was a very different company when Longshore bought it because by that point Gen3 had built up its sales team, hired a CFO, and made acquisitions in Canada, Florida, and Pennsylvania.

40.     Gen3 continued to make new acquisitions after Longshore bought it, and eventually grew to the point that it had triple the number of employees and was generating four times the profits.  Longshore subsequently resold Gen3 to Comvest Partners for approximately $117 million.  The three sales are briefly summarized in the following chart:

| Year of Sale | Buyer | Approximate Purchase Price |
|---|---|---|
| 2017 | LaSalle | $23 million |
| 2020 | Longshore | $70 Million |
| 2021 | Comvest | $117 Million |

41.     Cornelis explained that when LaSalle originally purchased Gen3 in 2017, LaSalle invested $12 million of its own money and utilized debt for the remainder of the funding to reach the $23 million purchase price.  (*See* Tr. Vol. II at 27:14–21.)  In addition, LaSalle had only purchased 65% of the equity in the business as a consequence of the sale.  (*Id.* at 27:20–21.)  After Longshore

purchased Gen3 for $70 million, LaSalle had to pay $25 million to the debt holders from the 2017 transaction.  (*Id.* at 24:1–12.)  That left $45 million from the $70 million sale after the $25 million in debt had been paid off.  (*Id.* at 24:13–14.)  But because LaSalle only held 65% of the equity in Gen3, it received $30 million of the remaining $45 million.  (*Id.* at 24:18–20.)  In other words, LaSalle's initial $12 million investment in Gen3 (as a share of the $23 million purchase price) resulted in a $30 million share of the subsequent $70 million sale that occurred just three years later.  That $30 million share of the sale was, in effect, an $18 million profit on LaSalle's initial $12 million investment in Gen3. (*Id.* at 25:9–10.) ("Q.  So you invested 12.  30 came back.  So you net the 18?  A. Correct.").  Thus, in the period from LaSalle's purchase of Gen3 in December 2017 to its sale of the business to Longshore in August 2020 the Gen3 deal generated $18 million in profit for LaSalle on a $12 million investment.[5]

## III.   Discussion of Evidence and Relevant Law

The NDA between Redstone and LaSalle contains a choice-of-law provision stating that Delaware law applies to the construction of the agreement.  (*See* DX 96) ("This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its conflict of laws principles or rules.").  Delaware law therefore applies to Redstone's breach of contract claim against LaSalle for its breach of the NDA.  As previously noted, the

---

[5] LaSalle did not take part in Longshore's subsequent resale of Gen3 to Comvest in 2021, so it did not receive a share of the $117 million in proceeds from that later transaction.  However, Christopher, who had founded and moved to Longshore in 2020, did partake in the proceeds of that subsequent sale.

Court already granted summary judgment to Redstone on its breach of contract claim, so the issue currently before the Court is how to determine the appropriate measure of Redstone's damages.

In Delaware, damages that flow from a breach of contract should be assessed based on the reasonable expectations of the parties *ex ante. Henkel Corp. v. Innovative Brands Holdings, LLC*, No. CIV.A. 3663-VCN, 2013 WL 396245, at *4 (Del. Ch. Jan. 31, 2013); *Cobalt Operating, LLC v. James Crystal Enters., LLC*, No. CIV.A. 714-VCS, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007), *judgment entered*, (Del. Ch. 2007), *and aff'd*, 945 A.2d 594 (Del. 2008) ("In Delaware, the traditional method of computing damages for a breach of contract claim is to determine the reasonable expectations of the parties.") (citing *Duncan v. Theratx,* 775 A.2d 1019, 1022 (Del. 2001)).  A non-breaching party's expectation damages are calculated based on "the amount of money that would put the non-breaching party in the same position that the party would have been in had the breach never occurred." *Cobalt Operating*, 2007 WL 2142926, at *29. When a contract is silent as to the remedy for a breach — as is the case here — any form of legal or equitable relief is available, and the Court is not limited to awarding contract damages for breach of the agreement.  *Id.* (citing *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 107 (Del. Ch. 2006)); *see also Universal Studios, Inc. v. Viacom, Inc.,* 705 A.2d 579, 583 (Del. Ch. 1997) (stating that "when the parties' agreements have been breached but neither the

innocent party nor the venture suffers immediate quantifiable harm, the [Court of Chancery has] broad discretion in fashioning appropriate relief").

In an effort to quantify its damages, Redstone presented expert testimony from Mr. Joseph Lesovitz, a forensic accountant who specializes in quantification of economic damages.  In response, LaSalle presented rebuttal testimony from their own expert, Mr. Mark Hosfield, a consultant who is both a Certified Public Accountant and Certified Management Accountant.  Before trial, both parties filed motions *in limine* seeking to exclude portions of the opposing party's expert testimony.  The Court denied each of these motions, but the parties reasserted their objections at trial.

In addition to the quantification of Redstone's damages, the parties have raised a number of other issues bearing on Redstone's quantum of recovery, including whether Redstone is entitled to pre-judgment interest for the breach, whether Redstone is entitled to attorney's fees, and if so, how those fees should be calculated, and whether the recovery should be reduced based on the doctrine of unclean hands.  The Court's additional related findings of fact and conclusions of law with respect to each of these issues are addressed below.

### A.    Quantification of Redstone's Damages

During his testimony, Lesovitz identified three different models for assessing Plaintiff's damages:  (1) the deal structure model; (2) the CIM valuation model; and (3) the LaSalle Capital profits model.  Of these three models, Lesovitz said it was his opinion that the deal structure model was the most appropriate

model for assessing Redstone's damages, and that the damages reflected in that model would ultimately put Redstone in the position it would have been in absent the breach.

According to Lesovitz's testimony, the deal structure model is based on what he estimates Redstone potentially would have received if it had been included in the deal for the purchase of Gen3.  He estimated that under this model Redstone should receive between $11.5 and $14.5 million in damages.  Of course, this model assumes that Redstone would have actually been a part of a deal involving LaSalle and Gen3, an issue that the parties disputed both at summary judgment and at trial.  As the Court acknowledged in its summary judgment order, if in fact there was "no chance that Gen3 would have gone forward with an acquisition involving Plaintiffs" it would mean that, contrary to Lesovitz's assertion, "Plaintiffs' damages are not simply equal to the amount they expected to gain by participating in the acquisition of Gen3."  (MSJ Order, Doc. 103 at 29.)  The weight of the evidence suggests that this was in fact the case.

As LaSalle points out, Tabasso and Cantos stated in no uncertain terms that they would not have done a deal with Comer and Igherighe even if the latter two men had come up with the capital to buy the company.  By way of example, at one point during his deposition Tabasso stated,

> Andy and I had such a crisis of confidence, we had decided that these folks were not who they had presented themselves to be. Certainly Mr. Comer had presented himself to be a professional and sharp and put-together guy. And he was neither professional, nor sharp, nor put together. And AJ was just a fool. And the idea of spending the

> next five years with those two guys was so distasteful that I said to
> Andy at one point around this time, I don't care if he backs a Brinks
> truck up to my house and dumps the money on the front porch, I
> don't want to work with him.

(Dep. of Michael J. Tabasso, Doc. 75-4 at 144:23–145:14.)  Cantos went as far as

to say at his deposition that he was willing to walk away from $25 million to not

work with Comer and Igherighe:

> Trust me, trust me, I will say factually and faithfully and honestly I
> did not want to sell my business to them. I was willing to walk away
> from $25 million, there about, for the right not to work with this
> individual.

(Dep. of Andrew H. Cantos, Doc. 75-3 at 32:6–11.)  Their testimony could not

have been any clearer.

In the face of this testimony, Redstone argues that Comer and Igherighe

could have potentially changed Tabasso and Cantos's minds about working with

them once Comer obtained funding from LaSalle.  Redstone places particular

emphasis on Prabu Antony's testimony that the reason why the deal between

Gen3 and North Avenue failed was Comer's inability to obtain capital, and

Tabasso's email to Cantos in which he said he was not inclined to take the

meeting to discuss a deal with Comer and LaSalle but that he could be convinced

otherwise.

As the Court noted in its summary judgment order, Antony was speaking

as a representative of Sett & Lucas, not Gen3.  And as Antony admitted in his

testimony, even though Sett & Lucas did not care who bought the company, the

identity of the buyer still could have been an important factor to Tabasso and

Cantos.  As Tabasso put it, the buyer had to be "the right fit" for them because he and Cantos were planning to stay with the company after selling it, and they had to have a good working relationship with the buyer.   These interpersonal considerations were irrelevant to Sett & Lucas because once the deal closed Sett & Lucas's role in the transaction would have ended, as would its relationship with the buyer.   But Tabasso and Cantos's relationship with the buyer would have continued for years to come.[6]

On top of that, Antony's testimony was at best conflicting.  Although he represented that the primary concern about Comer was his inability to obtain capital, he also suggested that Tabasso and Cantos may have had concerns about working with Comer and Igherighe even if they had secured the funding.  He also corroborated Tabasso and Cantos's testimony that they had decided to move on from Comer's proposed deal around the time the LOI with North Avenue expired in June 2017.  And during his deposition when Redstone's counsel asked Antony if deals often happen after the LOI expires, he responded that when they do the seller generally extends the LOI, though that formal LOI extension was not arranged when LaSalle purchased Gen3.  Still, in the context of the testimony here, the fact that Tabasso and Cantos did not extend the LOI with North Avenue supports LaSalle's theory that Tabasso and Cantos had made up their minds not to do a deal with North Avenue.

---

[6] Sett & Lucas also had an incentive to try to make a deal happen because that was the only way it would receive its success fee, whereas Tabasso and Cantos may have been inclined to walk away from the deal based on interpersonal considerations as well as other unrelated personal stress concerns referenced in their testimony.

As for the email in which Tabasso said to Cantos that he could be convinced otherwise, by the conclusion of that email exchange Tabasso and Cantos had both agreed that Comer was not the right partner and that they would not move forward with the deal regardless of whether Comer had obtained funding from LaSalle.  Thus, it does not appear that Redstone would have actually been able to convince them otherwise absent compelling circumstances.

Based on the record, the Court finds that Gen3 would not have done a deal with Redstone even if LaSalle had not breached the NDA.  As a consequence, Redstone could not have reasonably expected to be a part of any deal for the sale of Gen3, and it could not have reasonably expected to receive a share of the profits from that deal as a component of its damages.

In an effort to support a contrary conclusion, Redstone cites *Cura Financial Services. N.V. v. Electronic Payment Exchange, Inc.*, No. CIV.A. 18278, 2001 WL 1334188 (Del. Ch. Oct. 22, 2001), another case involving a breach of a non-circumvention clause.  As Redstone points out, in *Cura* the court found that the non-breaching party there was entitled to a share of the profits from the deal at issue in that case as a component of his damages.  But the evidence in *Cura* did not  suggest that the seller in that case would have refused to do a deal with the plaintiff there, as is the case here.  Therefore, unlike the court in *Cura*, this Court cannot assume that Plaintiff here would have been part of the deal but for the Defendants' breach, nor can the Court conclude that Plaintiff's potential share of the profits would properly fall within the scope of its

expectation damages.   The deal structure damages model is therefore inappropriate under the circumstances.

Lesovitz also presented the LaSalle Capital profits model as an alternative to the deal structure model.  As Lesovitz explained at trial, the LaSalle Capital profits model is essentially a disgorgement model under which LaSalle would be required to surrender its own profits from the Gen3 deal as a measure of Redstone's damages.  Lesovitz estimated that Redstone's damages under this model would come out to $6.8 million.  But as LaSalle points out, while disgorgement is available as a remedy under Delaware law for claims involving a breach of fiduciary duty, such as when an employee breaches the duty of loyalty to an employer, it is not available as a remedy for breach of contract claims like the claim at issue here.  *Compare In re Mobilactive Media, LLC*, No. 5725-VCP, 2013 WL 297950, at *23 (Del. Ch. Jan. 25, 2013) ("In cases where the defendant breaches the duty of loyalty, the infringing party must disgorge all profits and equity from the usurpation."), *with Meyer Ventures, Inc. v. Barnak*, Civ. A. No. 11502, 1990 WL 172648, at *5 (Del. Ch. Nov. 2, 1990) ("I conclude that it is this breach of contract measure of damages and not a disgorgement measure which might apply to a disloyal fiduciary, that has application here.").  Though Redstone attempts to analogize this case to situations involving disclosure of trade secrets, in which disgorgement could potentially be an appropriate remedy, the Court does not find that analogy particularly apt.  The components of the CIM that LaSalle actually utilized in reaching the conclusion to pursue the Gen3 deal –

primarily the manner in which the ideas were presented rather than the ideas in the CIM itself – could hardly be described as trade secrets.[7]  Further, Redstone cites no caselaw standing for the proposition that disgorgement should apply to a case involving a breach of a non-circumvention clause.  As such, the LaSalle Capital profits model is not an appropriate remedy.

That leaves the CIM valuation model, which is the model Lesovitz used to ascertain the value of the CIM.[8]  As Mr. Lesovitz explained at trial, the value of the CIM is the value of the opportunity to pursue the deal.[9]  Practically speaking, Redstone held a veto power over LaSalle's opportunity to pursue the deal because without Redstone's approval, LaSalle would not have been able to acquire Gen3 in the first place.  Consistent with that premise, the parties' experts agree that the value of the CIM would effectively be the amount LaSalle would have to pay Redstone in order for Redstone to agree not to exercise its veto power over the deal, and that a hypothetical negotiation between the parties to determine the amount of that payment would be an appropriate means of identifying that value.

---

[7] To the extent there were any trade secrets involved in the Gen3 transaction more broadly, they would have been Gen3's trade secrets rather than Redstone's.

[8] Fittingly, Lesovitz described the CIM valuation model as the model he included in response to the Court's summary judgment order.  In that order, the Court indicated that Redstone's damages could be ascertained by "looking at the market value of the Plaintiffs' intellectual property, the extent to which LaSalle relied on Plaintiffs' information in their decision-making, or the portion of LaSalle's profits from the acquisition which may be attributable to Plaintiffs' influence." (MSJ Order at 29.)

[9] As discussed earlier, LaSalle likely would not have proceeded with the purchase of Gen3 if Nick Christopher had not been provided and had not reviewed the Redstone CIM.  Christopher had evinced no interest in Gen3 when originally presented with Sett & Lucas's CIM regarding the company.  That said, it still does not appear that the additional profits Gen3 generated post acquisition were attributable to any of the specific ideas in the CIM as opposed to the manner in which Redstone illuminated the major opportunities for growth and the investment value in the acquisition deal.

Other courts have applied this method of determining damages in the patent law context, most notably using the damages model set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), where there court found that damages could be assessed based on

> [t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Id.* at 1120; *see, e.g.*, *Putnam v. Henkel Consumer Adhesives, Inc.*, No. 1:05-cv-2011, 2007 WL 4794115, at *1 (N.D. Ga. Oct. 29, 2007) (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001), and *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). Although this case involves a breach of a NDA rather than an act of patent infringement, the Court finds the hypothetical negotiation framework to be equally applicable in this context.

Lesovitz estimated that in this hypothetical negotiation LaSalle would have been willing to pay — and Redstone would have been willing to accept — between $3.2 and $5.5 million for the right to pursue the Gen3 deal without Redstone. Lesovitz explained that LaSalle typically receives a 15 percent internal return on investment on its deals, but that the projected and actual return on investment for LaSalle was "well over that" in the case of the Gen3 deal. (*See* Tr. Vol. II at

83:10–18.)  LaSalle's projected return on the Gen3 deal was $3.2 million more than what LaSalle would have received in the typical deal, and its actual return was $5.5 million more.  Thus, according to Lesovitz, the Gen3 deal was either $3.2 or $5.5 million more valuable to LaSalle than the typical deal, depending on whether actual or projected performance were to apply.  (*See id.* at 75:21–24.) With that background in mind, Lesovitz assumed that Redstone would not have been willing to accept any less than $3.2 million to forgo the opportunity to participate in the Gen3 deal and receive a share of a profits.  (*Id.* at 76:13–20.) And he also assumed that LaSalle would have been willing to pay as much as $5.5 million for the option to acquire Gen3 because the incremental value of the Gen3 deal was $5.5 million greater than LaSalle's average deal.  (*Id.* at 75:7–20.)

According to Lesovitz's theory, if LaSalle were forced to pay Redstone more than $5.5 million for the opportunity to pursue the Gen3 deal, the incremental value of the Gen3 deal would no longer be greater than that of the typical deal, and it would have made more sense for LaSalle to pursue another deal instead. But if Redstone asked for anything less than that, LaSalle would have been willing to pay it and pursue the Gen3 deal instead of another deal because, even after subtracting the money it would have had to pay to Redstone, the incremental value of the Gen3 deal would still have been greater than that of LaSalle's typical deal.

Defendants' rebuttal expert, Mr. Hosfield, testified that Redstone's damages should only come out to at most $303,402 in a hypothetical negotiation.

31

He based that figure on his determination of the market value of the consulting services Redstone performed in connection with creating the CIM.  To reach that figure, Hosfield explained that Sett & Lucas was paid $925,000 for its consulting services over the course of the 548 days that it worked on the Gen3 deal between June 21, 2016 and December 20, 2017.  So, using Sett & Lucas's compensation as a baseline, and considering that Redstone did not work on the transaction for nearly as long as Sett & Lucas, Hosfield estimated that the market value of Redstone's services was $303,402.  (Tr. Vol. III, Doc. 192 at 159:8–25.)  He also noted that Redstone listed a $150,000 consulting fee in the financial model included in the CIM.[10]   (*Id.* at 166:20–21.)   Based on these considerations, Hosfield stated that in his opinion in exchange for a decision by Redstone not to exercise its veto power over Lasalle's acquisition of Gen3 LaSalle likely would have been willing to pay, and Redstone would have been willing to accept, an amount in between the $150,000 consulting fee listed in the financial model and the $303,402 market value of the services.  (*Id.* at 166:24–167:15.)

To summarize, Lesovitz estimated that the measure of Redstone's damages under the CIM valuation model should be between $3.2 and $5.5 million, whereas Hosfield estimated that it should be somewhere in the significantly lower range of $150,000 to $303,402.

---

[10] The $150,000 consulting fee appeared on page 14 of the CIM, along with a $650,000 "Sponsor Fee."  (*See* DX 97 at 14.)  LaSalle contends that under the proposed transaction Redstone would have received the $150,000 consulting fee and North Avenue would have received the sponsor fee; however, Redstone contends that it would have  also received a share of the $650,000 sponsor fee.

Naturally, both parties reject a number of the assumptions relied upon by the opposing party's expert. Specifically, Defendants argue that Lesovitz erred because he falsely assumed (1) that Redstone would have been part of the Gen3 deal; and (2) that the deal would have been successful. In contrast, Redstone argues that Hosfield erred because he assumed both that Redstone would have been limited to a consulting fee and that all deals are equally valuable, when in fact the Gen3 deal was $5.5 million more valuable than the average LaSalle deal.

As an initial matter, the Court has already determined that Redstone would not have been part of the Gen3 deal, and the Court agrees with LaSalle that Lesovitz erred my making that assumption. But Hosfield's methodology also has it flaws. At the most basic level, even if the Court were to assume that Hosfield's calculations as to the market value of Redstone's services are correct, a matter that the Court does not reach, the Court does not consider the market value of Redstone's services to be an appropriate metric for its damages in these particular circumstances. The question is not how much LaSalle would have been willing to pay Redstone to prepare a CIM; it is how much LaSalle would have been willing to pay Redstone in a hypothetical negotiation in exchange for the right to pursue the deal and to be released from the NDA.

Admittedly, there is some intuitive merit to LaSalle's argument that Lesovitz erred by assuming that the Gen3 deal would have been a successful one. And the Court takes LaSalle's point that, simply as a matter of common sense, LaSalle would not have been willing to pay several millions of dollars to Redstone

up front for the opportunity to pursue an investment of uncertain prospects absent circumstances that pointed to the reliability of the projected profits. But as Redstone's attorneys asserted at oral argument, the legal doctrine of the Book of Wisdom requires the parties to assess damages with the benefit of a lens into the future. *See, e.g.*, *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 466 (D. Del. 2005); *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1133 & n.142 (Del. 2015).

For background, the Book of Wisdom doctrine originates from Justice Cardozo's opinion in the case *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933). The central dispute in *Sinclair Refining Co.* was over ownership of a patent, and the principal issues were (1) whether "in ascertaining the value of the patent at the time of the breach, the triers of the facts would be at liberty to consider the commercial use that had been made of the patented device," *id.* at 692, and (2) whether "[t]he use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach," *id.* at 697. In determining that this post-breach evidence could be considered to determine the value of the patent, Justice Cardozo explained:

> [A] different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

*Id.* at 698. He added,

> To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense. It is to bring out and expose of light the elements of value that were there from the beginning.

*Id.*

Applying these principles to the case at hand, the "uncertain prophecy" in this case is whether the Gen3 deal would be successful. And as Redstone argues, under the Book of Wisdom doctrine, rather than treating the negotiation as one in which LaSalle could not know whether the deal would be successful, the Court must treat the fact that the Gen3 deal generated $18 million in profits for LaSalle as "value that was there from the beginning" that would have to be considered in the context of the hypothetical negotiation.

More recent authority is in accord with this approach. As the Federal Circuit later clarified in reference to hypothetical negotiations such as this one,

> The methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events  and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.

*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004). In the instant case, the "fantasy" component requires the Court to assume that LaSalle would have willingly negotiated instead of breaching the contract, and the "flexibility"

component allows the Court to consider post-breach evidence, including the actual profits that LaSalle received from the deal. This flexible approach to hypothetical negotiations under the Book of Wisdom doctrine is well recognized by Delaware courts. *See Honeywell*, 378 F. Supp. 2d at 466 ("Given this flexibility, the court would clearly be acting within its discretionary limitations by permitting Honeywell to calculate damages using the 2004–05 sales projections as a royalty base."); *see also Siga Techs.*, 132 A.3d at 1133 & n.142 (finding that "post-breach evidence could be used in order to aid in [the court's] determination of the proper expectations as of the date of the breach") (internal quotation marks omitted) (citing *Sinclair Refining Co.*, 289 U.S. at 697–98). Applying the Book of Wisdom doctrine in this case is also consistent with the principle that uncertainties about the amount of damages should be construed against the breaching party. *Cura*, 2001 WL 13341881, at *20. Simply put, LaSalle should not be permitted to benefit from the uncertain world that it created by breaching the NDA. The fact that the deal generated $18 million in profits should therefore be considered as a relevant factor for purposes of the hypothetical negotiation.

LaSalle does not dispute any of the caselaw Redstone cites pertaining to the Book of Wisdom doctrine. Instead, in its post-trial brief LaSalle simply argues that evidence of its actual profits are irrelevant to Redstone's expectation damages because all Redstone ever could have expected to receive from the Gen3

deal was a consulting fee.[11]  But the consulting fee measure does not refer to or encompass damages that Redstone incurred in connection with LaSalle's breach of the 2-year non-circumvention provision in its contract with Redstone.  And what LaSalle ignores is that according to Lesovitz's testimony, which was unrebutted at trial, the incremental value of the Gen3 deal was approximately $5.5 million more than LaSalle's average deal.  In light of that reality, it is difficult for the Court to conclude that LaSalle would have only paid Redstone between $150,000 and $303,402 in a hypothetical negotiation for a deal that was worth $5.5 million more than their average deal.

At the same time, Lesovitz erred by assuming that Redstone would have been unwilling to accept anything less than $3.2 million, given Redstone's objectively weaker economic sway in the bargaining circumstances presented.  As Redstone would not have been part of any deal for the acquisition of Gen3, the only way it could have obtained compensation from the deal would be by accepting an agreed-upon payment from LaSalle that would release LaSalle from any breach of contract and confidentiality NDA claims Redstone could pursue.  If either side walked away from the negotiation, Redstone would not have received $3.2 to $5.5 million in profits from the deal — it would have been empty handed except for its capacity to seek breach of contract damages, as in fact occurred

---

[11] The parties spent a significant portion of the trial arguing over what proportion of the damages should be attributed to Redstone as opposed to North Avenue.  While this issue would potentially be relevant to the deal structure damages model because Redstone could only reasonably expect to obtain its own share of the profits in a transaction involving Gen3, this issue is not relevant to the CIM valuation model.  Unlike the deal structure model, the CIM valuation model depends on what amount of money LaSalle would have had to pay Redstone in exchange for a decision not to exercise its veto power over the deal.

here.  Similarly, if LaSalle walked away, it would have lost the option of being able to proceed with the financially promising deal with Gen3 without breaching its non-circumvention agreement with Redstone.  Alternatively, if LaSalle proceeded with this promising acquisition notwithstanding its obligations to Redstone, it would (as occurred) bear the potential legal and financial liability associated with it alleged breach of a binding term of its contract with Redstone.  None of these were inherently promising options.

That being said, Redstone would have had at least some leverage over the negotiation, and LaSalle would have had an incentive to come to the bargaining table and negotiate with Redstone in good faith, because LaSalle could not acquire Gen3 without Redstone's consent and NDA contractual release.  As Lesovitz noted at trial, LaSalle could not have simply waited for the two-year non-circumvention period in the NDA to expire because by that point the opportunity to acquire Gen3 likely would have been gone.

But even though it would have had a financial incentive to negotiate in good faith, LaSalle still would have had substantially more leverage over the hypothetical negotiation than Redstone because if the negotiation broke down LaSalle could have just looked for another deal or as it did, take its legal and associated financial chances and proceed with the deal in contravention of the terms of the NDA.  While LaSalle was arguably in the position to take such a risk, the same cannot be said of Redstone.  By the time of the hypothetical negotiation, Igherighe would have already spent several months trying to make this deal

happen — time that he and his company could never get back if the deal fell through.  For that reason, Redstone would have had significantly more to lose than LaSalle if the negotiations broke down without the two sides agreeing on a price.  Between the two sides, Redstone was the party that needed an agreement to happen the most, and LaSalle could still more easily walk away or tough out the risks entailed in proceeding — which would have given LaSalle significantly more leverage over the negotiation.  *Cf. Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109-CS, 2013 WL 6327997, at *19–*20 (Del. Ch. Dec. 4, 2013) ("BGP had the most leverage. . . . BGP also had the least to lose from walking away from the transaction. . . . The other two parties, Fletcher and ION, had much less leverage than either BGP or the Existing Lenders. Both of them needed the BGP Transaction to close, because without it they were both likely facing bankruptcy.").

If Redstone had started off the negotiation by refusing to accept anything less than $3.2 million, as Lesovitz suggested, it would have risked causing a breakdown in the negotiations, causing LaSalle to walk away from the negotiation and leaving Redstone with nothing to show for all of its efforts.  Common sense suggests that Redstone would have been more conservative with its offer.

As is true in virtually any negotiation, the parties could have agreed to any number of prices between Hosfield's projected range of $150,000 to $303,402 (representing the consulting fee included in the CIM and Hosfield's estimate of the market value of Redstone's work, reduced by the months of work on this

project (compared to that performed by S&L)), and Lesovitz's range of $3.2 to $5.5 million (representing the projected and actual incremental value of the Gen3 deal over the typical LaSalle deal). But the Court still must determine a reasonable price that the parties could have agreed to within that range. *Cf. Fromson*, 853 F.2d at 1576 ("Though it is probably safe to say that almost any licensee would be willing to pay less than one cent on each dollar of profit, or one-twelfth of a 10% profit, the question at hand is whether the royalty here is reasonable."). Based on the considerations described above, the Court concludes that $1.5 million would be a reasonable price for the parties to have agreed upon in a hypothetical negotiation, and that this is the appropriate measure of Redstone's damages arising from LaSalle's breach of the NDA, exclusive of attorneys' fees (separately discussed later). The Court considers as well that LaSalle was purchasing an ongoing productive business that clearly had investment value if tweaked and expanded and that by the time of LaSalle's planned execution of the purchase, it would not likely have wanted to walk away from such a deal. The Court notes in turn, that if LaSalle had exercised proper caution in connection with the provisions of the NDA, at the time of execution of the purchase it would also have sought to limit its legal risks and liabilities associated with the NDA rather than just plowing ahead without full legal consultation and advice.

### B.    Pre-judgment Interest

Having determined that $1.5 million is the appropriate value of Redstone's damages, the next question is whether Redstone is entitled to prejudgment interest from the date of the breach.  Redstone relies on O.C.G.A. § 13-6-13,[12] which states,

> In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery.

When determining whether to grant pre-judgment interest under Georgia law, "[t]he award of pre-judgment interest arising out of a breach of contract is within the discretion of the factfinder."  *Whitesell Corp. v. Electrolux Home Prods., Inc.*, CV 103-050, 2016 WL 11248975, at *2 (N.D. Ga. May 17, 2016); *see* John K. Larkins, Jr. & Hon. John K. Larkins III, Georgia Contracts: Law and Litigation § 12:37 (2d ed.) ("Where the damages are unliquidated, the finder of fact may award legal interest, but is not required to do so.").

LaSalle argues that Redstone should not be entitled to pre-judgment interest because pre-judgment interest is only available when the damages are ascertainable at the time of the breach.  And in this case a determination of Redstone's damages required the Court to consider post-breach evidence, such as LaSalle's future profits from the Gen3 deal.  Of course, one could argue, as

---

[12] Although Delaware law applies to Redstone's substantive claim for breach of contract, under Georgia's choice-of-law rules "law of the forum controls questions of remedies, including pre-judgment interest."  *Kahn v. Visador Holding Corp.*, No. 2:07-cv-73, 2010 WL 11506861, at *3 (N.D. Ga. Jan. 13, 2010); *see Menendez v. Perishable Distribs., Inc.*, 329 S.E.2d 149, 151 (Ga. 1985).

Redstone does, that Redstone's damages are still ascertainable as of the time of the breach even though the Court had to go through a hypothetical negotiation exercise to reach that number.    Redstone relies on *Caradigm USA LLC v. PruittHealth, Inc.*, No. 1:15-cv-2504, 2018 WL 1959498, at *5 (N.D. Ga. Apr. 25, 2018), where the court noted that "[j]ust because the factfinder must decide how much the damages are does not necessarily imply that the damages as of the time of breach are not ascertainable." *Id.* at *5.  While that may be so, determining the amount of Redstone's damages in this case required a more complex analysis than it typically does in cases in which Georgia courts have awarded pre-judgment interest in the past.  In this case the Court was required to determine the amount of payment that Redstone and LaSalle would have agreed to in a hypothetical negotiation in exchange for a decision by Redstone to decline to exercise its veto power over LaSalle's acquisition of Gen3.  That specific exercise is not as straightforward as, for example, determining the market value of a home prior to foreclosure, *see Tower Fin. Servs. v. Smith*, 423 S.E.2d 257, 263–64 (Ga. Ct. App. 1992), or the pre-breach value of damaged rugs, *see Carpet Transp., Inc. v. Kenneth Poley Interiors, Inc.*, 466 S.E.2d 70, 74 (Ga. Ct. App. 1995).

In addition, as previously discussed, determining the appropriate value of the Redstone CIM through a hypothetical negotiation required the Court to consider post-breach evidence; namely, the amount that LaSalle ultimately profited from the Gen3 deal.  Though the Court could properly consider this post-breach evidence for purposes of determining the underlying damages award, it is

questionable whether the Court could also consider that post-breach evidence for purposes of awarding pre-judgment interest. After all, LaSalle's future profits would not have been ascertainable to the parties as of the time LaSalle breached the NDA.

Absent binding authority that would support an award of pre-judgment interest in these circumstances, the Court will decline to award pre-judgment interest to Redstone on its $1.5 million in damages.

## C.    Bad Faith

The next question is whether Redstone should be entitled to recover attorney's fees based on O.C.G.A. § 13-6-11. Under that statute,

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

Redstone argues that it is entitled to recover attorney's fees both on the theory that LaSalle breached the NDA in bad faith and on the theory that LaSalle engaged in stubborn litigiousness.

The Court begins with the question of bad faith. To start, the sequence of events after Christopher learned that the deal between North Avenue and Gen3 had fallen through at the very least entails a serious spell of bad judgment on LaSalle's part or alternatively, bad faith. As Redstone points out, just a matter of hours after Comer informed him that the Gen3 deal had fallen through, Christopher emailed "Sean Brayden" from Sett & Lucas to set up a meeting with

Alex Varghese in New York, which ultimately set in motion LaSalle's acquisition of Gen3.  And when Christopher reached out to "Sean," he replied to the very same email thread in which the two had previously discussed the Gen3 deal, albeit under the pseudonym Project Genesis.  In Redstone's view, this is strong circumstantial evidence that Christopher sought to swoop in at the earliest opportunity and acquire Gen3 behind Comer and Igherighe's backs in violation of the NDA, which Redstone argues would be a willful violation of the agreement.

At trial, Christopher claimed not to know that Project Genesis and Gen3 were in fact the same company, a position that may seem questionable in hindsight.  However, the Court notes that Christopher was not included on the email to Kremer (LaSalle's office manager) in which "Sean" revealed the real name of the business, and it is unclear from the record whether anyone ever actually told Christopher the business's real name.[13]  Moreover, the record suggests that the Sett & Lucas and Redstone CIMs were sufficiently different that one could look at them and reasonably conclude that they were describing two completely different businesses.  And when Christopher emailed Sean to set up a meeting, he did not mention that he was seeking to pursue any specific deals. Aside from the subject line of the email thread, nothing about Christopher's email suggests that the purpose of the meeting was to discuss acquiring Gen3.  In fact, when asked by Redstone's counsel whether Christopher set up the meeting with

---

[13] Notably, Christopher continued to refer to the business as "Project Genesis" in his subsequent email to Sean.  On the other hand, both CIMs referred to Tabasso and Cantos by name, albeit under the title "Co-Founder" in the Redstone CIM and under the title "Principal" in the Sett & Lucas CIM.  *Compare* (DX 97 at 6), *with* (DX 139 at 32).

Varghese specifically to talk about the Gen3 deal Antony was adamant that it was not.  According to Antony, the purpose of the meeting was to talk about available deals in general, and it was actually Varghese, not Christopher, who brought up the possibility of LaSalle pursuing Gen3.

Though it is certainly plausible that, as Redstone suggests, Christopher sought to jump on the Gen3 deal once he learned that North Avenue and Redstone had lost out on the opportunity, it is at least as plausible that Christopher never had this intent.  After all, Comer had just communicated to Christopher that Gen3 was in conversations with a large strategic, meaning that someone else had apparently secured the deal.  Contrary to Redstone's suggestion, it seems unlikely that Christopher would have emailed Sean for the purpose of swooping in on a deal that he had just been told another entity had all but secured.

But even if the Court were to reject Redstone's narrative and accept LaSalle's alternative explanation, including that Christopher failed to make the connection between Gen3 and Project Genesis, the Court finds it more difficult to accept Christopher's rationale for continuing to pursue the deal *after* he had clearly made that connection at his breakfast meeting with Varghese on July 20, 2017.  Christopher may not have been inclined to take Comer and Igherighe seriously after they had misrepresented their relationship with Gen3 and, ostensibly, the fact that Gen3 was in the process of being acquired by somebody else; however, that did not change the fact that he had a binding agreement with

Redstone, which included a two-year non-circumvention clause.  Christopher even admitted to Jon Levy (a former customer of LaSalle's) that LaSalle was "under NDA" on the deal, and he stated at trial that at some point in the fall of 2017 LaSalle realized that they could not use the ideas from the Redstone CIM.  Even though he plainly recognized that LaSalle had a binding NDA with Redstone that limited LaSalle's ability to acquire Gen3 on its own, Christopher decided to pursue the deal anyway — without including Redstone or contacting Redstone to negotiate the terms of a full release from the CIM and NDA.

Christopher claimed that in making that decision he was relying on the "carve-out" in the NDA for information that was already public.  While this argument may have excused LaSalle's use of some of the ideas Redstone included in the CIM that were also referenced in the Sett & Lucas CIM, or any ideas that were mentioned in the non-confidential teaser, it would not excuse LaSalle's decision not to include Redstone in the deal.  Indeed, Comer and Igherighe testified that the whole purpose of having an NDA was so that a potential capital partner could not go around them and acquire Gen3 on their own after seeing the Redstone CIM, which was a situation they had experienced in the past.  In other words, the purpose of the NDA was to prevent exactly what happened here, and that was why the agreement included a two-year non-circumvention provision in the first place.

Christopher admitted at trial that he made no effort to comply with this provision in the agreement — in fact, he never even read it.  This became clear

during the following exchange Christopher had with Redstone's counsel during

cross-examination:

> **Q.** Do you know when you first read this provision of the
> contract?
> **A.** Probably after we got served with a lawsuit.
> **Q.** So you never read that before?
> **A.** Not to my knowledge. And that would have been governed by
> the carve-out in our view that we -- you are only restricted if
> it is not something that you have already looked at.
>
> . . . .
>
> **Q.** All right. And since you didn't read Section 5 before the
> lawsuit, you didn't consider taking any steps to comply with
> it? Is that correct?
> **A.** No. We felt we were in compliance with what we agreed to
> in the confidentiality agreement because we had the ability to
> use previously received information and could pursue deals on
> that basis.
> **Q.** And I don't want to belabor this point. But that belief
> was based on you not reading it yourself; correct?
> **A.** I had a vice president read it who showed it to me. He is
> a -- you know, an experienced person.
> **Q.** All right. And not consulting with an attorney?
> **A.** We did not consult with an attorney.

(Tr. Vol. III at 89:14–20, 91:20–92:7.)   LaSalle's corporate designee, Kelly

Cornelis, also stated during cross-examination that LaSalle made no effort to

comply with the non-circumvention provision:

> **Q.** Did LaSalle take any action to comply with the provision
> of this contract, to your knowledge?
> **A.** Not to my knowledge. As I think everyone knows, we had
> already received the opportunity through our own sourcing. So
> I think that's why it wasn't reviewed.
> **Q.** So it wasn't reviewed at all?
> **A.** I didn't. I don't know if other people did.
> **Q.** To your knowledge, did LaSalle take -- ever provide any
> notice to RedStone or any party associated with RedStone or the

> acquirer, as noted here -- did they ever provide any notice
> whatsoever under this contract?
> **A.** Not to my knowledge.
> **Q.** Okay. Did LaSalle make any effort at all to comply with
> this provision?
> **A.** Not to my knowledge.

(Tr. Vol II. at 8:17–9:6.)   Yet knowing that it was subject to an NDA that contained a two-year non-circumvention provision, LaSalle pursued the Gen3 deal anyway and failed to include Redstone in the process and failed alternatively to attempt to negotiate a buy-out of any part of its contractual obligations, apparently without giving it a second thought.

LaSalle's apparent lack of even a particle of consideration of its obligations under the NDA evinces not just "'bad judgment' or 'negligence,'" but a "conscious doing of wrong." *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1345 (N.D. Ga. 2019).   LaSalle's conscious doing of wrong is therefore sufficient to constitute bad faith, and for that reason, the Court finds that Redstone is entitled to attorney's fees.[14]

### D.    Attorney's Fees

The next question is how to determine the *amount* of attorney's fees that Redstone can recover from LaSalle's bad faith breach.   In this case, Redstone seeks to recover the larger of either an amount equivalent to the 37% contingency fee it agreed to with its attorneys, or the amount the law firms representing Redstone billed in the course of the lawsuit.

---

[14] Having concluded that LaSalle breached the NDA in bad faith, the Court need not consider Redstone's alternative argument that it is entitled to attorney's fees on the theory that LaSalle engaged in stubborn litigiousness.

As evidence of their fees, in addition to their fee agreement for the case, Redstone's attorneys submitted summaries of their billing records totaling $864,628.50 through November 17, 2021 from the firm Bondurant Mixson & Elmore, LLP, and $127,105.00 through November 16, 2021 from the firm David M. Abner & Associates.[15]  Notably, these totals are significantly greater than the amount of the contingency fee, which comes out to 37% of $1.5 million, or $555,000.  One of Redstone's attorney's, Jason Carter, also testified that the hours of work performed and the amount billed were reasonable, but the parties dispute whether Redstone's attorneys should be required to produce the underlying billing records to substantiate those expenditures, rather than simply producing summaries, as an accompaniment to Mr. Carter's testimony.

Relying on *Cajun Contractors, Inc. v. Peachtree Property Sub, LLC*, 861 S.E.2d 222 (Ga. Ct. App. 2021), Redstone argues that there is no requirement "that contingency fee matters must be contemporaneously tracked in a manner similar to the assiduous tenth-of-an-hour record keeping commonly done in matters billed by the hour."  *Id.* at 239.  Instead, it claims that Mr. Carter's testimony coupled with the summary evidence of the law firms' fees should be sufficient to substantiate the value of the fees that are reasonably recoverable. Redstone cites a number of cases in which similar evidence, including testimony from the plaintiff's own attorneys, has been deemed sufficient to support a plaintiff's award of attorney's fees on its own.

---

[15] These figures did not include any of the work Redstone's attorney's performed during trial.

For example, Redstone cites *City of Atlanta v. Hofritcher/Stiakakis*, 663 S.E.2d 379 (Ga. Ct. App. 2008). In *City of Atlanta*, the plaintiff had agreed to a 40% contingency fee, which one of her attorneys testified was reasonable. *Id.* at 385. And the attorney also testified "that he and co-counsel had taken over 26 depositions and had spent hundreds of hours on the case; and that his firm had expended $38,948.04 in litigation expenses." *Id.* Significantly, in *City of Atlanta* "the City did not cross-examine counsel on the issue of fees or offer any evidence to the contrary," and the court only concluded that the evidence established that "the *contingency fee* charged by counsel was reasonable." *Id.* (emphasis added). Here, not only are Plaintiff's attorneys seeking to recover an amount significantly greater than the value of the contingency fee, but Defendants also seek to cross-examine the Plaintiff's attorney and scrutinize the billing records to determine whether the fees were reasonable.

LaSalle argues that this case is more analogous to *Intel Corp. v. Terabyte International, Inc.*, 6 F.3d 614 (9th Cir. 1993), where the defendant was found liable for trademark infringement, and like in this case, the court awarded attorney's fees on the ground that the violation was willful. Additionally, like in this case the plaintiffs attorney's in *Intel Corp.* had only produced "mere summaries of hours worked," and the defendant had argued that "those summaries alone made it very difficult to ascertain whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours." *Id.* at 623. The Ninth Circuit ultimately concluded that the plaintiff's

attorneys were required to provide their underlying billing records because the defendant "was not required to take [the plaintiff's] word that  every hour was needed and all overlap had been eliminated." *Id.*  Rather, the defendant "was entitled to see just what was charged and why" and had a "right to peruse and parse [the plaintiff's] fee demand." *Id.*

The same is true in this case.  Although the Court will not require Redstone's attorneys to produce their original full billing records at this juncture, the Court directs them to prepare a limited fee petition and file it on the docket to provide LaSalle with an opportunity to "peruse and parse" Redstone's fee demand.  The fee petition should set forth the attorneys' billing rates and include a summary of the activities for which each hour (or fraction of an hour) by date was billed as well as reflect what hours and fees have been deducted.  The deductions should identify time spent on claims in which Plaintiffs were not successful, including work related to the separate claims raised by North Avenue that the Court dismissed earlier. (MSJ Order at 47.)  Along with the fee petition, each firm should submit an accompanying affidavit from one lead attorney describing the years of experience and normal billing rates of each attorney and paralegal who worked on the case.  The supporting affidavits should also discuss what hours have been reduced as an exercise of billing judgment.  To the extent counsel's work cannot easily be dis-entangled on prevailing vs. non-prevailing claims, the lead attorney's affidavit should address how the firm has proceeded to assess the proportion of hours spent on prevailing vs. non-prevailing claims and

the related requisite fee reductions.  Counsel are authorized to redact privileged information from the fee petition if there is any such.

### E.  Unclean Hands

Lastly, the Court will address whether the quantum of recovery should be reduced on the theory that Redstone had unclean hands.  LaSalle cites *King v. Edwards*, 559 F. Supp. 75 (N.D. Ga. 1982) for the proposition that "when a party seeking equitable relief is itself guilty of a violation of law or general equitable principles, the doctrine of unclean hands allows the court to withhold relief to the extent it deems appropriate."  *Id.* at 88.  Like in *King*, LaSalle argues that even if "[P]laintiff[ ] [is] entitled to reasonable attorneys' fees and expenses . . . the quantum of recovery must be discounted because of [Plaintiff's] unclean hands."  *Id.* at 98.  More specifically, LaSalle contends that the doctrine of unclean hands should apply in this case because Redstone misrepresented to LaSalle that North Avenue had the Gen3 deal under a LOI.  Redstone responds in its post-trial brief that the unclean hands defense is waived, and even if it is not the defense still does not apply as this case involves a contract claim as opposed to a claim based in equity.

In support of its waiver argument, Redstone cites *Hassan v. U.S. Postal Service*, 842 F.2d 260 (11th Cir. 1988) for the proposition that "the general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial."  *Id.* at 263.  But Redstone leaves out the Eleventh Circuit's additional clarification that "when the failure to raise an

affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Id.* Even though LaSalle did not raise its unclean hands defense until closing argument, Redstone still had a full and fair opportunity to brief the issue. Redstone had both notice from LaSalle that it sought to address this issue in post-trial briefing and an opportunity to file a written response to the arguments raised by LaSalle. Under the circumstances, there is no prejudice to Redstone and the Court need not treat LaSalle's unclean hands defense as waived.

But even though the unclean hands defense is not waived, it still does not apply because the defense is only available for equitable claims, not for claims for contractual money damages. *See Holmes v. Henderson*, 549 S.E.2d 81, 81–82 (Ga. 2001) ("The equitable doctrine of unclean hands, however, has no application to an action at law."). Additionally, as the court observed in *Pirelli Tire LLC v. Cronrath*, No. 4:12-cv-68, 2014 WL 12756247 (N.D. Ga. Jan. 27, 2014),

> To assert an unclean hands defense in this Circuit, a defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted, and, even if directly related, the defendant must also show that it was personally injured by the plaintiff's wrongful conduct.

*Id.* at *9 (quoting *Regions Bank v. Old Jupiter, LLC*, No. 10-80188-CIV, 2010 WL 5148467, at *5 (S.D. Fla. Dec. 13, 2010)). The alleged wrongdoing by Redstone — namely, misrepresenting that the Gen3 deal was under LOI — was only indirectly related to LaSalle's breach of the NDA. Though LaSalle appears to be correct

about Redstone making a misrepresentation,[16] that misrepresentation does not excuse LaSalle's breach of the NDA; there was still a binding NDA between Redstone and LaSalle regardless of whether there was in fact an LOI between North Avenue and Gen3. And LaSalle as a sophisticated corporate investment firm surely was in the position both to confirm the status of the LOI between North Avenue and Gen3 as well as to properly address its legal obligations under the CIM and NDA.

At bottom, "the unclean hands doctrine does not attach to all prior bad acts made by the plaintiff bringing suit," and in this case there was no "direct relationship between the allegations comprising the complaint and the acts giving rise to the unclean hands." *West v. West*, 825 F. Supp. 1033, 1049 (N.D. Ga. 1992). Accordingly, the Court declines to reduce Redstone's quantum of recovery on the theory that Redstone had unclean hands.

## IV.   Conclusion

For the foregoing reasons, the Court **ORDERS** that

a)      Redstone is entitled to $1.5 million in damages; and

b)      Redstone is entitled to reasonable attorney's fees on the ground that LaSalle breached the NDA in bad faith.

The Court declines to award pre-judgment interest, and the Court will not reduce the quantum of recovery on the theory that Redstone had unclean hands.

---

[16] It is not clear from the record whether Comer and Igherighe ever affirmatively represented that the agreement was under LOI in any of their conversations with Christopher. But it appears that they did at least conveniently omit that the LOI had not been extended past its initial expiration date.

Redstone's attorneys are **DIRECTED** to submit a fee application consistent with this Order on or before September 12, 2022, and LaSalle shall file its response not later than September 19, 2022. After receiving the fee application briefing, the Court will determine whether it will need to set a brief virtual hearing to address any questions it has regarding the billing and amount of Redstone's attorney's fees. Counsel are **DIRECTED** to reserve September 21, 2022 at 4:00 p.m. for such a possible hearing.

**IT IS SO ORDERED** this 2nd day of September, 2022.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**